**SLATER ROSS**
Christopher A. Slater, OSB No. 97398
Michael J. Ross, OSB No. 91410
Sovereign Hotel, 4th Floor
710 S.W. Madison Street
Portland, Oregon 97205
Tel: (503) 227-2024
Fax: (503) 224-7299
cslater@slaterross.com
mjross@slaterross.com

**FARUQI & FARUQI, LLP**
Michael J. Hynes
PA Bar ID 62702
Ligaya Hernandez
PA Bar ID 210229
101 Greenwood Avenue, Suite 600
Jenkintown, Pennsylvania 19046
Telephone: (215) 277-5770
Facsimile: (215) 277-5771
mhynes@faruqilaw.com
lhernandez@faruqilaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| ELEANOR WERBOWSKY, Derivatively on Behalf of Nominal Defendant GALENA BIOPHARMA, INC., | CASE NO. : |
| Plaintiff, | |
| SANFORD HILLSBERG, RICHARD CHIN, STEPHEN S. GALLIKER, STEVEN A. KRIEGSMAN, RUDOLPH NISI, and MARK J. AHN, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **(28 U.S.C. §1332)** |
| Defendants, | **JURY TRIAL DEMANDED** |
| and | |
| GALENA BIOPHARMA, INC. | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT – PAGE 1

Plaintiff Eleanor Werbowsky ("Plaintiff"), by and through her attorneys, derivatively on behalf of nominal defendant Galena Biopharma, Inc. ("Galena" or the "Company"), submits this Verified Shareholder Derivative Complaint against the directors and officers named herein (collectively, the "Individual Defendants"). Plaintiff's allegations are based upon personal knowledge as to herself and her own acts, and upon information and belief developed from the investigation and analysis of her counsel, which includes, among other things, public filings by Galena with the U.S. Securities and Exchange Commission ("SEC"), as well as, press releases, news reports, analyst reports and other information available in the public domain.

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this action derivatively for the benefit of Galena against certain members of its Board of Directors ("Board") and executive officers seeking to remedy defendants' breaches of fiduciary duty and unjust enrichment.

2.    According to its SEC filings, Galena is a biopharmaceutical company that focuses on developing oncology treatments to address major unmet medical needs to advance cancer care.

3.    This is a story of true greed by the Individual Defendants, who knowingly hired a public relations ("PR") firm for the single purpose of promoting the Company and driving up its stock price so they could sell millions of dollars of their personally held Galena shares for their own illicit benefit.

4.    In July 2013, Galena paid the PR firm, The DreamTeam Group (the "DreamTeam"),a known stock-promotions firm with questionable marking tactics, $50,000 for 240 days of "advertising, branding, marketing, investor relations and social media services" according to evidence obtained by *TheStreet*. Among its other services,

media services" according to evidence obtained by *TheStreet*. Among its other services, DreamTeam operates multiple investor websites that entice investors with stock picks that can "trade for at least a 100% profit."

5.      Galena was promoted on many of the DreamTeam stock-touting websites to create "market buzz about the company to a new group of investors," according to a DreamTeam document, "Galena Biopharma Case Study: Investor Awareness Campaign" obtained by *TheStreet*.  Moreover, as part of the campaign, the DreamTeam published multiple supposedly independent articles on sites like *Seeking Alpha* under a list of pseudonyms, recommending an investment in Galena.

6.      As a result, the Company's stock began to rise, from approximately $2 per share in the summer of 2013to over $7 in January 2014.Based on their knowledge of the foregoing material non-public information regarding the Company, the Individual Defendants, in contravention of their fiduciary duties, sold more 2,709,265 of their personally held shares of Galena stock, garnering over $14.6 million in gross proceeds for their own personal benefit.

7.      In sum, there is no doubt that the Individual Defendants personally benefited from the Company's illicit promotion campaign as the stock price actually tripled in value from the time the DreamTeam was hired in summer 2013to the time the Individual Defendants sold their stock in January and February 2014.

## II.    JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332.  All Defendants are completely diverse from Plaintiffs and the amount in controversy exceeds $75,000.00.

9.     This Court has personal jurisdiction over each of the Defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because (i) one or more of the Defendants either resides or maintains executives offices in the District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in the District; and (iii) Defendants have received substantial compensation and other transfers of money in the District by doing business and engaging in activities having an effect in the District.

### III.    PARTIES

11.     Plaintiff is a shareholder of Galena, was a shareholder of Galena at the time of the wrongdoing alleged herein, and has been a shareholder of Galena continuously since that time.  Plaintiff is a citizen of New Jersey.

12.     Nominal defendant Galena is incorporated under the laws of Delaware. Galena maintains executive offices at 4640 S.W. Macadam Ave., Suite 270, Portland, OR 97239.According to its public filings, Galena is a biopharmaceutical company focused on developing innovative, targeted oncology treatments addressing major unmet medical needs to advance cancer care.

13.     Defendant Sanford J. Hillsberg ("Hillsberg") has been the Chairman of the Board since 2007.  Upon information and belief, Hillsberg is a citizen of California.

14.     Defendant Richard Chin ("Chin") has served as a director of Galena since 2009.Upon information and belief, Chin is a citizen of California.

15.     Defendant Stephen S. Galliker ("Galliker") has served as a director of Galena since 2007.Upon information and belief, Galliker is a citizen of Florida and Massachusetts.

16.     Defendant Steven A. Kriegsman ("Kriegsman") has served as a director of Galena since 2006.Upon information and belief, Kriegsman is a citizen of California.

17.     Defendant Rudolph Nisi ("Nisi") has served as a director of Galena since 2009.Upon information and belief, Nisi is a citizen of New York.

18.     Defendant Mark J. Ahn ("Ahn") has served as Galena's President and Chief Executive Officer ("CEO") since March 31, 2011 and as a director since 2007.Upon information and belief, Ahn is a citizen of Oregon.

19.     Defendants Hillsberg, Chin, Galliker, Kriegsman, Nisi and Ahn are referred to collectively herein as the "Individual Defendants."

## IV.     DUTIES OF THE DEFENDANTS

20.     By reason of their positions as officers, directors and/or fiduciaries of Galena and because of their ability to control the business and corporate affairs of Galena, the Individual Defendants owed Galena and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Galena in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Galena and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

21.    Each director and officer of the Company owes to Galena and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

22.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Galena, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

23.    To discharge their duties, the officers and directors of Galena were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and operations of the Company. By virtue of such duties, the officers and directors of Galena were required to refrain from, among other things:

a)    Engaging in self-dealing or otherwise using their position of trust and confidence with the Company and its shareholders for their own personal gain;

b)    Participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the shareholders of the Company; and/or

c)    Unjustly enriching themselves at the expense of or to the detriment of the Company and its shareholders.

24.    Moreover, the Individual Defendants, as either an officer or director of the Company, were required to comply with the Company's Corporate Code of Ethics and Conduct ("Code"). The general policy of the Code is "to conduct business in compliance with all applicable laws, rules and regulations. Further, it is our policy to conduct business with integrity." The Code itself states in relevant part:

### 3. Stocks

Because our stock is a publicly traded security, certain activities of the Company are subject to certain provisions of the federal securities laws. These laws govern the dissemination or use of information about the affairs of the Company or its subsidiaries or affiliates, and other information, which might be of interest to persons considering the purchase or sale of our stock. Violations of the federal securities laws could subject you and the Company to stiff criminal and civil penalties. Accordingly, the Company does not sanction and will not tolerate any conduct that risks a violation of these laws.

#### a.　　Disclosure of Transactions in Company's Securities

The Securities and Exchange Commission ("SEC") requires continuing disclosure of transactions in the Company's publicly traded securities by the Company, its directors, officers, major shareholders and other affiliated persons. We are committed to complying with obligations related this disclosure.

#### b.　　Insider Trading

It is illegal for any person, either personally or on behalf of others, (i) to buy or sell securities while in possession of material nonpublic information, or (ii) to communicate (to "tip") material nonpublic information to another person who trades in the securities on the basis of the information or who in turn passes the information on to someone who trades. All directors, officers, employees and temporary insiders, such as accountants and lawyers, must comply with these "insider trading" restrictions.

### V.　　SUBSTANTIVE ALLEGATIONS

#### Background of the Company

25.　　According to its SEC filings, Galena is a biopharmaceutical company, focused on developing oncology treatments to address major unmet medical needs to advance cancer care. The Company is developing a pipeline of immunotherapy product candidates for the treatment of various cancers based on the E75 peptide. The Company's lead product candidate is NeuVax (nelipepimut-S or E75) ("NeuVAx"), which is in Phase 3 clinical trials for preventing the recurrence of breast cancer.

26.　　Galena's roots trace all the way back to 1995 and a company called Apthera. Apthera was a small biotech company with one peptide-based immunotherapy

product in clinical trials looking to treat low-to-intermediate HER2+ breast cancer patients.

27.     In 2011, RXi Pharmaceuticals ("RXi") acquired Apthera in a stock based deal for 4.8 million shares of RXi's common stock with additional payments based on development and commercial milestones relating to NeuVax.

28.     Shortly after, Galena was formed due toRXi's decision to split into two publicly-traded companies. RXi Pharmaceuticals was to remain targeted on RNAi-Based Therapeutics, and Galena was spun off as a company focused on targeting cancer therapies through its one product, NeuVax, and a limited scope of RNAi activities.

29.     It appears that management placed almost zero value on Galena and actually used the spin-off of the Company to erase an unenviable balance sheet and history. To offset the loss of RXi, Galena shareholders received an aggregate of 100million shares in RXi in connection with the spin-off transaction. The 100 million shares represented roughly 11% of the fully diluted share count, essentially resulting Galena being worth approximately $15M in total value.  Galena eventually announced its initial public offering in April 2012.

**Analysts Doubt the Validity of NeuVax**

30.     As admitted by the Company, NeuVax is the Company's lead product. However, analysts have seriously questioned the financial success of this product. According to a January 31, 2014 article  entitled "Galena Biopharma: Numerous Red Flags Suggest A Significant Overvaluation" issued on *Seeking Alpha*, NeuVax" will fail to ever generate significant revenue for Galena." The January 31, 2014 Seeking Alpha article states in relevant part:

**NeuVax Will Fail to Ever Generate Significant Revenue for Galena**

**Why the Nuevax PRESENT Phase III Trial is Poised for Failure**

Simply put, science and logic will prevail here. There is little to no evidence to support the notion that NeuVax will demonstrate a 30% disease-free progression differential in a large, randomized trial.

NeuVax (nelipepimut-S) is a vaccine that claims to train T-cells in the patient's body to terminate cancer cells that express HER2. The current Phase III PRESENT trial is attempting to prove that NeuVax will prevent or delay breast cancer recurrence after standard of care treatment such as chemotherapy, radiation therapy or hormone therapy. The primary outcome of the trial is listed below (as obtained from clinicaltrials.gov)

Primary Outcome Measures:

Comparison of disease-free survival in vaccine treated patients and control patients

The primary objective is to compare the disease-free survival (DFS) in subjects with operable early-stage, node-positive breast cancer who receive standard of care multimodality therapy plus NeuVax™ as the treatment group or standard of care multimodality therapy plus the vaccine adjuvant, Leukine (sargramostim, GM-CSF) as the control group.

Based on previous data obtained for NeuVax, the PRESENT trial is poised for failure. Let me explain.

Data presented at ASCO 2010 revealed the following:

Out of the 188 patients enrolled in the study, results for NeuVax failed to show a meaningful benefit with a p value of $p = 0.08$. At 24 months, the vaccine group revealed a 6.5% recurrence rate and the control group revealed a 14.5% recurrence rate.

As noted in the primary outcome for the PRESENT trial, the time frame is 36 months. Wait, NeuVax failed to display significant data after 24 months; how will disease-free survival be reached after 36 months? Good question.

The data presented at ASCO 2010 also highlighted a **sub-group** of subjects with low and intermediate levels of HER2 displayed statistically significant recurrence rates of 7.8% in the vaccine group (n=50) compared to a 23.5% recurrence rate in the control group (n=34) after 36 months. This data was reported to be statistically significant with a p-value of $p=0.045$. This data is important because it's exactly how the PRESENT trial is designed. The Phase III PRESENT study is enrolling breast cancer patients with tumors that express low and intermediate levels of HER2.

The problem that I have with this data is that the sub-groups were too small to justify a successful study. In my opinion, the disease-free survival benefit in this sub-group is random chance. Basically, I believe it was pure luck that the control group had a few more patients with recurrence of breast cancer. There is a noteworthy underlying issue with this original study. The methods that we currently use to detect breast cancer disease have limits of detection that are not low enough to prove that the subjects enrolled were in fact disease free to begin with. A number of patients could have been enrolled in the study with disease that was "undetected". With such a small sub-group of patients; by chance, it is not that far-fetched to believe that the control group could have had subjects with undetectable disease that progressed further, possibly skewing the study results in favor of NeuVax.

Therefore, we should rely on the overall study results of the data for all 188 patients enrolled in the study. This data is more likely to predict the outcome of the PRESENT Phase III trial. Let me remind you, NeuVax failed to show a meaningful benefit.

With a larger 700 patient Phase III PRESENT trial, random chance will be removed and reveal the true ability of NeuVax. Keep in mind, the p-value was only p=0.045 for the original study, which doesn't give NeuVax much room for statistical error in the larger trial. In addition, I believe that there will be a number of patients enrolled in the trial with "undetected disease" that will run a higher risk of recurrence of breast cancer. With a larger population of patients, the vaccine group and control group with patients with "undetected disease" are more likely to be equivalent and likely disease-free survival will not be significant for NeuVax. If NeuVax truly worked, why is the study aimed to treat patients who are already disease free? I predict that NeuVax will not meet the primary outcome of the PRESENT Phase III trial. In fact, I also predict the PRESENT trial won't even continue past the interim analysis.

The interim data will sufficient to prove that there is no meaningful benefit of Neuvax and further funding of the PRESENT trial won't be necessary.

It is also worth noting that Dr. George Peoples was the primary investigator of the Phase II study. Dr. Peoples has a working relationship with Galena and is compensated by the company as outlined below in their annual reports:

"This Scientific Advisory Agreement (the "Agreement") dated as of May 1, 2011, is made by Dr. George E. Peoples (the "Advisor") and RXi Pharmaceuticals Corporation, a Delaware corporation ("RXi" and together with the Advisor, the "Parties"). As of the Effective Date, the Advisor agrees to make himself available to render the Services, at such time or times and location or locations as may be mutually agreed, from time to time at the request of RXi.

RXi will compensate the Advisor for providing the Services to RXi as follows, with such compensation to be the full consideration for the Services:

*Cash Compensation. The Advisor will receive a monthly consulting fee of $25,000 during the Term, payable on the last day of each calendar month and pro- rated for each partial month of engagement hereunder."*

Unfortunately for GALE, the PRESENT trial won't be associated with extensive data mining and potentially misguided interested. The data will speak for itself and determine the fate of Neuvax (as well as GALE).

**Galena Lacks Vital Exclusivity Rights to NeuVax**

Even [if] PRESENT Phase III trial does prove to meet its agreed endpoint, and the FDA does not require an additional Phase III study (which is possible based on GALE's assessment of the situation stated in their <u>latest 10K</u>), Neuvax faces some difficult challenges as it relates to intellectual property.

Neuvax's Key Composition of Matter Patent expires in 2015

Issued U.S. Patent No. 6,514,942, titled "Methods and Compositions for Stimulating T-lymphocytes" will expire next year…**YEARS before** NeuVax even has a shot to hit the market.

Intellectually property (IP) in biotechnology can get quite tricky and tough to track in some cases. But one thing is for certain, strong "Composition Patents" are one of the key components of strong IP. GALE even says so in their quarterly filings:

*"Composition of matter patents are a particularly effective form of intellectual property protection for pharmaceutical products, as they apply without regard to any method of use."*

In addition to the expiration of Patent 6,514,942, an additional patent for Neuvax recently received a Non Final Rejection Notice from the USPTO.

**Galena's Pipeline and "Partnerships" add very little value**

The Press Releases concerning partnerships have been misleading.

In December 2012, GALE announced "signature of commercialization partnership with Teva in Israel".

However, GALE's sec filings provide some clarity into the specifics of the "partnership" with Teva. *"Effective December 3, 2012, we entered into a license and supply agreement with ABIC Marketing Limited."*

This press release raises a red flag for a couple of reasons:

1.      While the full financials terms haven't been disclosed, it appears GALE did not receive any upfront payment in the deal. It seems GALE will be entitled to royalties based on future sales of Neuvax in Israel. My question is, if Neuvax was

the potential blockbuster drug like GALE management claims, then why would they agree to a deal with such miniscule financial benefit?

2.      The timing of the press release, coupled with the terminology and verbiage used seems to be misguided.

Gale also touts their "collaboration with Genentech/Roche as illustrated in a November 2011 press release.

However, as Adam Feuerstein of thestreet.com points out, the company is not a partner in a phase II study testing the combination of NeuVax and Herceptin in breast cancer. He writes:

*"Galena has issued many press releases claiming Roche/Genentech's involvement in this small phase II study, but that's misleading because Roche/Genentech's participation is limited to a small amount of funding and the donation of Herceptin supplies to the investigator so he can conduct the study, says company spokesman Ed Lang."*

**Abstral**

In March 2013, GALE announced the following via press release: *"Galena Biopharma Acquires Abstral(R) (fentanyl) Sublingual Tablets in U.S., a Novel, Best-in-Class Treatment Approved for Breakthrough Cancer Pain"*

*"In exchange for the U.S. rights to Abstral, (1) we paid Orexo $10 million in cash from our cash on hand, and (2) we agreed to pay to Orexo: (A) $5 million in cash upon the earlier of (i) the approval by the FDA of a specified U.S. manufacturer of Abstral and (ii) the first anniversary of the closing; (B) three one-time future cash milestone payments based on our net sales of Abstral; and (C) a low double-digit royalty on future net sales. No further milestone or royalty payments will be due after the date on which all claims of the last remaining licensed patents expire (currently 2019) or become invalidated by a governmental agency."*

However, Abstral is in a similar situation as Neuvax in terms of a cloudy intellectual property future (although it is fair to say that Abstral has stronger patent protection compared to Neuvax). In summer 2011, Orexo filed an official complaint for Patent Infringement in Civil Action against Mylan Pharmaceuticals Inc.

In fact, Galena warns about the potential for Generic competition in their 10Q filed in August 2013:

**"We may not be able to obtain and enforce patent rights or other intellectual property rights that cover Abstral and that are of sufficient breadth to prevent third parties from competing against us.**

*Our success with respect to Abstral will depend in part on our ability to obtain and maintain patent protection in the United States, to preserve our trade secrets,*

*and to prevent third parties from infringing upon our proprietary rights. Fentanyl, the sole active pharmaceutical ingredient, or "API," in Abstral, has been approved for many years and therefore our ability to obtain any patent protection is limited. Composition of matter patents are a particularly effective form of intellectual property protection for pharmaceutical products, as they apply without regard to any method of use. However, we will not be able to obtain composition of matter patents or methods of use patents that cover the APIs in Abstral. As a result, competitors who obtain the requisite regulatory approval can offer products with the same active ingredients as Abstral so long as the competitors do not infringe any formulation patents that we may have or may obtain or license, if any."*

It is also concerning that GALE limited their contractually obligated marketing responsibilities to a two-year span. Logic would dictate that if a company expected a drug to succeed and achieve growth in sales, they would have no problem committing to marketing it throughout its lifespan.

GALE states the following in their latest 10Q:

*"Under our agreement with Orexo, we assumed responsibility for the U.S. commercialization of Abstral and for all regulatory and reporting matters in the U.S. **We also agreed to establish and maintain through 2015 a specified minimum commercial field force to market, sell and distribute Abstral and to use commercially reasonable efforts to reach the specified sales milestones.** Orexo is entitled to reacquire the U.S. rights to Abstral from us for no consideration if we breach our obligations to establish and maintain the requisite sales force throughout the marketing period."*

(internal citations omitted).

31.     Thus, even analysts knew that Galena was just a small company with few

assets, including a lead drug candidate that had no real guarantee of financial success.

Faced with no other recourse, the Individual Defendants decided to take their financial

future into their own hands.

**Unbeknownst to the Market, Galena Hires the DreamTeam to For a Marketing Campaign Designed to Pump Up Company Stock**

32.     According to a February 21, 2014 article issued on *The Street* entitled,

"Galena Biopharma Pays For Stock-Touting Campaign While Insiders Cash Out

Millions," Galena hired a PR firm to boost the Company's stock price through a

marketing campaign and once Galena's shares tripled in value, Galena insiders made millions of dollars selling Company stock.

33.    According to a disclaimer on the DreamTeam's web site, in July 2013, Galena paid $50,000 to a subsidiary of the DreamTeam for 240 days of "advertising, branding, marketing, investor relations and social media services."

34.    Some of the DreamTeam's marketing tactics appear to resemble stock promotion schemes which run afoul of standard investor relations practices. Among its other services, the DreamTeam operates more than two dozen investor web sites with names like "Home Run Stocks," "Touchdown Stocks," "Quality Stocks" and "Tout Sheet." The web sites entice investors with stock picks that can "trade for at least a 100% profit.  "Missing from the DreamTeam's website, of course, is the material information that the companies being promoted on the website, including Galena, are paying customers.

35.    According to a DreamTeam document, entitled "Galena Biopharma Case Study: Investor Awareness Campaign" obtained by *TheStreet,* Galena was promoted on many of the DreamTeam stock-touting Web sites to create "market buzz about the company to a new group of investors."

36.    As part of the promotional campaign, the DreamTeam hired writers to say positive things about Galena on blogs, investor websites, and social media groups but failed to disclose their financial relationship to Galena and/or the DreamTeam.

37.    DreamTeam published numerous, favorable articles regarding Galena on *Seeking Alpha* that were supposedly from independent sources. For example, articles published on *Seeking Alpha* on August 6, 2013 and November 22, 2013, were written

under aliases and fail to mention any information regarding the DreamTeam and its paid promotional campaign with Galena. Rather, the articles are given from the perspective of individual investors recommending an investment in Galena to other readers of *Seeking Alpha*.

38.    "... investors must look for biopharmaceutical companies that have a unique approach to science, a deep pipeline, drugs with huge market potential, and a healthy fundamental picture. Galena has all of these attributes and shareholders with patience will be handsomely rewarded in due time," is how the author called "Wonderful Wizard" touts Galena to *Seeking Alpha* readers in the August 6, 2013 article, entitled "Galena Biopharma Presents an Attractive Investment Opportunity."

39.    A similar article praising Galena was written by "Kingmaker" in a November 22, 2013 article published on *Seeking Alpha* titled, "Galena Biopharma Continues to Develop a Deep Pipeline of Products." Notably, neither article disclosed a financial relationship with DreamTeam or Galena.

40.    The August 6, 2013 and November 22, 2013 articles were removed from *Seeking Alpha* because it was revealed they were written by the same person using different aliases. According to documents obtained by *TheStreet*, the August 6, 2013 and November 22, 2013 articles were part of the "brand awareness campaign" designed by the DreamTeam to boost Galena's stock price. The DreamTeam document also describes a third pro-Galena article published on *Wall Street Cheat Sheet* on Dec. 5, 2013.

41.    Overall, there were twenty-six articles about Galena published on *Seeking Alpha* between July 2013 and February 2014, the time period in which DreamTeam was providing paid stock promotional services for Galena.

42.     *TheStreet* also obtained a second DreamTeam document which explains how the PR firm hires writers to publish articles on *Seeking Alpha* and other investor Web sites to promote the stocks of its paying clients.  This second DreamTeam document states:

Although blogs are widely read and a key part of our social media relations strategy, they take a more informal approach and don't offer the deeper analysis our articles offer. Articles are directed toward sophisticated investors who understand complex evaluation of investments, and *we publish our articles* where these investors commonly go to seek new investment ideas - ensuring that the highest quality content about YOUR company gets seen by the right people. *We use our own writers to generate content*, and we utilize our network for distribution. We reach a vast audience through our partners and media contacts, and for those who do their own research, it certainly helps to have positive information coming from multiple sources.

*Seeking Alpha, which boasts more than 1 million members, is the No. 1 outlet we use to circulate this kind of detailed information for our clients.* Recognized as the premier Web site for actionable stock market opinion and analysis, Seeking Alpha handpicks articles from the world's top market blogs, money managers, financial experts and investment newsletters - publishing approximately 250 articles each day. Seeking Alpha was named 'Most Informative Web Site' by Kiplinger's Magazine and has also received Forbes' 'Best of the Web' award.

*Utilizing this outlet, we've received more than 6,500 views for a single article, and our articles are also featured on many prominent sites, including Yahoo! Finance.* We not only craft superior content - we maximize its effectiveness on your behalf.

(emphasis added).

43.     Tellingly, since the public reveal that Galena hired the DreamTeam for a promotional campaign and Galena insiders sold stock on that material non-public information, documents highlighting the DreamTeam's investor awareness campaign for Galena have been pulled from the DreamTeam's websites.  Specifically, any references to Galena have been expunged from the DreamTeam's enterprise of web sites, blogs and Twitter feeds, and the PR firm has refused to comment on the situation. The

compensation disclosure noting the $50,000 payment made by Galena to the DreamTeam has also been deleted.

**The Individual Defendants Reap the Benefits of Their Material Non-pubic Information**

44.     As a result of the DreamTeam's promotional campaign, Galena shares tripled in value from the time the DreamTeam was hired in the summer of 2013.  At the end of July 2013, Galena's stock price was hovering below $2 per share and by January 2014 Galena stock price had increased to a high of $7.24 per share.

45.     According to a February 14, 2014 *Seeking Alpha* article, entitled "A Deeper Look At The Galena Biopharma Controversy," Galena's staggering increase in stock price was directly correlated to the DreamTeam's marketing campaign.  The February 14, 2014 *Seeking Alpha* article states in relevant part:

**So, did DreamTeam's efforts pay off?**

As I mentioned in my other Galena article, the company's monstrous rise appeared to occur without a catalyst. In fact, I stated the following at the time:

> "The initial NeuVax data is a little over a year and a half away, Abstral won't turn the company cash flow positive for a minimum of 4 more years, and Galena is about to embark on an expensive Phase 2 trial for another clinical candidate."

Put simply, I saw no reason for such a staggering bull run that topped out at a whopping 470% gain over the last 52 weeks. And I fail to see how the recent acquisition of Mills Pharmaceuticals adds anything of value to Galena at the current time.

> ***Logic thus dictates that this meteoric rise was primarily the result of promotional efforts by DreamTeam, and had little to do with a change in the underlying fundamentals of the company***.

(emphasis added).

46.     Based on the material non-public information that Galena had hired the DreamTeam to inflate its stock price via a promotional campaign, and around the time the DreamTeam Group was set to conclude their work, the Individual Defendants made enormous and suspiciously timed insider sales totaling approximately *$14.6 million* from January 17, 2014 to February 12, 2014 as follows:

| Name | Title | Trade Date | Shares Sold | Sale Price | Gross Proceeds |
|---|---|---|---|---|---|
| Richard Chin | Director | 2/12/14 | 187,500 | $4.33 | $811, 875 |
| | | 1/30/14 | 75,000 | $5.57-$5.61 | $419,000 |
| | | | | **TOTAL:** | **$1,230,875** |
| | | | | | |
| Stephen S. Galliker | Director | 2/3/14 | 300,000 | $4.18 | $1,254,000 |
| | | | | **TOTAL:** | **$1,254,000** |
| | | | | | |
| Sanford Hillsberg | Director | 1/30/14 | 250,000 | $5.41 | $1,325,500 |
| | | 1/17/14 | 200,000 | $6.93 | $1,386,000 |
| | | | | **TOTAL:** | **$2,711,500** |
| | | | | | |
| Rudolph Nisi | Director | 1/29/14 | 250,000 | $5.28 | $1,320,000 |
| | Director | 1/17/14 | 200,000 | $6.90 | $1,380,000 |
| | | | | **TOTAL:** | **$2,700,000** |
| | | | | | |
| Mark Ahn | President, CEO and Director | 1/27/14 | 796,765 | $4.83 | $3,848,374 |
| | | | | **TOTAL:** | **$3,848,374** |
| | | | | | |
| Steven A. Kriegsman | Director | 1/22/14 | 250,000 | $6.13 | $1,532,500 |
| | | 1/17/14 | 200,000 | $7.00 | $1,400,000 |
| | | | | **TOTAL:** | **$2,932,500** |
| | | | | | |
| | | | | **GRAND TOTAL:** | **$14,677,249** |

47.     These stock sales are suspicious because the stock sales were not part of any normal or regular pattern or practice of such sales by the Individual Defendants. Indeed, none of the Individual Defendants had sold Company stock for 4 years prior to the foregoing sales.

48.     There is also no indication of any Rule 10b5-1 plans in place by any of the Individual Defendants at any time of the sales.

**Galena Issues a Letter to Shareholders**

49.     On February 14, 2014, in a feeble attempt to defend the Individual Defendants, Ahn issued a press release addressing the DreamTeam's promotional campaign and the Individual Defendants' subsequent insider trading.  The February 14, 2014 press release states:

Dear Shareholders:

 Due to the recent media attention on Galena Biopharma that we acknowledge is having an impact on investor confidence, we felt it necessary, as a service to our shareholders, to publicly respond to the discussions and set the record straight.

The genesis of this attention is due to a single reporter, Adam Feuerstein from TheStreet.com, who clearly has an agenda when it comes to Galena. This can be evidenced by his numerous, tabloid-like articles on the company that have appeared over the past three years and are sensational but largely devoid of true information. The article this week is just another in the line, which for us have become noise.

 Mr. Feuerstein has never requested a meeting with the company to understand the details of our programs or the goals of the company. On the contrary, his requests for information are consistently accusatory and negative. As a result, we do not feel it is worthwhile to engage him or respond to other media outlets that serve to advance his agenda. However, we do recognize that you, our shareholders, deserve a direct response on the matters at hand.

*The only facts in Mr. Feuerstein's most recent article that are remotely accurate are that Galena previously engaged the DreamTeamGroup and that insiders at the company, including me, divested shares in mid January.* All

other accusations in this article - as with his prior reporting on Galena - are specious and conveniently arranged to create controversy.

Over the past year, we have accomplished the following:

• Acquired Abstral® (fentanyl) sublingual tablets, implemented a commercial team, launched the drug in October 2013, and currently have approximately 5% of the branded market after only four months of launch. Abstral is part of a class-wide Transmucosal Immediate Release Fentanyl (TIRF) Risk Evaluation and Mitigation Strategy (REMS) program designed to mitigate the risk of misuse, abuse, addiction, overdose and serious complications due to medication errors with the use of TIRF medicines.

• Initiated our RELIEF Patient Registry trial for Abstral.

• Continued to progress our pivotal, Phase 3 PRESENT trial for NeuVax™ (nelipepimut-S) and added another commercial partnership with Dr. Reddy's in India.

• Progressed enrollment with our Phase 2b combination trial with NeuVax and Herceptin® (trastuzumab).

• Expanded our Intellectual Property with an issued patent for NeuVax in Europe.

• Advanced our pipeline with the initiation of a Phase 2 trial with GALE-301, and we expect to report the Phase 1 data mid-year.

• Broadened our portfolio into hematology with the acquisition of Mills Pharmaceuticals and anagrelide controlled release, now GALE-401.

These facts about Galena and our progress are indisputable and clearly demonstrate our dedication to the mission of transforming Galena into a leader in providing therapeutics across the entire cancer-care spectrum. My expectation is that 2014 will unlock additional opportunities that will undoubtedly serve to benefit all who are connected to the success of Galena - most importantly those individuals who are unfortunately confronted with the specter of cancer.

Looking ahead, I would hope that all investors, stakeholders and the media judge Galena on our ability to meet our publicly stated goals. Let success or failure be dictated by facts and data, not the questionable logic of a headline-seeking reporter.

We look forward to further updating you on our progress during our earnings conference call next month. Thank you for your continued interest in Galena.

Mark J. Ahn, Ph.D.

President & CEO

(emphasis added).

50.     The press release did little to assuage the culpability of the Individual Defendants' insider selling.  First, the Company *admits* in the press release to hiring the DreamTeam, which published numerous articles under pseudonyms touting the Company's stock without disclosing who paid for them, and that Company insiders subsequently sold millions of Company shares aided by this promotional campaign.

51.     Second, Ahn's letter provided no evidence to support his or Galena's position. Regarding the Galena situation, Ahn spoke to a reporter for *The Oregonian* who wrote a story on February 14, 2014:

"Ahn, Galena's CEO, said the company did not intend to mislead investors. He [Ahn] did not know the DreamTeam Group was not disclosing that its promotional materials were funded by Galena. In fact, he said he'd been told DreamTeam didn't write the Seeking Alpha articles. It was 'an independent writer,' he said."

52.     However, Ahn's defense directly contradicts the DreamTeam document which affirms that the DreamTeam published the two *Seeking Alpha* articles on August 6, 2013 and November 22, 2013.

53.     Lastly, Ahn told *The Oregonian* that insiders were prohibited from selling stock until very recently because Galena was in negotiations to acquire Mills Pharmaceuticals. However, when asked about insider selling in a different interview published on a February 4, 2014 *Seeking Alpha* article entitled "Galena: Read, Decide, Invest" Ahn contradicted this statement by stating that he had sold Galena stock to "diversify for my family," and made no mention of insider sale restrictions.  This, of course, begs the questions, "What is the truth?" At a minimum, it is clear that the Individual Defendants have lied to the Galena shareholders at the expense of the valuation of the Company, and have themselves profited from these lies.

## VI.   DERIVATIVE AND DEMAND-EXCUSED ALLEGATIONS

54.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

55.   Plaintiff is the owner of Galena common stock and was an owner of Galena common stock at all times relevant hereto.

56.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

57.   As a result of the facts set forth herein, Plaintiff has not made any demand on the Galena Board to institute this action against the Individual Defendants.   Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

58.   At the time this action was commenced, the Board consisted of seven directors: defendants Hillsberg, Chin, Galliker, Kriegsman, Nisi, and Ahn and non-defendant director William Ashton.   Given that six of the seven directors are alleged to have committed the wrongs described herein, a majority of the Board was conflicted with respect to the subject of this suit.   Accordingly, Plaintiff did not make any demand on the Board to institute this action because such a demand would have been futile, wasteful, and a useless act.

59.   As a result of the actions complained of herein, director defendants Hillsberg, Chin, Galliker, Kriegsman, Nisi, and Ahn each received a material financial benefit that was not shared by Galena's shareholders in that each and all of them were able to reap significant profits through the misuse of non-public Company information to

which they were privy as a result of their positions as fiduciaries of the Company.   More specifically, Hillsberg, Chin, Galliker, Kriegsman, Nisi, and Ahn sold large quantities of Galena stock based on the material information that Galena had hired the PR firm of the DreamTeam to engage in a marketing campaign using questionable marketing tactics, for the purpose of boosting Galena's stock price.   The illicit profits reaped by defendants Hillsberg, Chin, Galliker, Kriegsman, Nisi, and Ahn were a direct result of the Company's inflated stock price due to the DreamTeam's promotional campaign. Because each of the Individual Defendants received significant pecuniary benefits from their wrongdoing, they are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action without being influenced by their overriding personal interest.

### VII.    COUNT I
### Against All Individual Defendants for Breach of Fiduciary Duty
### In Connection with Insider Stock Sales

60.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

61.    As complained of herein, the Individual Defendants' sale of Galena common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

62.    Each of the Individual Defendants had actual or constructive knowledge of the misconduct alleged herein.  Moreover, the sole reason for the Individual Defendants' actions was to secure material financial benefits.

63.    The Individual Defendants dominate and control the business and corporate affairs of Galena, and are in possession of private corporate information

concerning Galena's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Galena, which makes it inherently unfair for them to benefit their own interests to the detriment of the best interest of the Company and its shareholders.

64.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Galena has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

65.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Individual Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds the Individual Defendants obtained thereby.

## VIII.     COUNT II
### Against All Individual Defendants for Unjust Enrichment

66.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67.     By their wrongful acts, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Galena and it would be unconscionable to allow them to retain the benefits of their illegal conduct. The Individual Defendants were unjustly enriched by their receipt of proceeds from their illegal sales of Galena common stock, as alleged herein,

68.     Plaintiff, as a shareholder of Galena, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all proceeds obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and breaches of fiduciary duty.

69.     As a result of Defendants' unjust enrichment, Galena has been injured and is entitled to damages.

## IX.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Imposing a constructive trust in favor of the Company for the amount of proceeds each of the Individual Defendants received from their sales of Galena common stock alleged herein;

C.      Ordering the Individual Defendants to disgorge to the Company all proceeds derived from their sales of Galena common stock alleged herein

D.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff hereby demands a trial by jury for all claims triable to a jury.

Dated: March _7th_, 2014                    Respectfully submitted,

                                            **SLATER ROSS**

                                            _[signature]_

                                            Christopher A. Slater, OSB No. 97398
                                            Sovereign Hotel, 4th Floor
                                            710 S.W. Madison Street
                                            Portland, Oregon  97205
                                            Tel: (503) 227-2024
                                            Fax: (503) 224-7299
                                            cslater@slaterross.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT – PAGE 25

**FARUQI & FARUQI, LLP**
Michael J. Hynes
PA Bar ID 62702
Ligaya Hernandez
PA Bar ID 210229
101 Greenwood Avenue, Suite 600
Jenkintown, Pennsylvania 19046
Telephone: (215) 277-5770
Facsimile: (215) 277-5771
mhynes@faruqilaw.com
lhernandez@faruqilaw.com

## VERIFICATION

I, Eleanor Werbowsky, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.


DATE: March 5, 2014

_____
Eleanor Werbowsky