Christopher A. Slater, OSB # 97398
cslater@slaterross.com
Michael J. Ross, OSB # 91410
mjross@slaterross.com
SLATER ROSS
Sovereign Hotel, 4th Floor
710 S.W. Madison Street
Portland, Oregon  97205
Telephone: (503) 227-2024
Facsimile: (503) 224-7299

*Local Counsel for Plaintiffs*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | | |
|---|---|---|
| In re GALENA BIOPHARMA INC. DERIVATIVE LITIGATION | : : : : : : : : | Case No.: 3:14-cv-382-SI LEAD<br><br>3:14-cv-514-SI<br>3:14-cv-516-SI |
| This Document Relates To: ALL ACTIONS. | : : : : : : : : | **PLAINTIFFS' VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Lead Plaintiff Jeffrey Klein ("Klein"), and Plaintiff Pratik Rathore ("Rathore") (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Galena Biopharma, Inc. ("Galena" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from July 2013 to the present (the "Relevant Period").

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - 1

## NATURE OF THE ACTION

2.    According to its public filings, Galena is a biopharmaceutical company developing and commercializing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care.  The Company's lead product candidate has been NeuVax™ (nelipepimut-S) ("NeuVax"), which is in Phase 3 clinical trials for preventing the recurrence of breast cancer.

3.    The defendants have admitted that NeuVax is the Company's lead product.  By 2013, however, analysts were beginning to seriously question the financial success of this product.  The defendants knew the meaning of this--if NeuVax was lackluster, so was Galena.  And this fact would be reflected in Galena's share price.

4.    In July 2013, the defendants hired a subsidiary of stock promotion firm the DreamTeam Group ("DreamTeam") to begin a misleading campaign designed to boost the Company's stock price.[1]  The plan (which was not disclosed to Galena's stockholders) was simple, and would be executed in two main parts.  First, the DreamTeam would post and publish misleading articles and comments on investor websites, touting the supposed strength of Galena and its products.  Second, when the share price was high enough (and armed with material, adverse, non-public information), the defendants would unload massive amounts of their personally held stock, and would continue to do so for as long as the ruse continued (which is to say, for as long as the share price was artificially elevated).  If and when the share price dropped, the defendants would cease their illicit insider sales, having already unloaded massive amounts of stock.

5.    From then on, as a result of the defendants' deal with DreamTeam, DreamTeam

---

[1] Upon information and belief, MissionIR was the affiliate of DreamTeam that the defendants entered into the agreement with.  For purposes of this complaint, DreamTeam will be referring to any entity and/or affiliate of that firm.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - 2

published a variety of "articles" on third party websites (such as *Seeking Alpha*), under multiple aliases, which promoted Galena's stock. At no time did these "articles" disclose that Galena (under the defendants' direction and on their watch) had paid for the promotion. After it was revealed that several of these "articles" were written by the same person (using multiple aliases), the articles were removed from the site without the disclosure of the paid marketing relationship with Galena.

6.    By early January 2014, phase one of the defendants' scheme was complete. Due to the defendants' illicit actions, Galena's stock price had risen significantly. For reference, in October 2013, Galena's stock price traded at between $2.00 per share and $3.00 per share. By January 2014, due to the defendants' illicit actions, Galena's stock price was trading at an artificially inflated price of between $5.00 per share and $7.00 per share. With phase one of the scheme complete, it was time for the defendants to pursue phase two: cashing in on their scheme by selling massive amounts of their personally held Galena stock at artificially inflated prices.

7.    In a period of ***less than one month***, between January 17, 2014 and February 12, 2014 (a period of just eighteen trading days), and while in possession of material, adverse, non-public information, certain of the defendants (including six members of the Board) sold over ***2.8 million shares*** of their personally held Galena stock, collectively reaping proceeds of over ***$15.2 million***. Upon information and belief, none of these defendants had engaged in open market sales of Galena stock in the four years prior to January 2014, and none have sold any shares subsequent to February 12, 2014 (which is to say, during and subsequent to the unraveling of the scheme).

8.    On February 12, 2014, the defendants' scheme unraveled. On that day, *TheStreet.com* published an article detailing defendants' payments to DreamTeam to artificially

inflate the Company's stock price, and the defendants' subsequent illicit insider sales.  On this news, shares of Galena fell $0.85 per share, or 16%, to close at $4.34 per share on February 12, 2014.

9.    Two days later, on February 14, 2014, the defendants *admitted* to hiring DreamTeam to bolster the Company's stock price and *admitted* to divesting massive numbers of Galena shares while the Company's stock price was inflated.  On this news, Galena shares declined by $0.63 per share, or over 14%, to close at $3.73 per share on February 14, 2014.  Galena's share price has never recovered, and currently trades for less than $3.00 per share.

10.    On March 16, 2014, the defendants disclosed "that the SEC is investigating certain matters relating to our company and an outside investor-relations firm that we retained in 2013."

11.    Accordingly, as a result of defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between Plaintiffs and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in this District.  Further, defendants regularly conduct business in this District and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

14.     Plaintiff Klein is a current shareholder of Galena, and has continuously held Galena stock since June 2013.  Klein is a citizen of Virginia.

15.     Plaintiff Rathore was a shareholder of Galena at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Galena shareholder.  Rathore is a citizen of Indiana.

16.     Nominal defendant Galena is a Delaware corporation, with its principal executive offices at 4640 SW Macadam Avenue, Suite 270, Portland, Oregon 97239.  According to its public filings, Galena is a biopharmaceutical company developing and commercializing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care.

17.     Defendant Mark J. Ahn ("Ahn") has served as the Company's President Chief Executive Officer ("CEO") since March 31, 2011, and as a director of the Company since 2007.  Upon information and belief, defendant Ahn is a citizen of Oregon.

18.     Defendant Ryan Dunlap ("Dunlap") has served as the Company's Vice President, Chief Financial Officer ("CFO") since July 2012.  Upon information and belief, defendant Dunlap is a citizen of Oregon.

19.     Defendant Mark. W. Schwartz ("Schwartz") has served as the Company's Executive Vice President and Chief Operating Officer ("COO") since April 2011.  Upon information and belief, defendant Schwartz is a citizen of Oregon.

20.     Defendant Sanford J. Hillsberg ("Hillsberg") has served as Chairman of the Board since 2007.  Upon information and belief, defendant Hillsberg is a citizen of California.

21.     Defendant Richard Chin ("Chin") has served as a director of the Company since

2009.  In addition, defendant Chin served as a member of the Board's Audit Committee (the "Audit Committee"), as a member of the Board's Nominating and Corporate Governance Committee (the "Governance Committee"), and as a member of the Board's Compensation Committee (the "Compensation Committee") during the Relevant Period.  Upon information and belief, defendant Chin is a citizen of California.

22.    Defendant Stephen S. Galliker ("Galliker") has served as a director of the Company since 2007.  In addition, defendant Galliker served as Chair of the Audit Committee and as a member of the Governance Committee during the Relevant Period.  Upon information and belief, defendant Galliker is a citizen of Florida.

23.    Defendant Steven A. Kriegsman ("Kriegsman") has served as a director of the Company since 2006.   In addition, defendant Kriegsman served as Chair of the Compensation Committee during the Relevant Period. Upon information and belief, defendant Kriegsman is a citizen of California.

24.    Defendant Rudolph Nisi ("Nisi") has served as a director of the Company since 2009.  In addition, defendant Nisi served as a member of the Audit Committee, a member of the Compensation Committee, and Chair of the Governance Committee during the Relevant Period. Upon information and belief, defendant Nisi is a citizen of New York.

25.    Defendant William L. Ashton ("Ashton") has served as a director of the Company since 2013.  Upon information and belief, defendant Ashton is a citizen of Pennsylvania.

26.    Collectively, defendants Ahn, Dunlap, Schwartz, Hillsberg, Chin, Galliker, Kriegsman, Nisi and Ashton shall be referred to herein as "Defendants."

27.    Collectively, defendants Chin, Galliker and Nisi shall be referred to as the "Audit Committee Defendants."

28.     Collectively, defendants Chin, Galliker and Nisi shall be referred to as the "Governance Committee Defendants."

29.     Collectively, defendants Chin, Kriegsman and Nisi shall be referred to as the "Compensation Committee Defendants."

30.     Collectively, defendants Ahn, Schwartz, Hillsberg, Chin, Galliker, Kriegsman and Nisi shall be referred to as the "Insider Selling Defendants."

### DEFENDANTS' DUTIES

31.     By reason of their positions as officers, directors, and/or fiduciaries of Galena and because of their ability to control the business and corporate affairs of Galena, Defendants owed Galena and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Galena in a fair, just, honest, and equitable manner.   Defendants were and are required to act in furtherance of the best interests of Galena and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to Galena and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     Defendants, because of their positions of control and authority as directors and/or officers of Galena, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Galena, each of the Defendants had knowledge of material non-public information regarding the Company.

33.     To discharge their duties, the officers and directors of Galena were required to

exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Galena were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

    34.    The Defendants were required to comply with the Company's Corporate Code of Ethics and Conduct (the "Code").  The Code specifically deals with the Company's insider trading policies.  The Code sets forth, in relevant part:

3. Stocks

Because our stock is a publicly traded security, certain activities of the Company are subject to certain provisions of the federal securities laws. These laws govern the dissemination or use of information about the affairs of the Company or its subsidiaries or affiliates, and other information, which might be of interest to persons considering the purchase or sale of our stock. Violations of the federal securities laws could subject you and the Company to stiff criminal and civil penalties. Accordingly, the Company does not sanction and will not tolerate any conduct that risks a violation of these laws.

    a. Disclosure of Transactions in Company's Securities
The Securities and Exchange Commission ("SEC") requires continuing disclosure of transactions in the Company's publicly traded securities by the Company, its directors, officers, major shareholders and other affiliated persons. We are committed to complying with obligations related this disclosure.

    b. Insider Trading
It is illegal for any person, either personally or on behalf of others, (i) to buy or sell securities while in possession of material nonpublic information, or (ii) to communicate (to "tip") material nonpublic information to another person who trades in the securities on the basis of the information or who in turn passes the information on to someone who trades. All directors, officers, employees and temporary insiders, such as

accountants and lawyers, must comply with these "insider trading" restrictions.

35.     Pursuant to the Governance Committee's Charter, the members of the Governance Committee are required to (among other things), review the Company's corporate governance principles and, if necessary or otherwise appropriate, recommend modifications to such principles for Board approval, and review and if necessary or otherwise appropriate, recommend to the Board modifications to the Company's insider trading policy and the Company's code of business conduct and ethics.

36.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are charged with oversight of the Company's legal compliance, including the Company's system of internal control over financial reporting and policies relating to risk assessment and management.

37.     Pursuant to the Compensation Committee's Charter, the members of the Compensation Committee are charged with granting stock options, shares of restricted stock and other equity-based awards under the Company's incentive compensation plans and other equity-based plans, including awards to the Company's CEO and other executive officers, and determining the terms of such stock options, shares of restricted stock and other equity-based awards.

## SUBSTANTIVE ALLEGATIONS

### A.    **Company Background**

38.     According to its public filings, the Company is a biopharmaceutical company developing and commercializing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care.  The Company is developing a pipeline of immunotherapy product candidates for the treatment of various cancers based on the E75

peptide.  The Company's lead product candidate has been NeuVax, which is in Phase 3 clinical trials for preventing the recurrence of breast cancer.

39.      Galena traces its roots to 1995, and a company called Apthera.  Apthera was a small biotech company with one peptide-based immunotherapy product in clinical trials, which was to treat low-to-intermediate HER2+ breast cancer patients.

40.      In 2011, RXi Pharmaceuticals ("RXi") acquired Apthera in a stock deal of 4.8 million shares of RXi's common stock, with additional payments based on development and commercial milestones relating to NeuVax.  Subsequently, and as a result of RXi's decision to split into two publicly-traded companies, Galena was formed.  RXi was to remain targeted on RNAi-Based Therapeutics, while Galena was spun off as a company focused on targeting cancer therapies through its one product, NeuVax, and a limited scope of RNAi activities.

41.      It appears as though little to no value was placed on Galena, as Defendants used the spin-off to erase a disappointing balance sheet and history.   To offset the loss of RXi, Galena shareholders received an aggregate of 100 million shares of RXi in connection with the spin-off transaction.  These shares represented approximately 11% of the fully diluted share count, which resulted in Galena being worth about $15 million.  In April 2012, Galena had its initial public offering ("IPO").

42.      Defendants have admitted that NeuVax is the Company's lead product.  By 2013, however, analysts were beginning to seriously question the financial success of this product. Defendants knew the meaning of this--if NeuVax was lackluster, so was Galena.  And this fact would be reflected in Galena's share price.

43.      By this time, many analysts were coming to the realization that Galena was a small company with few assets, including a lead drug candidate with no guarantee of financial

success.  Thus, Defendants decided to take their financial future into their own hands, at the expense of the Company and its shareholders.

### Defendants' Illicit Scheme

44.    In July 2013, Defendants hired a subsidiary of stock promotion firm the DreamTeam to begin a misleading campaign designed to boost the Company's stock price.  The plan (which was not disclosed to Galena's stockholders) was simple: the DreamTeam would post and publish misleading articles and comments on investor websites, touting the supposed strength of Galena and its products.  When the share price was high enough, Defendants would unload massive amounts of their personally held stock, and would continue to do so for as long as the ruse continued to work (which is to say, for as long as the share price was artificially elevated).  If and when the share price dropped, Defendants would cease their illicit insider sales.

45.    From then on, as a result of Defendants' agreement with DreamTeam, DreamTeam published a variety of articles on third party websites (such as *Seeking Alpha*), under multiple aliases, to promote Galena's stock.  At no time did these "articles" disclose that Galena (under Defendants' direction and on their watch) had paid for the promotion.  By way of example only, a November 22, 2013 article appeared on *Seeking Alpha*, purportedly written by "Kingmaker," and entitled "Galena Biopharma Continues to Develop a Deep Pipeline of Products."  This article never disclosed the financial relations with DreamTeam or Galena.

46.    After it was revealed that several of these "articles" were written by the same person (using multiple aliases), the articles were removed from the site without the disclosure of the paid marketing relationship to Galena.

47.    Overall, there were twenty-six articles about Galena published on *Seeking Alpha* between July 2013 and February 2014, the time period in which DreamTeam was providing paid

stock promotional services for Galena.

48.    In September 2013, shortly after the publication of an August 6, 2013 DreamTeam "article" on *Seeking Alpha* entitled "Galena Biopharma Presents an Attractive Investment Opportunity," Defendants caused the Company to conduct a $37.5 million public offering of common stock and warrants.

49.    On November 6, 2013, Defendants issued a press release entitled "Galena Biopharma Reports Third Quarter 2013 Results." The press release set forth, in relevant part:

> Galena Biopharma (Nasdaq:GALE), a biopharmaceutical company commercializing and developing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care, today reported its financial results for the three and nine months ended September 30, 2013 and provided a business update.
>
> "Our commercial success to date with Abstral® has been very encouraging and we are excited to report initial revenues ahead of schedule. With our sales force and commercial organization fully deployed, we continue to make significant strides with physicians, payors and patients—and expect continuing strength with the launch," said Mark J. Ahn, Ph.D., President and Chief Executive Officer. "We are also making steady progress in advancing our NeuVax™ and FBP cancer immunotherapy pipeline."
>
> **Third Quarter 2013 Financial Highlights**
>
> Net revenue was $1.2 million for the three months ended September 30, 2013, the first quarter of Abstral® (fentanyl) sublingual tablet sales, ahead of our official launch and commencement of promotional efforts in the fourth quarter. Cost of revenue and gross profit for the three months ended September 30, 2013 were $0.3 and $0.9 million, respectively.
>
> Operating loss for the three months ended September 30, 2013 was $6.9 million, including $0.5 million in stock-based compensation charges, compared with an operating loss of $5.5 million for the three months ended September 30, 2012, which includes $0.4 million in stock-based compensation charges. For the nine months ended September 30, 2013, operating loss from continuing operations was $21.5 million compared with $15.6 million for the nine months ended September 30, 2012.
>
> *      *      *

Net loss for the three months ended September 30, 2013 was $9.3 million, or $0.11 per basic and diluted share, versus a net loss of $6.3 million, or $0.09 per basic and diluted share, for the three months ended September 30, 2012. Net loss for the nine months ended September 30, 2013 was $28.2 million, or $0.34 per basic and diluted share, versus a net loss (including both continued operations and discontinued operations) of $31.2 million, or $0.52 per basic and diluted share, for the nine months ended September 30, 2012.

50.      That same day, Defendants caused the Company to file with the SEC a quarterly report on Form 10-Q.  The Form 10-Q was signed by defendants Ahn and Dunlap, and reiterated the financial results announced that same day.  In the Form 10-Q, Defendants made no mention whatsoever of the agreement with DreamTeam.

51.      In addition, the Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Ahn and Dunlap, attesting to the soundness of the Company's internal controls over financial reporting.

52.      On November 22, 2013, DreamTeam published an "article" on *Seeking Alpha* entitled "Galena Biopharma Continues to Develop a Deep Pipeline of Products."  Four days later, on November 26, 2013, the Compensation Committee Defendants granted defendants Nisi, Ahn, Schwartz, Kriegsman, Dunlap, Hillsberg, Galliker, Chin and Ashton a collective total of 2.75 million stock options, which carried an exercise price of $3.88.  These grants were the only grants that were made by the Compensation Committee Defendants at that time of year.  The usual practice of the Compensation Committee Defendants was to grant options to the officers and directors in January of a calendar year (as was done in 2011, 2012 and 2013).  The first tranche of the November 2013 option grants vested on February 26, 2014, shortly before the eight-month DreamTeam promotional campaign was scheduled to end.

**The Massive Insider Selling**

53.      By early January 2014, phase one of Defendants' scheme was complete.  Due to

Defendants' illicit actions, Galena's stock price had risen significantly.  For reference, in October 2013, Galena's stock price traded at between $2.00 per share and $3.00 per share.  By January 2014, due to Defendants' illicit actions, Galena's stock price was trading at an artificially inflated price of between $5.00 and $7.00 per share.  With phase one of the scheme complete, it was time for the Insider Selling Defendants to pursue phase two: cashing in on their scheme by selling massive amounts of their personally held Galena stock at artificially inflated prices.  These sales were made while the Insider Selling Defendants were in possession of material, adverse, non-public information about the Company.

54.    In a period of *less than one month*, between January 17, 2014 and February 12, 2014 (a period of just eighteen trading days), and while in possession of material, adverse, non-public information, the Insider Selling Defendants sold over *2.8 million shares* of their personally held Galena stock, reaping proceeds of over *$15.2 million*.

55.    These were direct sales, and upon information and belief were not pursuant to any pre-arranged 10b5-1 trading plan.  Further, upon information and belief, none of the Insider Selling Defendants had engaged in open market sales of Galena stock in the four years prior to January 2014, and none have sold any shares subsequent to February 12, 2014 (which is to say, during and subsequent to the unraveling of the scheme).  Indeed, the scheme would unravel *the very same day* of the final sale of February 12, 2014.

56.    Also telling is the massive number of shares the Insider Selling Defendants unloaded during single-day periods.  Upon information and belief, the Insider Selling Defendants had reason to believe that Defendants' scheme could unravel at any time.  As such, the Insider Selling Defendants unloaded as many shares as they could in one or two day periods.  In fact, during this period of time, the *minimum* number of shares sold during a one day period by an

Insider Selling Defendant was defendant Chin's sale of **75,000 shares** on or about January 30, 2014.  Perhaps most egregiously, defendant Ahn sold **796,765 shares during a single day** on or about January 27, 2014.

57.    The insider trading by the Insider Selling Defendants between January 17, 2014 and February 12, 2014 is set forth in the following chart:

| | Defendant | Shares | | Price per share ($) |
|---|---|---|---|---|
| Feb 12, 2014 | Chin | 187,500 | Sale at $4.33 per share. | 811,875 |
| Feb 3, 2014 | Galliker | 300,000 | Sale at $4.18 per share. | 1,254,000 |
| Jan 30, 2014 | Hillsberg | 250,000 | Sale at $5.41 per share. | 1,352,500 |
| Jan 30, 2014 | Chin | 75,000 | Sale at $5.57 - $5.61 per share. | 419,000 |
| Jan 30, 2014 | Schwartz | 100,000 | Sale at $5.57 per share. | 557,000 |
| Jan 29, 2014 | Nisi | 250,000 | Sale at $5.28 per share. | 1,320,000 |
| Jan 27, 2014 | Ahn | 796,765 | Sale at $4.83 per share. | 3,848,374 |
| Jan 22, 2014 | Kriegsman | 250,000 | Sale at $6.13 per share. | 1,532,500 |
| Jan 17, 2014 | Nisi | 200,000 | Sale at $6.90 per share. | 1,380,000 |
| Jan 17, 2014 | Hillsberg | 200,000 | Sale at $6.93 per share. | 1,386,000 |
| Jan 17, 2014 | Kriegsman | 200,000 | Sale at $7 per share. | 1,400,000 |
| ***Totals:*** | | ***2,809,265*** | | ***$15,261,249*** |

### The Truth Begins to Emerge

58.    By late January 2014, Defendants' scheme had not yet unraveled.  However, analysts were beginning to question the financial success of NeuVax.  For example, a *Seeking Alpha* article entitled "Galena Biopharma: Numerous Red Flags Suggest A Significant Overvaluation" suggested that NeuVax might never generate significant revenue for Galena, and that the NeuVax PRESENT Phase II Trial was poised for failure, since there was little to no evidence to suggest that NeuVax would demonstrate a 30% disease-free progression differential in a large, randomized trial.

59.    On February 12, 2014, Defendants' scheme finally unraveled.  On that day,

*TheStreet.com* published an article entitled "Galena Biopharma Pays For Stock-Touting Campaign While Insiders Cash Out Millions."  The article revealed, in relevant part:

> **Two articles touting** *Galena Biopharma* **(GALE)** *were removed from* **Seeking Alpha** *Monday because they were written by the same person using different aliases.*
>
> **This is the second time** **Seeking Alpha** *has been forced to take action against individuals using multiple aliases to tout Galena, a small drug developer with a breast cancer vaccine in a phase III study.* In January 2013, the investor Web site removed five articles promoting Galena written by the same individual under three different pseudonyms.
>
> **The most recent incident is more serious and potentially damaging because of evidence linking Galena to a stock-promotions firm which wrote and published the articles on** **Seeking Alpha.** *The articles were part of a broader, coordinated "brand awareness campaign" designed to boost Galena's stock price, according to a document obtained by* **TheStreet.**
>
> Aided by this promotional campaign, Galena shares tripled in value from this summer. Coincidence or not, Galena insiders have made millions of dollars by selling company stock in January.
>
> Galena did not respond to phone calls and emails seeking comment.
>
> **In July 2013, Galena paid $50,000 to a subsidiary of** *The DreamTeam Group* **for 240 days of "advertising, branding, marketing, investor relations and social media services," according to a disclaimer on The DreamTeam Group's Web site.**
>
> [Update: Following publication of this story, DreamTeam Group removed the Galena compensation disclosure from its web site. Here is the screen shot disclosing Galena's payment to DreamTeam Group.]
>
> > • GALE: MissionIR, an affiliate of DreamTeamGroup, received $50,000 from GALE for 240 days of advertising, branding, marketing, investor relations and social media services provided by MissionIR and affiliate DreamTeamGroup Business Brands. Please read entire MissionIR Disclaimer for FULL Compensation Disclosures.
>
> Publicly traded companies routinely pitch their stock to new investors, but **some of DreamTeam's marketing tactics appear to resemble stock promotion schemes which run afoul of standard investor relations practices.** Among its other services, DreamTeam Group operates more than two dozen investor Web sites with names like "Home Run Stocks," "Touchdown Stocks," "Quality Stocks," and "Tout Sheet." The Web sites entice investors with stock picks that can "trade for at least a 100% profit."

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - 16

*All the stock picks touted on these DreamTeam Web sites, including Galena, are paying clients -- a fact omitted from the Web sites unless someone clicks on a small disclaimer link.*

Galena was promoted on many of the DreamTeam stock-touting Web sites to create "market buzz about the company to a new group of investors," according to a DreamTeam document, "Galena Biopharma Case Study: Investor Awareness Campaign" obtained by *TheStreet*.

As part of this campaign, DreamTeam published favorable articles about Galena on *Seeking Alpha* on Aug. 7, 2013 and Nov. 22, 2013, according to the case-study document. But the articles were written under aliases and make no mention of DreamTeam or its paid marketing relationship with Galena. Instead, they're written from the perspective of individual investors recommending an investment in Galena to other readers of *Seeking Alpha*.

"... investors must look for biopharmaceutical companies that have a unique approach to science, a deep pipeline, drugs with huge market potential, and a healthy fundamental picture. Galena has all of these attributes and shareholders with patience will be handsomely rewarded in due time," is how the author "Wonderful Wizard" pitches Galena to *Seeking Alpha* readers in the article, headlined "Galena Biopharma Presents an Attractive Investment Opportunity," [The article was actually published on Aug. 6.]

On Nov. 22, "Kingmaker" published a similar article on *Seeking Alpha* titled, "Galena Biopharma Continues to Develop a Deep Pipeline of Products." Neither article disclosed a financial relationship with DreamTeam Group or Galena. Both articles were removed from *Seeking Alpha* on Monday because they were written by the same person.

"We pulled the Aug. 6 and Nov. 22 articles. Upon investigation, the contributor was in violation of our Terms of Use because 'Kingmaker' and 'Wonderful Wizard' were the same person but failed to tell us so," said *Seeking Alpha* Vice President of Content and Editor in Chief Eli Hoffman.

*Seeking Alpha* was unable to determine if the author was paid by DreamTeam Group to write the two articles on Galena, added Hoffman. Hoffman would not disclose the real identify of the author publishing under the "Kingmaker" and "Wonderful Wizard" aliases.

The DreamTeam Group promoted Galena's stock in other ways than just publishing *Seeking Alpha* articles.

"By December 20, 2013, DTG has published a total of 50 unique GALE-centered blogs that were distributed throughout the DTG network and a number of

investor-oriented community site on the Internet such as StockHouse, StockTwits, Seeking Alpha and Wall Street Cheat Sheet," DreamTeam explains in the document obtained by *TheStreet*.

DreamTeam also employs people who promote the stocks of paying clients on message boards, Facebook and via Twitter, according to the document. DreamTeam Managing Partner Michael Andrew McCarthy did not respond to a message left on his cellphone.

*All that DreamTeam promotion worked wonders for Galena's stock price, which tripled in value from $2 per share in July 2013 to almost $7.50 in the middle of January. DreamTeam's contract for eight months of work with Galena ends this month.*

*Galena CEO Ahn unloaded $2.8 million in company stock in January, according to SEC filings. Director Steven Kriegsman, who's also the CEO of Cytrx (CYTR), pocketed $2.1 million from the sale of Galena stock in the same month, according to SEC filings. Other Galena executives and directors have also been selling shares.*

Cytrx is also a DreamTeam Group client, paying $65,000 for a year's worth of stock promotion, according to a disclaimer on DreamTeam Group's Web site.
The timing of the Galena insider sales may or may not be related to the end of the promotional work being done by Galena. In a recent published interview, Ahn said he sold part of his Galena holding to "diversify for my family." [Emphasis added.]

60.    On this news, shares of Galena fell $0.85 per share, or 16%, to close at $4.34 per

share on February 12, 2014.

61.    Two days later, on February 14, 2014, *Seeking Alpha* published an article entitled

"A Deeper Look At The Galena Biopharma Controversy."  This article revealed, in relevant part:

*As I mentioned in my other Galena article, the company's monstrous rise appeared to occur without a catalyst.* In fact, I stated the following at the time:

"The initial NeuVax data is a little over a year and a half away, Abstral won't turn the company cash flow positive for a minimum of 4 more years, and Galena is about to embark on an expensive Phase 2 trial for another clinical candidate."
Put simply, I saw no reason for such a staggering bull run that topped out at a whopping 470% gain over the last 52 weeks. And I fail to see how the recent acquisition of Mills Pharmaceuticals adds anything of value to Galena at the current time.

*Logic thus dictates that this meteoric rise was primarily the result of promotional efforts by DreamTeam, and had little to do with a change in the underlying fundamentals of the company.* [Emphasis added.]

62.     Defendants read and were aware of these articles, and in particular the February 12, 2014 article cited above.  As such, on February 14, 2014, Defendants caused the Company to issue a press release wherein Defendants attempted to "respond" to these articles.  The press release, entitled "Galena Biopharma Issues Letter to Shareholders" and purportedly written by defendant Ahn, set forth, in relevant part:

Dear Shareholders:

Due to the recent media attention on Galena Biopharma that we acknowledge is having an impact on investor confidence, we felt it necessary, as a service to our shareholders, to publicly respond to the discussions and set the record straight.

The genesis of this attention is due to a single reporter, Adam Feuerstein from TheStreet.com, who clearly has an agenda when it comes to Galena. This can be evidenced by his numerous, tabloid-like articles on the company that have appeared over the past three years and are sensational but largely devoid of true information. The article this week is just another in the line, which for us have become noise.

Mr. Feuerstein has never requested a meeting with the company to understand the details of our programs or the goals of the company. On the contrary, his requests for information are consistently accusatory and negative. As a result, we do not feel it is worthwhile to engage him or respond to other media outlets that serve to advance his agenda. However, we do recognize that you, our shareholders, deserve a direct response on the matters at hand.

*The only facts in Mr. Feuerstein's most recent article that are remotely accurate are that Galena previously engaged the DreamTeamGroup and that insiders at the company, including me, divested shares in mid January.* All other accusations in this article - as with his prior reporting on Galena - are specious and conveniently arranged to create controversy.

Over the past year, we have accomplished the following:

- Acquired Abstral® (fentanyl) sublingual tablets, implemented a commercial team, launched the drug in October 2013, and currently have approximately 5% of the branded market after only four months of launch. Abstral is part of a class-wide Transmucosal Immediate Release Fentanyl (TIRF) Risk Evaluation and

Mitigation Strategy (REMS) program designed to mitigate the risk of misuse, abuse, addiction, overdose and serious complications due to medication errors with the use of TIRF medicines.

- Initiated our RELIEF Patient Registry trial for Abstral.
- Continued to progress our pivotal, Phase 3 PRESENT trial for NeuVax™ (nelipepimut-S) and added another commercial partnership with Dr. Reddy's in India.
- Progressed enrollment with our Phase 2b combination trial with NeuVax and Herceptin® (trastuzumab).
- Expanded our Intellectual Property with an issued patent for NeuVax in Europe.
- Advanced our pipeline with the initiation of a Phase 2 trial with GALE-301, and we expect to report the Phase 1 data mid-year.
- Broadened our portfolio into hematology with the acquisition of Mills Pharmaceuticals and anagrelide controlled release, now GALE-401.

These facts about Galena and our progress are indisputable and clearly demonstrate our dedication to the mission of transforming Galena into a leader in providing therapeutics across the entire cancer-care spectrum. My expectation is that 2014 will unlock additional opportunities that will undoubtedly serve to benefit all who are connected to the success of Galena - most importantly those individuals who are unfortunately confronted with the specter of cancer.

Looking ahead, I would hope that all investors, stakeholders and the media judge Galena on our ability to meet our publicly stated goals. Let success or failure be dictated by facts and data, not the questionable logic of a headline-seeking reporter. [Emphasis added.]

63.    Thus, Defendants *admitted* to hiring DreamTeam to bolster the Company's stock price and *admitted* to divesting massive numbers of Galena shares while the Company's stock price was inflated.  On this news, Galena shares declined by $0.63 per share, or over 14%, to close at $3.73 per share on February 14, 2014.  Galena's share price has never recovered, and currently trades for less than $3.00 per share.

64.    On March 17, 2014, Defendants caused Galena to file with the SEC its annual report on Form 10-K.  Therein, Defendants disclosed the following:

In February 2014, we learned that **the SEC is investigating certain matters relating to our company and an outside investor-relations firm that we retained in 2013.** We have been in contact with the SEC staff through our counsel and are cooperating with the investigation.

*        *        *

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - 20

On March 14, 2014, the company's board of directors appointed Irving M. Einhorn agreed to serve as a Class II director of the company, with a term expiring at the 2015 annual stockholder meeting, and as a member of the special committee of the board of directors formed to investigate certain allegations contained in the purported derivative complaint recently filed against the company and certain of its directors. Mr. Einhorn will be compensated for his services as director and member of the special committee in the same manner as other directors and special committee members. [Emphasis added.]

65.    Accordingly, as a result of Defendants' breaches, the Company has been damaged.

## DERIVATIVE AND DEMAND ALLEGATIONS

66.    Plaintiffs bring this action derivatively in the right and for the benefit of Galena to redress the breaches of fiduciary duty and other violations of law by Defendants.

67.    Plaintiffs will adequately and fairly represent the interests of Galena and its shareholders in enforcing and prosecuting its rights.

68.    At the time this action was initiated, the Board consisted of the following eight (8) directors: defendants Ahn, Hillsberg, Chin, Galliker, Kriegsman, Nisi and Ashton, and non-defendant Irving M. Einhorn ("Einhorn").  Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

a.   During the Relevant Period, defendants Ahn, Hillsberg, Chin, Galliker, Kriegsman and Nisi (a majority of the Board) each illicitly sold shares of Galena stock while in possession of material, adverse, non-public information, during a time in which Galena stock was artificially inflated due to Defendants' actions.  As a result of these illicit sales, defendants Ahn, Hillsberg, Chin, Galliker, Kriegsman and Nisi each received direct financial benefits not shared with Galena shareholders, and are, therefore, each directly interested in a demand.  Further, defendants Ahn, Hillsberg, Chin, Galliker, Kriegsman and Nisi each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith.  Accordingly, demand upon Ahn, Hillsberg, Chin, Galliker, Kriegsman and Nisi is futile.

b. Defendants Nisi, Ahn, Kriegsman, Hillsberg, Galliker, Chin and Ashton (a majority of the Board) are each directly interested in a demand due to their receipt of illicit stock option awards in November 2013.  The option grants were illicit because (among other things) they were timed to coincide with certain DreamTeam publications, and the exercise price of the options may have been fixed before DreamTeam's efforts caused further increases in Galena's stock price.  Accordingly, defendants Nisi, Ahn, Kriegsman, Hillsberg, Galliker, Chin and Ashton are each directly interested in a demand, rendering any demand upon them is futile.

c. The principal professional occupation of defendant Ahn is his employment with Galena as President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the Company's Proxy Statement filed with the SEC on April 29, 2013, Defendants have admitted that defendant Ahn is not independent.  Thus, defendant Ahn lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  In addition, defendant Ahn faces a substantial likelihood of liability for his illicit insider sales of Galena stock and his illicit receipt of stock option awards, as set forth above.

d. During the Relevant Period, defendants Chin, Galliker and Nisi served as members of the Governance Committee.  Pursuant to the Company's Governance Committee Charter, the members of the Governance Committee were and are responsible for, *inter alia*, reviewing the Company's corporate governance principles, and reviewing and recommending modifications to the Company's insider trading policies and the Code.  Defendants Chin, Galliker and Nisi breached their fiduciary duties of due care, loyalty, and good faith, because the Governance Committee, *inter alia*, allowed or permitted the Company to engage DreamTeam to artificially inflate the price of the Company's stock and allowed or permitted the Insider Selling Defendants to sell a massive amount of Galena shares while in possession of material, adverse, non-public information.  This was in violation of the Company's insider trading policy and the Code.  Therefore, defendants Chin, Galliker and Nisi each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

e. During the Relevant Period, defendants Chin, Galliker and Nisi served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, oversight of the Company's legal compliance program, reviewing the Company's annual and quarterly financial reports and press releases, and reviewing the integrity of the Company's internal controls.  Defendants Chin, Galliker and Nisi breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed

or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures, as well as causing the above breaches of legal compliance with respect to the illicit insider trading.  Therefore, defendants Chin, Galliker and Nisi each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

    f.    During the Relevant Period, defendants Chin, Kriegsman and Nisi served as members of the Board's Compensation Committee.  The Compensation Committee Defendants face a substantial likelihood of liability in connection with the stock option grants in 2013 and 2014.  In particular, the Compensation Committee Defendants face a substantial likelihood of liability in connection with timing the stock option grants to coincide with certain DreamTeam publications, and fixing the exercise price of the options before DreamTeam's efforts caused further increases in Galena's stock price.  Therefore, defendants Chin, Kriegsman and Nisi face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

    g.    According to Defendants, defendant Ashton is not independent. Galena's website contains a list of non-employee directors, with an "I" designating a director as independent.  As illustrated below,[2] Defendants have not conferred such a designation on defendant Ashton.  Thus defendants have admitted that defendant Ashton lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  In addition, defendant Ashton faces a substantial likelihood of liability for his illicit receipt of stock option awards, as set forth above.

## Committee Composition

| | Audit | Compensation | Nominating and Governance | Ad Hoc (Strategy, Pricing, etc) |
|---|---|---|---|---|
| William L. Ashton | | | | Member |
| Dr. Richard Chin, M.D. (I) | Member | Member | Member | |
| Stephen S. Galliker (I) | Chair | | Member | |
| Sanford J. Hillsberg (★) | | | | Chair |
| Steven A. Kriegsman (I) | | Chair | | Member |
| Dr. Rudolph Nisi, M.D. (I) | Member | Member | Chair | Member |

★ = Chair of the Board    G = Chair    = Member    I = Independent Director

---

[2] http://investors.galenabiopharma.com/committees.cfm, as accessed on March 21, 2014.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - 23

h. According to Defendants, defendant Hillsberg is not independent. Galena's website contains a list of non-employee directors, with an "I" designating a director as independent. As illustrated above, Defendants have not conferred such a designation on defendant Hillsberg. Thus defendants have admitted that defendant Hillsberg lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action. In addition, defendant Hillsberg lacks independence due to his position as a senior partner at the law firm TroyGould. TroyGould served as Galena's outside corporate counsel, and rendered an opinion as to the validity of the securities in the September 2013 public offering. Defendant Hillsberg thus lacks independence due to this intertwined professional relationship. In addition, defendant Hillsberg faces a substantial likelihood of liability for his illicit insider sales of Galena stock and his illicit receipt of stock option awards, as set forth above.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

69. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

70. As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Galena disseminated accurate, truthful and complete information to its shareholders.

71. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Galena shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

72. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

73.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

74.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

75.     Defendants willfully ignored the obvious and pervasive problems with Galena's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

76.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

77.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

78.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Galena.

79.     Plaintiffs, as shareholders and representatives of Galena, seek restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV
### AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

80. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

81. At the time of the stock sales set forth herein, the Insider Selling Defendants were in possession of material, adverse, non-public information described above, and sold Galena common stock on the basis of such information.

82. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company that the Insider Selling Defendants used for their own benefit when they sold Galena common stock.

83. At the time of their stock sales, the Insider Selling Defendants knew that Defendants had hired DreamTeam to artificially inflate the price of the Company's stock, and that DreamTeam had in fact artificially inflated the price of Galena stock.

84. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby. Plaintiffs, on behalf of Galena, have no adequate remedy at law.

## COUNT V
### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

85. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

86. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Galena, for which they are legally responsible. In particular, Defendants

abused their positions of authority by causing or allowing Galena to misrepresent material facts regarding its financial position and business prospects.

87.     As a direct and proximate result of Defendants' abuse of control, Galena has sustained significant damages.

88.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

89.     Plaintiffs, on behalf of Galena, have no adequate remedy at law.

### COUNT VI
### AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

90.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

91.     Defendants had a duty to Galena and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Galena.

92.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Galena in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Galena's affairs and in the use and preservation of Galena's assets.

93.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Galena to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Galena, thus breaching their duties to the Company.  As a result,

Defendants grossly mismanaged Galena.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing Galena to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.    Awarding to Galena restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: June 10, 2014                                        Respectfully submitted,

                                                           **SLATER ROSS**

                                                           /s/ Christopher A. Slater
                                                           Christopher A. Slater, OSB # 97398

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT - 28

Michael J. Ross, OSB # 91410
Sovereign Hotel, 4th Floor
710 S.W. Madison Street
Portland, Oregon  97205
Telephone: (503) 227-2024
Facsimile: (503) 224-7299
cslater@slaterross.com
mjross@slaterross.com

*Local Counsel for Plaintiffs*

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
PA Bar ID 81575
Brett D. Stecker
PA Bar ID 86242
Jeffrey J. Ciarlanto
PA Bar ID 205838
Joseph M. Profy
PA Bar ID 77141
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jjc@weiserlawfirm.com
jmp@weiserlawfirm.com

**THE WEISER LAW FIRM, P.C.**
Kathleen A. Herkenhoff
CA Bar ID 168562
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone:  (858) 794-1441
Facsimile:  (858) 794-1450
kah@weiserlawfirm.com

**HYNES KELLER &**
**HERNANDEZ, LLC**
Michael J. Hynes
PA Bar ID 62702
Ligaya Hernandez
PA Bar ID 210229
Hynes Keller & Hernandez, LLC
1150 First Avenue, Suite 501

King of Prussia, PA 19406
Telephone: (610) 994-0292
Facsimile: (914) 752-3041
mhynes@hkh-lawfirm.com
lhernandez@hkh-lawfirm.com

**FEDERMAN & SHERWOOD**
William B. Federman
OK Bar ID 2853
Sara E. Collier
OK Bar ID 20473
10205 N Pennsylvania Ave
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com
sec@federmanlaw.com

*Co-Lead Counsel for Plaintiffs*

## <u>GALENA BIOPHARMA, INC. VERIFICATION</u>

I, Jeffrey Klein, hereby verify that I am familiar with the allegations in the Consolidated Complaint, that I have authorized the filing of the Consolidated Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.


Date:_____6/4/14_____                    _____
                                                   Jeffrey Klein

## **VERIFICATION**

I, Pratik Rathore, declare that I have reviewed the Verified Consolidated Shareholder Derivative Complaint ("Consolidated Complaint") prepared on behalf of Galena Biopharma, Inc. [NASDAQ: GALE], and I authorize its filing. I have reviewed the allegations made in the Consolidated Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Galena Biopharma, Inc. common stock during the time period in which the wrongful conduct alleged and complained of in the Consolidated Complaint was occurring.

9th June 2014
Date

PRATIK RATHORE

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2014, I served a true and correct copy of the foregoing PLAINTIFFS' VERIFIED CONSOLIDATED DERIVATIVE SHAREHOLDER COMPLAINT on all attorneys registered through the CM/ECF as attorneys of record:

❐      By mailing a copy thereof to the address(es) above, contained in a sealed envelope, with postage prepaid, and deposited the same in the United States Post Office at Portland, Oregon.

❐      By transmitting via facsimile transmission a copy thereof to the published facsimile number(s) of the person(s) above.

❐      By hand delivery, via messenger, to the office(s) above a copy thereof, contained in a sealed envelope, addressed to the person(s) above.

❐      By transmitting via electronic delivery to the person(s) above.

✔      By transmitting via the CM/ECF system.

Dated: June 10, 2014.

**/S/ CHRISTOPHER A. SLATER**

Christopher A. Slater, OSB No. 97398
Of Attorneys for Plaintiff