# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **In Re GALENA BIOPHARMA, INC. DERIVATIVE LITIGATION**, | Case No.   3:14-cv-382-SI LEAD<br>3:14-cv-514-SI<br>3:14-cv-516-SI |
| This Document Relates To:<br>ALL ACTIONS | **OPINION AND ORDER** |

Christopher A. Slater and Michael J. Ross, SLATER ROSS, Sovereign Hotel, 4th Floor, 710 S.W. Madison Street, Portland, OR 97205; Robert B. Weiser, Brett D. Stecker, Jeffrey J. Ciarlanto, THE WEISER LAW FIRM, P.C., 22 Cassatt Avenue, First Floor, Berwyn, PA 19312; Kathleen A. Herkenhoff, THE WEISER LAW FIRM, P.C., 12707 High Bluff Drive, Suite 200, San Diego, CA 92130; Michael J. Hynes and Ligaya Hernandez, HYNES KELLER & HERNADEZ, LLC, 1150 First Avenue, Suite 501, King of Prussia, PA 19406; William B. Federman and Sara E. Collier, FEDERMAN & SHERWOOD, 10205 N. Pennsylvania Avenue, Oklahoma City, OK 73120. Of Attorneys for Plaintiffs.

Lois O. Rosenbaum and Stephen H. Galloway, STOEL RIVES LLP, 900 S.W. Fifth Avenue, Suite 2600, Portland, OR 97204; Paul R. Bessette, Michael J. Biles, James P. Sullivan, KING & SPALDING LLP, 401 Congress Avenue, Suite 3200, Austin, TX 78701. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Before the Court is the motion of nominal defendant Galena Biopharma, Inc. ("Galena") to stay the pending consolidated derivative actions for 90 days to allow sufficient time for an investigation by a single-member special litigation committee ("SLC") formed by Galena's Board of Directors ("Board"). For the following reasons, Galena's motion to stay is denied.

PAGE 1 – OPINION AND ORDER

**STANDARDS**

"[F]ederal courts should apply state law governing the authority of independent directors to discontinue derivative suits to the extent such law is consistent with [federal law]." *Burks v. Lasker*, 441 U.S. 471, 486 (1979). Therefore, the propriety of Galena's requested stay is a question to be resolved under the law of Galena's state of incorporation, Delaware.

Under Delaware law, a properly formed SLC is generally entitled to a stay of derivative litigation for a reasonable period of time necessary to complete its investigation. *See In re Oracle Corp. Derivative Litig.*, 808 A.2d 1206, 1211 (Del. Ch. 2002); *Kaplan v. Wyatt*, 484 A. 2d 501, 510 (Del. Ch. 1984); *Abbey v. Computer Commc'ns Tech. Corp.*, 457 A.2d 368, 375-76 (Del. Ch. 1983). There is an exception, however, if it is clear from the stay application that any decision by the committee to terminate litigation will not withstand scrutiny. *See Biondi v. Scrushy*, 820 A.2d 1148, 1165 (Del. Ch. 2003) (denying an SLC's motion to stay because the SLC would not meet the independence requirement of *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981)). Any such decision by the SLC would need withstand *Zapata's* requirement that the SLC be independent and act in good faith and that the investigation be reasonable and conducted objectively. *See Zapata*, 430 A.2d at 788 (holding that an SLC could move to dismiss a derivative action "[a]fter an objective and thorough investigation" and that the company would "have the burden of proving independence, good faith and a reasonable investigation, rather than [a court] presuming independence, good faith and reasonableness."); *see also Booth Family Trust v. Jeffries*, 640 F.3d 134, 138-39 (6th Cir. 2011) ("Under *Zapata* . . . . If a court finds that a corporation's special litigation committee was independent, conducted its investigation in good faith, had reasonable bases for its conclusion and the decision to dismiss the lawsuit is not inconsistent with business judgment, the court will dismiss the derivative action.").

# BACKGROUND

## A.  The Alleged Wrongdoing

As alleged in the Verified Amended Consolidated Shareholder Derivative Complaint

("Amended Complaint"), Galena is a biotechnology company based in Portland, Oregon. The

Company is focused on the development and commercialization of targeted oncology treatments

that address major unmet medical needs to advance cancer care. Galena is pursuing the

development of cancer therapeutics, including its main product candidate, NeuVax™, for the

treatment of breast cancer and other tumors.

In July 2013, Galena entered into a contract with The DreamTeam Group or one of its

subsidiaries, MissionIR (also known as "Mission Investor Relations") (collectively

"DreamTeam"). Galena paid DreamTeam $50,000 for 240 days of advertising, branding,

marketing, investor relations, and social media services. Plaintiffs allege that as part of these

services DreamTeam was to place, or plant, misleading articles and comments on investor

websites touting Galena. Plaintiffs further allege that Defendants hired DreamTeam with the plan

to wait until the share price of Galena was high enough and then sell their personally-held stock.

After Galena hired DreamTeam, DreamTeam published a variety of articles. For

example, on or about August 6, 2013, DreamTeam published, on the online investment advice

website *Seeking Alpha*, an article entitled "Galena Biopharma Presents an Attractive Investment

Opportunity." This article recommended investment in Galena stock, but failed to disclose any

financial relationship between the author, who was identified only as "Wonderful Wizard," and

either Galena or DreamTeam. Another article placed by DreamTeam touting Galena in *Seeking

Alpha* appeared on November 22, 2013, this time by an author identified as "Kingmaker," who

also failed to disclose any relationship with either Galena or DreamTeam. These two articles

about Galena in *Seeking Alpha* were purportedly written by two different people, each

recommending investment in Galena, but were allegedly written by the same author.[1] Overall, there were 26 articles about Galena published on *Seeking Alpha* between July 2013 and February 2014, the time period in which DreamTeam was providing paid promotional services for Galena.

In September 2013, shortly after the publication of the August 6th DreamTeam article on *Seeking Alpha*, Galena conducted a $37.5 million public offering of common stock and warrants. On November 6, 2013, Galena issued a press release, entitled "Galena Biopharma Reports Third quarter 2013 Results." This press release quoted Galena's then-president and chief operating officer, Mark Ahn, as stating that Galena's "commercial success to date with Abstral® has been very encouraging and we are excited to report initial revenues ahead of schedule. . . . [We] expect continuing strength with the launch. We are also making steady progress in advancing our NeuVax[TM] and FBP cancer immunotherapy pipeline." The press release also set forth the "financial highlights" for the third quarter 2013. That same day Galena filed a Form 10-Q with the SEC, signed by Ahn and vice president and chief financial officer Ryan Dunlap, which reiterated the financial results announced in the press release. Neither the press release nor the 10-Q disclosed the stock promotion agreement with DreamTeam.

On November 26, 2013, four days after the November 22nd *Seeking Alpha* article, Galena's Compensation Committee granted a collective total of 2.75 million shares of stock options to Defendants director Rudolph Nisi; current president and chief executive officer and former chief operating officer and executive vice president, Mark W. Schwartz; Chairman of the Board Sanford Hillsberg; director Richard Chin; director Stephen Galliker; director William

---

[1] Ultimately, the website *Seeking Alpha* removed from its website the August 6, 2013 article by "Wonderful Wizard" and the November 22, 2013 article by "Kingmaker." *Seeking Alpha*'s Vice President of Content and Editor-in-Chief, Eli Hoffman, explained that the removal of the articles was done because they violated *Seeking Alpha*'s terms of use when the author failed to disclose to *Seeking Alpha* that "Kingmaker" and "Wonderful Wizard" were, in fact, the same person.

Ashton; Ahn; and Dunlap. These options issued in November carried an exercise price of $3.88 per share. These grants were the only ones issued by the Compensation Committee at that time of year. The usual practice by the Compensation Committee was to grant stock options to Galena's officers and directors in January of a calendar year. The options granted in November 2013 vested on February 26, 2014, shortly before the eight-month DreamTeam promotional campaign was scheduled to end.

By early January 2014, Galena's stock price had risen significantly. In October 2013 it traded at between $2 and $3 per share. By January 2014, it more than doubled and traded at between $5 and $7 per share.

As alleged in the Amended Complaint, at the beginning of 2014 Defendants had reason to believe that the stock promotion deal with DreamTeam could be discovered at any time, so most of them engaged in a significant number of high-volume, single-day sales of their personally-held Galena stock. In a period of less than one month, between January 17, 2014 and February 12, 2014 (a period of eighteen trading days), many Defendants sold more than a total of 2.9 million shares, collectively receiving proceeds of more than $16 million. Specifically, Ahn sold approximately 800,000 shares for proceeds of approximately $3.8 million; Schwartz, sold 100,000 shares for proceeds of approximately $557,000; Hillsberg sold 450,000 shares for proceeds of approximately $2.7 million; director Steven Kriegsman sold 600,000 shares for proceeds of approximately $3.8 million; Chin sold 262,500 shares for proceeds of approximately $1.2 million; Galliker sold 300,000 shares for proceeds of approximately $1.2 million; and Nisi sold 450,000 shares for proceeds of approximately $2.7 million.[2] The Amended Complaint alleges that these were direct sales and were not pursuant to any pre-arranged Rule 10b5-1

---

[2] The Amended Complaint does not specifically allege any improper sale of shares and related proceeds by Defendants Dunlap or Ashton.

trading plan and that none of the selling Defendants had engaged in open market sales of Galena stock during the four years before January 2014.

On February 12, 2014, the last day any of the Defendants sold their personally-held stock, Adam Feuerstein published an online article on *TheStreet.com*, titled "Galena Biopharma Pays for Stock-Touting Campaign While Insiders Cash Out Millions." In his article, Mr. Feuerstein alleged that Galena was engaging in a misleading brand-awareness campaign aimed at boosting its stock price. The article also reported that Galena had paid DreamTeam to publish articles promoting the Company's stock without disclosing who paid for those articles. On this news, Galena's stock dropped $0.85 per share to close at $4.34 per share on February 12, 2014, a one-day decline of 16 percent.

Two days later, on February 14, 2014, *Seeking Alpha* published another article, titled "A Deeper Look at the Galena Biopharma Controversy," which noted that "the company's monstrous rise appeared to occur without a catalyst" and that "[l]ogic thus dictates that this meteoric rise was primarily the result of promotional efforts by DreamTeam, and had little to do with a change in the underlying fundamentals of the company." That same day, Ahn issued a letter to Galena's shareholders to "set the record straight," admitting that the Company had paid DreamTeam to promote the Company's stock and that company insiders had divested shares in mid-January 2014 and denying all other allegations. Galena's stock dropped $0.63 per share to close at $3.73 per share on February 14, 2014, a one-day decline of 14 percent. Thus, during the one-month period between January 16, 2014 and February 14, 2014, Galena's share price fell by approximately 50 percent from its all-time high of $7.48 per share.

On February 18, 2014, Mr. Feuerstein responded to Ahn's letter in an article, titled "Galena's CEO's Response to Stock Promotions Leaves Questions Unanswered." The article

highlighted what Mr. Feuerstein considered to be inconsistencies and unanswered questions. For example, Mr. Feuerstein questioned why, if there was nothing improper with DreamTeam's services provided to Galena, did DreamTeam, after its relationship with Galena became public, try to remove all evidence of DreamTeam's services from the internet by deleting articles, blogs, comments, Twitter feeds, and the compensation disclosure noting the $50,000 payment made by Galena. Mr. Feuerstin also questioned Ahn's inconsistent statements about why he sold his Galena shares—explained on February 4, 2014 as to "diversify for my family" and explained after the DreamTeam story broke that company insiders were prohibited from selling shares earlier because Galena was in negotiations to acquire Mills Pharmaceuticals.

On March 13, 2014, financial analyst and author Richard Pearson published the results of his investigation into the relationship between Galena, CytRx Corp., and DreamTeam on *Seeking Alpha* in an exposé, entitled "Behind the Scenes with Dream Team, CytRx and Galena." The article detailed Mr. Pearson's findings after going "undercover" as a writer for DreamTeam assigned to promote Galena. Mr. Pearson's article stated that Defendants approved all articles written about Galena before the articles were published. Mr. Pearson opined that Galena's "[m]anagement will have a very difficult time convincing investors that 'we didn't know'" and that "it seems no coincidence that there appears to have been great urgency to get these articles in almost exact proximity to sales/issuances of stock by insiders and the companies at both Galena and CytRx." Mr. Pearson concluded that "[t]he promotional articles and the paid retention of the Dream Team Group were coordinated with the release of news and data from the companies such that they coincided with the share prices of both stocks rising dramatically."

On March 17, 2014, two trading-days after the publication of the Pearson exposé, Galena announced that it was under investigation by the SEC, stating in its 10-K regulatory filing: "In

February 2014, we learned that the SEC is investigating certain matters relating to our company and an outside investor-relations firm that we retained in 2013. We have been in contact with the SEC staff through our counsel and are cooperating with the investigation." Upon disclosure of the SEC investigation, Galena's common stock share price dropped to $2.68, representing a 16.5 percent loss in market capitalization in a single day.

On August 21, 2014, Galena issued a press release stating that Ahn "resigned as the President and CEO and as a director of the company to pursue other long held personal and professional goals." The same day *TheStreet.com* reported, based on the account of "a source close to the company," that Ahn had been "fired" by the Board at a "special meeting" held on August 18, 2014.

**B.  Galena's Appointment of the Special Committee**

On February 17, 2014, three days after Ahn's letter to shareholders discussing the allegations of wrongdoing and before any lawsuits had been filed, Galena's Board formed a Special Committee of the Board of Directors ("Special Committee"), consisting of Defendants Kriegsman, Galliker, Ashton, and Hillsberg to investigate the allegations of wrongdoing being reported in the press. On or about February 27, 2014, the first lawsuit was filed against Galena: a shareholder derivative action filed in the Circuit Court of the State of Oregon for the County of Multnomah. On March 5, 2014, a securities class action was filed in this Court, and on March 7, 2014, the first lawsuit in this consolidated derivative action was filed. Additional securities class action lawsuits were filed in this Court on March 10, 2014 and March 12, 2014. On March 14, 2014, Irving Einhorn joined the Board of Directors of Galena. At approximately the same time that Einhorn joined the Board, the Special Committee was reconstituted to include only two members: Einhorn and Ashton (who had not sold any shares during the relevant period).

Additional lawsuits in this consolidated derivative action were filed on March 31, 2014, and one additional securities class action lawsuit was filed in this Court on April 4, 2014. The Special Committee investigated the allegations contained in the press reports and the allegations of the derivative and class action complaints filed in this Court and the Multnomah County Circuit Court.[3]

The Special Committee consisting of Einhorn and Ashton investigated for approximately four months. The investigation included interviewing numerous employees, officers, and directors of Galena and reviewing more than 140,000 pages of documents. On July 15, 2014, the Special Committee of Einhorn and Ashton issued their report to Galena's Board.[4] The report contained the following findings of fact by the Special Committee, as relevant to this case: (1) they found no evidence that Galena was aware that DreamTeam paid persons to write online articles or send emails favorable to Galena or its products; (2) they found no evidence that Galena was aware that persons affiliated with DreamTeam used multiple aliases when writing about Galena; (3) they found no evidence that Galena hired DreamTeam with the specific intent to increase the price of Galena's stock; (4) they found no evidence that articles allegedly written at the direction of DreamTeam contained false or misleading statements of material fact; (5) they

---

[3] In May and June of 2014, additional derivative actions were filed in the Delaware Court of Chancery. The Special Committee did not specifically investigate the allegations of the Delaware complaints, although many of the underlying facts are the same as alleged in the Oregon actions.

[4] It appears that the report by the Special Committee was not made public until September 25, 2014, when Galena posted a copy of the report on its public website and issued a press release regarding the report. *See* http://galenabiopharma.com/special-committee-report/ (last visited on October 19, 2014). A complete copy of the report, including appendices but excluding exhibits, is attached as an Appendix to this Opinion and Order. Although Galena had filed its second quarter 2014 Form 10-Q on August 11, 2014, disclosing that the Special Committee had completed its investigation, that filing failed to disclose the Special Committee's conclusions or the existence of the July 15, 2014 report. The Form 10-Q did, however, disclose that Einhorn had been appointed as a single-member SLC.

found no substantial evidence that the articles allegedly written at the direction of DreamTeam had a material effect on the price of Galena's stock; (6) they found no evidence that, with the exception of Ahn, Galena insiders had knowledge of DreamTeam's activities before trading Galena's stock; (7) they found no evidence that Galena's officers and directors had material nonpublic information before trading in Galena's stock; and (8) they found no evidence that the trades by officers and directors in the first quarter of 2014 violated any company policy. Based on these findings of facts, the Special Committee of Einhorn and Ashton concluded that there is no credible basis for finding that Galena or its officers and directors violated applicable law or that the officers and directors breached their fiduciary duties as alleged in the Oregon derivative and class action complaints. The Special Committee also recommended that Galena should not pursue claims against any person or entity as a result of the findings of the investigation.

## C.  Galena's Appointment of the Special Litigation Committee

On July 21, 2014, six days after the Special Committee of Einhorn and Ashton issued the report concluding that Galena and its officers and directors did not violate any law or breach any applicable fiduciary duties and that the company should not pursue any litigation, Galena's Board disbanded the Special Committee. The Board then appointed a new, "fully empowered" single-member SLC consisting only of Einhorn. This single-member SLC was authorized by the Board to: (1) investigate and evaluate the allegations and issues raised in the lawsuits filed in both Oregon and Delaware; (2) prepare reports, arrive at decisions, and take other actions in connection with these lawsuits as the SLC deems appropriate and in the best interests of Galena and its stockholders, in accordance with Delaware law; and (3) engage accountants and advisors, including independent legal counsel, that the SLC deems necessary or desirable in order to assist it in the discharge of its responsibilities.

In August 2014, the SLC retained the law firm of Young, Conaway, Stargatt & Taylor, LLP to act as its counsel. The SLC, with the assistance of its counsel, has begun to investigate the allegations contained in the various lawsuits.

## D. Additional Procedural History

On August 6, 2013, Galena's Board amended Galena's bylaws through unanimous written consent of the Board, adding a forum selection clause. On April 18, 2014, Galena filed a motion to dismiss this consolidated derivative action, asserting that the forum selection clause adopted by the Board was valid and enforceable and required dismissal of the action before this Court. After this motion was fully briefed, but six days before oral argument, the Court asked the parties to "address the process and timing by which Galena shareholders can amend or repeal a bylaw amendment and the date of the Galena annual meeting." Galena then withdrew its motion to dismiss. Under Delaware law a board is prohibited from unilaterally amending a corporation's bylaws unless the company's Certificate of Incorporation specifically allows such an amendment. As Plaintiffs have now explained, in Galena's Certificate of Incorporation there is no such authority for the Board unilaterally to amend Galena's bylaws; instead, the Certificate requires a shareholder vote with not less than 75 percent voting to approve any proposed amendment to the bylaws.

## DISCUSSION

Galena moves to stay this action so that the single-member SLC consisting of Mr. Einhorn can conduct and conclude its investigation. Delaware law has a strong presumption that derivative litigation should be stayed pending an SLC investigation. *See, e.g.*, *Biondi*, 820 A.2d at 1163 (noting that "the general rule under Delaware law is that a stay must be granted when a special litigation committee is formed to consider whether derivative actions should be prosecuted"); *In re Oracle*, 808 A.2d at 1211 ("[T]his court has acknowledged its duty to stay

derivative actions at the instance of a special litigation committee, 'pending the investigation and report of the Committee. . . .'") (citations omitted); *Kaplan*, 484 A.2d at 510 ("It is a foregone conclusion that such a stay must be granted. Otherwise, the entire rationale of *Zapata*, i.e., the inherent right of the board of directors to control and look to the well-being of the corporation in the first instance, collapses."). As explained by the Delaware Chancery Court:

> If *Zapata* is to be meaningful, then it would seem that such an independent committee, once appointed, should be afforded a reasonable time to carry out its function. It would likewise seem reasonable to hold normal discovery and other matters in abeyance during this interval. If a derivative plaintiff were to be permitted to depose corporate officers and directors and to demand the production of corporate documents, etc. at the same time that a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation to permit the suit to go forward, the very justification for the creating of the litigation committee in the first place might well be subverted. Likewise, in effect, it would likely amount to simultaneous discovery of the same persons and materials by two separate sources, both allegedly acting on behalf of the corporation.

*Abbey*, 457 A.2d at 375.

Although granting a motion to stay a derivative action pending an SLC investigation is the general rule, there are limited exceptions to that rule. The Delaware Chancery Court has discussed at length the essentially discretionary nature of a trial court's decision to stay an action, and noted that Delaware courts have strayed from that principle in articulating a seemingly firm rule favoring stays. *Carlton, Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1996 WL 33167168, at *8 (Del. Ch. June 6, 1996); *see also Biondi*, 820 A.2d at 1165 n.42 (noting that *Carlton* demonstrated that there are exceptions to the general rule favoring stays). The court in *Carlton* noted that the decision whether to grant a stay involves balancing the equities and denied the motion to stay because the equities favored continuing the litigation in light of the length of time

the litigation had been pending, the discovery and motions practice that had occurred, and the

resources expended litigating the case. *Carlton*, 1996 WL 33167168, at *9-10.

The Delaware Chancery Court also denied a motion to stay pending an SLC investigation

where it appeared at the time of the application for stay that any later conclusion by the SLC that

a lawsuit would not be in the company's best interest would not withstand judicial review.

*Biondi*, 820 A.2d at 1165. In *Biondi*, the court found that because the chairman of the SLC

previously had publicly commented that the findings of an investigation by a law firm that had

been retained by the company (and was not affiliated with the SLC) "puts to rest any question"

of wrongdoing by one of the company insiders that the SLC was charged with investigating, any

future decision by the SLC would not withstand scrutiny because "there will always be a

reasonable doubt that its investigation was designed to paper a decision that had already been

made." *Id.* at 1166 ("How can the court and the company's stockholders reasonably repose

confidence in an SLC whose Chairman has publicly and prematurely issued statements

exculpating one of the key company insiders whose conduct is supposed to be impartially

investigated by the SLC? The answer is that they cannot."); *see also London v. Tyrrell*, 2010 WL

877528, at *16 (Del. Ch. Mar. 11, 2010) ("In sum, the independence inquiry under *Zapata* is

critically important if the SLC process is to remain a legitimate mechanism in our corporate law.

SLC members should be selected with the utmost care to ensure that they can, in both fact and

appearance, carry out the extraordinary responsibility placed on them to determine the merits of

the suit and the best interests of the corporation, acting as proxy for a disabled board." (footnote

and citation omitted)). The court in *Biondi* denied the motion to stay, finding that it would be

"wasteful to stay litigation" for an investigation that could announce support for litigating the

derivative suits but could not issue "a contrary decision to terminate the litigation" because such

a decision "must necessarily be rejected because the SLC cannot demonstrate its independence." *Biondi*, 820 A.2d at 1166.

Galena argues in its reply brief that the "unique circumstances" of *Biondi* are not present in this case. Galena fails to mention, however, the fact that the earlier two-member Special Committee, of which Einhorn was one of only two members, issued a report exonerating the company insiders from any wrongdoing.[5] The Court disagrees with Galena's argument that the "unique circumstances" of *Biondi* are not present in this case.

In *Biondi* the SLC consisted of more than one person, while here there is only a single member, Einhorn. In *Biondi*, the court was concerned about one of the SLC members who, before the SLC completed its investigation, made a public statement that an investigation by a separate law firm "puts to rest" the allegations of wrongdoing by the company insider. Here, the sole member of the SLC, Einhorn, did not merely comment on an outside investigation, but conducted an investigation as part of the two-person Special Committee and issued a report finding that the company insiders did not engage in the wrongdoing as alleged in this case. This report recommended that the company not pursue any litigation. Six days after issuing this

---

[5] Additionally, in support of its motion to stay, Galena filed the affidavit of Irving M. Einhorn. In his affidavit, Einhorn explains that in February 2014 Galena's Board created a Special Committee of four directors to investigate the allegations of wrongdoing and report back to the Board its findings and recommendations. After Einhorn joined the Board on March 14, 2014, the Special Committee was "reconstituted" by the board to include only Einhorn and Board member William Ashton. Einhorn further explains in his affidavit that on July 21, 2014, "the Board determined to disband the special committee and to appoint in its place a fully empowered Special Litigation Committee (the 'SLC') of the Board, with me as its sole member." Mr. Einhorn in his affidavit, and Galena in its motion to stay, however, did not disclose to the Court that just six days before the Board disbanded the Special Committee consisting of Einhorn and Ashton, that same two-person Special Committee delivered to Galena's Board the Special Committee's report dated July 15, 2014, containing the findings and recommendations of Einhorn and Ashton described above. *See* Appendix. For the reasons explained in this Opinion and Order, the Court considers the existence of the July 15, 2014 report from Einhorn and Ashton, including its findings and recommendations, to be material to the Court's decision on the pending motion to stay.

report, Einhorn was appointed as the sole member of the SLC. Galena now asks the Court to delay three months so that Einhorn can conduct another investigation into the conduct alleged in this case. Einhorn has, however, already investigated the conduct alleged in this case and reached a conclusion regarding the very issue that he, as the sole member of the SLC, is now tasked to investigate.

The Court finds that it is unlikely that any future decision by the SLC to terminate this litigation will withstand scrutiny under *Zapata*. As in *Biondi*, here the Court and Galena's stockholders cannot "reasonably repose confidence in an SLC" whose sole member has "publicly and prematurely issued statements exculpating" the alleged wrongdoers "whose conduct is supposed to be impartially investigated by the SLC[.]" *Biondi*, 820 A.2d at 1266. It would be difficult for Galena to meet its burden to prove that Einhorn, as the SLC, conducted an objective, reasonable, and independent investigation done in good faith, after having already formed judgment as part of the two-member Special Committee. *See id.*; *see also Booth*, 640 F.3d at 145 (noting that "the mere appearance of the special litigation committee's lack of independence is enough to deny [the defendant's] motion based on the special litigation committee's recommendation and allow the derivative suit to proceed"); *London*, 2010 WL 877528, at *15 ("When SLC members are simply exposed to or become familiar with a derivative suit before the SLC is formed this may not be enough to create a material question of fact as to the SLC's independence. But if evidence suggests that the SLC members prejudged the merits of the suit based on that prior exposure or familiarity, and then conducted the investigation with the object

of putting together a report that demonstrates the suit has no merit, this will create a material question of fact as to the SLC's independence.").[6]

Further, under Delaware law, "the sole member of a one-person special committee [must] meet unyielding standards of diligence and independence." *Sutherland v. Sutherland*, 2007 WL 1954444, at *3 n.10 (Del. Ch. July 2, 2007). As the Delaware Chancery Court has warned, "[i]f a single member committee is to be used, the members should, like Caesar's wife, be above reproach." *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985). Here, because Einhorn has already conducted an investigation, issued a report to the Board as part of the two-person Special Committee, and publicly announced his conclusion that the Galena insiders did not engage in any wrongdoing, Einhorn fails an "unyielding" evaluation of his independence and objectivity to proceed with the SLC investigation. *Sutherland*, 2007 WL 1954444, at *3 n.10.

/ / /

---

[6] Galena also cites to an opinion in the consolidated derivative actions against it pending in the Delaware Court of Chancery. That case involves many of the same facts alleged in the case before this Court. Galena notes that the Delaware Court of Chancery stayed that consolidated derivative action in support of Galena's argument before this Court that a stay is appropriate. Galena did not provide the Court with a copy of the Delaware Court of Chancery's order. The Court takes judicial notice of the Order and the related briefing filed before the Delaware Court of Chancery, Consolidated Case No. 9715-VCN. In the Delaware case, unlike in this Case, the stay was agreed upon and jointly submitted by the parties. The Delaware order states that "Plaintiffs, Galena, and the SLC . . . agreed to resolve the motion to stay. . . ." Although the Court does not rely on the Delaware Chancery Court order or the stipulation of the parties in that case in resolving this pending motion, the Court notes that nothing filed with the Delaware Court of Chancery in connection with the motion to stay discloses the July 15, 2014 report of the two-member Special Committee. If any party believes that the Court has not properly taken judicial notice of the documents filed before the Delaware Court of Chancery, that party has leave to seek reconsideration of this portion of the Court's Opinion and Order. *See* Fed. R. Evid. 201(e).

**CONCLUSION**

Galena's motion to stay (Dkt. 38) is DENIED.

**IT IS SO ORDERED**.

DATED this 22nd day of October, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

**APPENDIX**

# REPORT TO THE BOARD OF DIRECTORS OF GALENA BIOPHARMA, INC. REGARDING THE 2012-2014 MARKET VISIBILITY CAMPAIGNS AND THE SALES BY INSIDERS IN THE FIRST QUARTER OF 2014

## July 15, 2014

### SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS

William L. Ashton
Irving M. Einhorn

### COUNSEL TO THE SPECIAL COMMITTEE

Locke Lord LLP

Michael F. Perlis
Christopher Lee
Lilian M. Khanjian

### Privileged and Confidential:

Protected by Attorney-Client Privilege and as Attorney Work Product

# TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ...........................................................................................1

II.  SCOPE AND METHODOLOGY OF INVESTIGATION ...................................6

    A.   Mandate From The Board.............................................................................6

    B.   Document Review.........................................................................................7

    C.   Witness Interviews.......................................................................................7

    D.   King & Spalding LLP's Role........................................................................9

    E.   Key Members Of The Investigative Team...................................................9

III. FINDINGS OF FACT: THE COMPANY'S USE OF INVESTOR RELATIONS
     FIRMS.......................................................................................................................11

    A.   DTG .............................................................................................................11

         i.   Movement Of The Price Of The Company's Stock.............................18

         ii.  The Insiders' Knowledge Of DTG's Activities ..........................21

    B.   Lidingo Holdings LLC.................................................................................22

         i.   The Company's Grant Of Stock Options To Lidingo................................25

    C.   Section 17(b) of the Securities Act of 1933 ................................27

IV.  FINDINGS OF FACT: SALES OF COMPANY'S STOCK BY INSIDERS IN 2014.....28

    A.   The Company's Insider Trading Policy ....................................................28

    B.   The Sales By Insiders.................................................................................32

    C.   Possession Of Material Nonpublic Information ...............................34

V.   RECOMMENDATIONS ..........................................................................................36

APPENDIX I ........................................................................................................................37

APPENDIX II .......................................................................................................................38

APPENDIX III......................................................................................................................39

APPENDIX IV......................................................................................................................40

APPENDIX V .......................................................................................................................42

APPENDIX VI......................................................................................................................43

## I.     EXECUTIVE SUMMARY

On February 12, 2014, Adam Feuerstein, staff writer for the website TheStreet, published an article reporting that the website Seeking Alpha had removed two articles touting Galena Biopharma, Inc. (the "Company" or "Galena") from its website because the articles were written by the same person using different aliases.[1]  Mr. Feuerstein made a similar report a year earlier, writing that Seeking Alpha removed five articles touting the Company from its website because the articles were written by a single individual using three pseudonyms.[2]  Mr. Feuerstein, however, claimed that this time there was evidence linking the articles to an investor relations firm the Company had retained known as the Dream Team Group ("DTG").[3]

Mr. Feuerstein reported that DTG had disclosed that the Company had paid it $50,000 in July of 2013 for 240 days of "advertising, branding, marketing, investors relations, and social media services" on its website.[4]  Based on a document obtained by TheStreet titled "Galena Biopharma Case Study: Investor Awareness Campaign," he concluded that DTG wrote several favorable articles about the Galena under the guise of individual investors.[5]  Mr. Feuerstein emphasized that none of the articles disclosed a financial relationship between DTG and the Company.[6]  Mr. Feuerstein conceded, however, that Seeking Alpha never determined if DTG paid the bloggers allegedly using multiple aliases.[7]  He ultimately concluded that the articles allegedly written at the direction of DTG must have been the cause for the dramatic increase in value of the Galena's stock over the previous eight months.[8]

Shortly thereafter, Richard Pearson, a frequent blogger, published an article on Seeking Alpha claiming that he had been approached by DTG to write paid promotional articles about

---

[1] Ex. 2. Article titled "Galena Biopharma Pays For Stock-Touting Campaign While Insiders Cash Out Millions" by Adam Feuerstein dated February 12, 2014.
[2] Ex. 1. Article titled "Seeking Alpha Author Used Multiple Aliases To Tout Biotech Stocks" by Adam Feuerstein dated January 28, 2013
[3] Ex. 2. Article titled "Galena Biopharma Pays For Stock-Touting Campaign While Insiders Cash Out Millions" by Adam Feuerstein dated February 12, 2014.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*

two of its clients, including the Company.[9] According to Mr. Pearson's account, Tom Meyer, his contact at DTG, offered to pay him $300 per article written about the Company.[10] Mr. Pearson wrote that he soon discovered that Mr. Meyer, who claimed to write paid promotional articles about the Company himself, used a slew of aliases when writing about the Company.[11] These aliases included Christine Andrews, John Rivers, James Ratz, James Johnson, Ted Meyer, Wonderful Wizard, Equity Options Guru, Kingmaker, and Expected Growth.[12] Mr. Pearson further wrote that, through Mr. Meyer, he met John Mylant, another of DTG's alleged paid promotional bloggers.[13]

As his article read, in order to investigate the extent of management's involvement in the "paid promotion scheme," Mr. Pearson began submitting "dummy articles" regarding Galena and another company to DTG.[14] His payments, he claimed, were conditioned on two prerequisites: the Company "signing off" and "editing" the articles and his ability to keep the payments a secret.[15] According to Mr. Pearson, he played along in his self-described undercover role and submitted at least two separate articles to DTG.[16] One company, Mr. Pearson wrote, heavily edited his article while, in contrast, the article he submitted about Galena to DTG was allegedly cancelled by Galena before publication.[17] Mr. Pearson attributed the cancellation to the publication of the Feuerstein article and the subsequent public scrutiny that followed.[18] In the end, Mr. Pearson concluded that the articles allegedly written at the direction of DTG, such as those written by Mr. Meyer and Mr. Mylant, had an "enormous effect" on the companies' stock prices.[19] Since the publication of Mr. Pearson's article, he has come under criticism for shorting the other company's stock before publishing his scathing article and for denying that he

---

[9] Ex. 3. Article titled "Behind The Scenes With Dream Team, CytRx And Galena" by Richard Pearson dated March 13, 2014.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

previously published articles touting Galena.[20] It has since been discovered that he touted the Company in a January 27, 2014 article.[21]

The publication of the Feuerstein and Pearson articles, along with the public disclosure that officers and directors of the Company had sold a large number of shares of the Company's stock just before the publications, led to a cascade of derivative and class actions tying the events to an alleged "pump and dump" scheme by insiders.[22] In response to the articles and complaints, the Board of Directors of the Company (the "Board") formed a Special Committee charged with determining the merits of the articles and complaints. The Special Committee thereafter retained Locke Lord LLP as counsel and began an investigation.

This report memorializes the findings of the Special Committee's investigation, which included the interviews of numerous employees, officers, and directors and the review of over 140,000 pages of documents. Although the Special Committee lacked subpoena power, we believe that we obtained sufficient information to make the following findings of fact:

(1) We found no evidence that the Company was aware that DTG paid bloggers[23] to write favorable articles about the Company or its products;

(2) We found no evidence that the Company was aware that certain bloggers used multiple aliases when writing about the Company;

(3) We found no evidence that the Company hired DTG with the specific intent to increase the price of the Company's stock, although DTG apparently used the Company's stock price as a measure of its effectiveness;

(4) We found no evidence that articles allegedly written at the direction of DTG contained false or misleading statements of material fact;

(5) We found no substantial evidence that the articles allegedly written at the direction of DTG had a material effect on the price of the Company's stock;

---

[20] Ex. 166. Article titled "At Financial News Sites, Stock Promoters Make Inroads" dated March 20, 2014; Ex. 4. Article titled "3 Oncology Biotechs To Watch" by Richard Pearson dated January 27, 2014.
[21] Id.
[22] Exs. 41-50. Class action and derivative complaints filed on various dates.
[23] The term "bloggers" as used in this report means authors that wrote articles or email blasts on non-DTG affiliate websites without indicating that the communication was on behalf of DTG or that they were an employee of DTG.

(6) We found no evidence that, with the exception of Mark Ahn, insiders[24] had knowledge of DTG's activities before trading in the Company's stock;

(7) We found no evidence that officers and directors had material nonpublic information before trading in the Company's stock; and

(8) We found no evidence that the trades by officers and directors in the first quarter of 2014 violated Company policy.

Based on these findings of fact, we conclude that there is no credible basis for finding that the Company or insiders violated applicable law as alleged in the class and derivative actions or that insiders breached their fiduciary duties to the Company under any jurisdictional standard.  Moreover, we do not recommend that the Company pursue claims against any person or entity as a result of the findings of this investigation.

During our investigation, we discovered that another of the Company's investor relations firms, Lidingo Holdings LLC ("Lidingo"), might have engaged in improper conduct relative to the payment of bloggers for promotional articles written about the Company.  As a result, the scope of our investigation expanded to include an analysis of whether the Company's retention and management of Lidingo violated any law or Company policy.  In connection with that analysis, we have made the following findings of fact:

(9) We found evidence that Lidingo paid bloggers to write promotional articles about the Company and that the Company was aware of this fact;

(10) We found evidence that Lidingo intended and claimed to have raised the Company's stock price through its efforts;

(11) We found that Mark Ahn granted stock options to Lidingo as part of its compensation for its services without Board approval, which is contrary to Company policy;

(12) We found no evidence that articles allegedly written at the direction of Lidingo had a material effect on the stock price; and

---

[24] The term "insiders" means the officers and directors who sold shares of Company stock in the first quarter of 2014.  Namely, Sanford Hillsberg, Steven Kriegsman, Stephen Galliker, Mark Ahn, Rudoplh Nisi, Richard Chin, and Mark Schwartz.

(13) We found no evidence that, with the exception of Mark Ahn, the selling directors had knowledge of Lidingo's activities before trading in the Company's stock.

Based on these findings of fact, we conclude that it is possible that Lidingo violated Section 17(b) of the Securities Act of 1933. Section 17(b) provides:

> It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

In 1998, the Director of the Securities and Exchange Commission's ("SEC") Division of Enforcement explained that Section 17(b) makes it unlawful for a person to publicize a security for payment unless the nature, amount, and source of the compensation is disclosed.[25]   The Director, however, stated that "[t]here is nothing illegal about companies paying fees to touters. The law requires the touters to disclose... The laws do not cover the companies themselves who make payments."[26]   Accordingly, we believe that the Company has limited, if any, exposure to liability under Section 17(b).

Although it was not our charge to determine whether insiders breached their fiduciary duties to the Company in connection with their involvement, if any, in the retention or management of Lidingo, we conclude that our findings of fact negate a finding that any officer or director breached their fiduciary duty to the Company in this regard with the possible exception of Mark Ahn.  The grant of stock options by Mr. Ahn to Lidingo was unauthorized, but even if this unauthorized act were to rise to the level of a breach of fiduciary duty, we conclude that the

---

[25] Ex. 167. Article titled "SEC Cracks Down On Internet Stock Fraud" dated October 29, 1998; *see also generally* Ex. 57.  SEC Press Release 98-117.
[26] *Id.*

Company suffered no appreciable harm from the grant. Indeed, the Company received monies when Lidingo exercised certain of its options and Mr. Ahn made the grant of options in return for services he believed would benefit the Company, facts that militate against a finding that he breached his fiduciary duty to the Company. Thus, while the Company should take remedial measures to prevent a reoccurrence of a similar event, we do not recommend pursing a claim against Mr. Ahn.

## II.   SCOPE AND METHODOLOGY OF INVESTIGATION

By its investigation, the Special Committee, with the assistance of Locke Lord LLP, sought to determine: (i) whether the Company violated any law or internal policy in connection with its retention or management of DTG or Lidingo; (ii) whether DTG or Lidingo paid bloggers to write favorable articles about the Company, and, if so, whether the Company had knowledge of that fact; (iii) whether bloggers who wrote favorable articles about the Company used multiple aliases to pose as separate individuals, and, if so, whether the Company had knowledge of that fact; (iv) whether the Company retained DTG or Lidingo in order to manipulate the price of the Company's stock; and (v) whether the sales by officers and directors in the first quarter of 2014 violated any law or Company policy. Throughout the investigation, the Company provided unfettered access and cooperation.

### A.   Mandate From The Board

In response to the allegations made in the Feuerstein and Pearson articles, the Board voted unanimously to form a Special Committee charged with determining whether the Company violated any law or internal policy in connection with its retention and management of DTG or whether any Company insider traded on material non-public information in the first quarter of 2014.[27] The scope of the investigation expanded during its course to include a review of the Company's retention and management of Lidingo between 2012 and 2014. The Board originally appointed William Ashton, Steven Galliker, Sanford Hillsberg, and Steven Kriegsman as members of the Special Committee.[28] The Board later reconstituted the Special Committee to

---

[27] Ex. 24. Minutes of the Board dated February 17, 2014.
[28] *Id.*

6

consist of William Ashton and Irving Einhorn.[29]   The Special Committee retained Michael F. Perlis and the law firm of Locke Lord LLP as counsel.

## B.      Document Review

Locke Lord LLP reviewed approximately 140,000 pages of documents covering sixteen categories of documents.  This review included documents related to trades of the Company's stock by any director or officer in the first quarter of 2014, Board and committee minutes, Board and committee agendas, Board presentation materials, documents related to product progression, documents reflecting a change in the Board's composition, financial statements, analyst reports, insider trading policies, press releases, 10b5-1 plans, communications between the Company and the press, communications between the Company and analysts, communications between the Company and the Food and Drug Administration ("FDA"), communications between the Company and DTG, and communications between the Company and Lidingo.

## C.      Witness Interviews

The Company provided Locke Lord LLP with unlimited access to interview any Company employee, officer, or director.  After a review of the documents, we determined that an interview of twelve Company employees, officers, and directors was appropriate.[30]   Those interviewed were: Mark Ahn, Chief Executive Officer and Director; Mark Schwartz, Executive Vice President and Chief Operating Officer; Ryan Dunlap, Chief Financial Officer; Remy Bernarda, Vice President of Marketing and Communications; John Burns, Senior Manager of Finance; Angela DiPilato, Senior Accountant; Madeline Hatton, Manager of Operations and Administration; Sanford Hillsberg, Chairman of the Board; Richard Chin, Director; Steven Kriegsman, Director; Rudolph Nisi, Director; and Stephen Galliker, Director.  All of the interviews were conducted by two Locke Lord LLP attorneys and a member of the Special Committee.

As part of the investigation, we sought to interview the plaintiffs or counsel for plaintiffs in the derivative and class actions asserting allegations that the Company and its directors and

---

[29] Mr. Ashton and Mr. Einhorn's biographies can be found on pp. 9-10 of this report.
[30] Mark Ahn and Ryan Dunlap were interviewed twice by the Special Committee.

officers acted improperly in connection with the Company's retention and management of DTG and in their sales of Company stock in the first quarter of 2014.[31]   Plaintiffs' counsel either did not respond, declined to be interviewed, or proposed a quid pro quo in exchange for an interview.   With respect to the latter, counsel for plaintiffs Partik Rathore, Eleanor Werbowsky and Jeffrey Klein stated that they would only agree to be interviewed by the Special Committee if the Special Committee agreed to be interviewed by plaintiffs' counsel.[32]   The Special Committee did not believe plaintiffs' counsel's request was appropriate and, therefore, did not agree to the proposed arrangement.

We also attempted to interview analysts that covered the Company during the relevant time period.   Numerous analysts from various financial institutions, such as Roth Capital Partners, Maxim Group, Cantor Fitzgerald, and MLV & Co, reported on the Company's prospects and progression from 2012 to 2014.   We attempted to determine what, if any, influence the articles written by bloggers on websites such as TheStreet, Seeking Alpha, or Wall St Cheat Sheet had on their reports.   All of the analysts either declined to be interviewed or did not respond to our request.   Their unwillingness to be interviewed was understandable; however, common sense dictates that they did not rely on articles written by bloggers to formulate their opinions, and we found no evidence to the contrary.

We also attempted to interview two executives of DTG, Michael McCarthy, Managing Director, and Jamie Spangler, Business Development.   Counsel for DTG, Paul Huey-Burns of the law firm of Shulman Rogers, stated that Mr. McCarthy and Mr. Spangler would not agree to be interviewed, but that they would consider answering written questions.   On May 30, 2014, we submitted eight written questions to Mr. McCarthy and Mr. Spangler through counsel, including whether it was true that DTG paid certain bloggers to write articles about the Company; whether bloggers who wrote articles about the Company used multiple aliases in order to pose as multiple individuals; and whether the Company hired DTG to affect the Company's stock price, among

---

[31] Ex. 51. Letters from Locke Lord LLP to counsel for plaintiffs dated April 24, 2014.
[32] Ex. 52.  Letters from various counsel for plaintiffs on various dates.

8

others.[33]  On June 12, 2014, Mr. Huey-Burns informed us that Mr. McCarthy and Mr. Spangler denied any wrongdoing, but that they could not answer the questions in less than six weeks.[34] Three weeks later, we received a letter from Jacob Frenkel of Shulman Rodgers stating that since Mr. McCarthy and Mr. Spangler required additional time to provide responses, they decided to decline to respond rather than delay the completion of this report.[35]  Given the nature of the questions we propounded, we found the series of communications and requests for additional time to be disingenuous.

It is important to note that, after thoughtful consideration, we did not attempt to interview Mr. Feuerstein, Mr. Pearson, or representatives of Lidingo.  We concluded that Mr. Feuerstein and Mr. Pearson almost certainly published the full extent of their knowledge as to these matters in their articles.  Moreover, we concluded that, given the sensitive nature of the investigation, attempts to interview them could have led to an inappropriate disclosure of our investigation's progress.  With respect to Lidingo, we determined that we had reviewed documents sufficient to determine if the Company acted improperly in its retention or management of Lidingo.

### D.    King & Spalding LLP's Role

King & Spalding LLP is the Company's outside counsel in the class and derivative actions and the pending SEC investigation into related matters.  In that role, attorneys at King & Spalding LLP accompanied Company employees and certain directors during the interview process.  King & Spalding LLP also assisted Locke Lord LLP in gathering documents and information.

### E.    Key Members Of The Investigative Team

William L. Ashton is Chair of the Special Committee and a senior executive with more than twenty-eight years of experience in biotechnology and pharmaceutical leadership and management. Most recently, at Amgen, Inc., he served as Vice President of Corporate and Government Affairs and Vice President of Sales, and was directly responsible for product

---

[33]  Ex. 53.  Letter from Christopher Lee to Paul Huey-Burns dated May 30, 2014.
[34]  Ex. 54.  Email from Paul Huey-Burns to Michael F. Perlis dated June 12, 2014.
[35]  Ex. 68.  Letter from Jacob Frenkel to Michael F. Perlis dated July 8, 2014.

launches, as well as interaction with key government agencies including the Centers for Medicare and Medicaid Services. After retiring from Amgen, Inc., Mr. Ashton joined the University of the Sciences in Philadelphia where he currently serves as Associate Provost and Senior Vice President of Strategic Business Development, Founding Dean, Mayes College of Healthcare Business and Policy, and Assistant Professor of pharmaceutical business. Mr. Ashton joined the Board in 2013.

Irving M. Einhorn is a member of the Special Committee and a former Regional Administrator of the SEC's Los Angeles office where he oversaw the enforcement of regulatory responsibilities in Arizona, Nevada, Hawaii, and California. Before becoming Regional Administrator, Mr. Einhorn was an Assistant Chief Trial Attorney with the Division of Enforcement's Trial Unit. Mr. Einhorn joined the Board as a Director in 2014.

Michael F. Perlis is counsel to the Special Committee and a Partner at Locke Lord LLP.[36] Mr. Perlis is a former assistant director of the SEC's Division of Enforcement, where he investigated and prosecuted a wide range of cases including insider-trading matters, foreign payment cases, financial fraud cases, and cases relating to organized crime in legitimate business. During his tenure, Mr. Perlis reviewed over fifty internal investigations as part of the SEC's Voluntary Disclosure Program. Since 1980, he has defended numerous class actions, derivative actions and SEC enforcement proceedings. In these matters, he has represented directors, officers, corporations, accountants, and directors and officers liability and comprehensive general liability insurance carriers. He has also represented several special committees of boards of directors of companies in connection with internal investigations.

---

[36] Locke Lord LLP has never represented the Company, the Board, or any committee of the Board prior to this matter.

### III.    FINDINGS OF FACT: THE COMPANY'S USE OF INVESTOR RELATIONS FIRMS

The Company retained several investor/public relations firms between 2012 and 2014 to increase retail investor interest and public awareness of the Company as a whole.[37]    This investigation focused on two of those firms: DTG and Lidingo.

#### A.    DTG

In the summer of 2013, Mark Ahn asked Remy Bernarda, who had recently joined the Company on May 1, 2013, to interview several investor relations firms that could potentially increase the Company's public exposure.[38]    Ms. Bernarda interviewed three firms, including DTG, which specialized in social media.[39]    After interviewing the firms, Ms. Bernarda recommended to Mr. Ahn that the Company retain Tiberend Strategic Advisors ("Tiberend"), an investor relations firm specializing in life science companies.[40]    Ms. Bernarda was familiar with Tiberend and appreciated that Tiberend treated bloggers on websites like Seeking Alpha and Motley Fool like traditional journalists.[41]    Mr. Ahn accepted Ms. Bernarda's recommendation, and the Company retained the firm.[42]

Conversely, Ms. Bernarda advised Mr. Ahn against retaining DTG for various reasons, including because DTG proposed taking over the Company's social media websites, including its Facebook, LinkedIn, and Twitter accounts, which she believed might draw scrutiny from regulatory authorities.[43]    Notwithstanding this advice, Mr. Ahn decided to retain DTG on the Company's behalf.[44]    The Company executed two contracts with DTG.    The first on July 23,

---

[37] The Company's investor base consists of two constituencies: retail and institutional investors.    The market visibility campaign targeted retail investors in a highly competitive biotech market.

[38] Interview of Remy Bernarda dated May 20, 2014.

[39] Id.

[40] Id.; www.tiberend.com.

[41] Interview of Remy Bernarda dated May 20, 2014; Ex. 72.    Email from Remy Bernarda to Mark Ahn dated July 15, 2013.

[42] Interview of Remy Bernarda dated May 20, 2014.    Ex. 72.    Email from Mark Ahn to Remy Bernarda dated July 15, 2013.

[43] Interview of Remy Bernarda dated May 20, 2014; Ex. 72.    Email from Remy Bernarda to Mark Ahn dated July 15, 2013.

[44] Interview of Remy Bernarda dated May 20, 2014; Ex. 11.    Dream Team/Mission IR contract signed by Mark Ahn on July, 23 2013.

11

2013 at a rate of $25,000 per quarter for a contract period of ninety days.[45]   The second on December 3, 2013 at a rate of $25,000 per quarter for a contract period of one hundred and fifty days.[46]   These contractual payments were disclosed by DTG on its website, although the disclosure has since been removed.[47]   DTG informed Mr. Ahn that it had been advised by counsel that the disclosure of the payments was required under Section 17(b) of the Securities Act of 1933.[48]

Pursuant to the contracts, DTG agreed to profile the Company on its affiliate websites, which included MissionIR, Tiny Gems, and Small Cap Relations, among others.[49]   At the time, DTG boasted a network of over two dozen affiliate websites.[50]   DTG further agreed to leverage its online social network and to distribute articles to its blog and message platforms.[51]   There was no specific written agreement to connect the Company with bloggers who wrote articles for publication on non-Dream Team affiliated websites.[52]

The articles attributed to DTG we found generally fell into two categories.   The first category was articles written by DTG and published on its affiliate websites.   These articles did not disclose that DTG had been compensated by the Company.[53]   There was, however, a disclaimer link on the webpage that would connect to a compensation disclosure where a person could find the Company listed.[54]

The second category was articles written by bloggers for publication on non-affiliate websites such as Seeking Alpha.   DTG, through Michael McCarthy and Jamie Spangler, would email Mark Ahn and/or Remy Bernarda a draft of an article for editing and approval for

---

[45] Ex. 11.  Dream Team/Mission IR contract signed by Mark Ahn on July, 23 2013.
[46] Ex. 12.  Dream Team/Mission IR contract signed by Mark Ahn on December, 3 2013.
[47] Ex. 2.  Article titled "Galena Biopharma Pays For Stock-Touting Campaign While Insiders Cash Out Millions" by Adam Feuerstein dated February 12, 2014.
[48] Ex. 71. Email from Michael McCarthy to Mark Ahn dated February 11, 2014.
[49] Exs. 11 and 12. Dream Team/Mission IR contracts signed by Mark Ahn on July, 23 2013 and December 3, 2013, respectively.
[50] Ex. 14.  Printout of Dream Team Family of Business Brands webpage.
[51] Exs. 11 and 12. Dream Team/Mission IR contracts signed by Mark Ahn on July, 23 2013 and December 3, 2013, respectively.
[52] Id.
[53] Ex. 15.  Articles published on www. http://blog.dreamteamgroup.com/ on September 18, 2013.  Ex. 16.  Articles published on http://missionir.com/blog/ on September 29, 2013.
[54] See generally Ex. 13.  Printout of Dream Team Statements and Policies.

publication.[55]  The draft articles would not contain a by-line and DTG would not specify which websites would be publishing the articles.[56]  At first, Ms. Bernarda was surprised that DTG had requested that the Company review the drafts before publication.[57]  But in the end, Ms. Bernarda and Mr. Ahn  reviewed and edited some of the articles before publication.  Based on our review, however, Ms. Bernarda and Mr. Ahn reviewed the articles only for factual and typographical errors.[58]  We found no edits to content, substance, or style.  What was described in the Pearson article as editing appears to have been nothing more than proofreading.

Because most, if not all, of the articles written by the bloggers identified in the Feuerstein and Pearson articles were taken down from the internet before our investigation began, we were unable to determine whether the Company reviewed and approved the publication of all the articles at issue.  We were, however, able to confirm that the Company did review and approve for publication an article written by Tom Meyer on Wall St. Cheat Sheet titled "4 Reasons Why Galena Biopharma Is Headed Higher" and by John Mylant titled "Galena Biopharma Stock Grows On More Than Speculation."[59]  We were unable to compare the draft and final versions of Mr. Mylant's article, but with respect to Mr. Meyer's article, the Company made virtually no changes before its publication.[60]  Neither the draft nor the final version of Mr. Meyer's article included a disclosure that Mr. Meyer was paid by DTG to write the article.[61]

---

[55] *See, e.g.*, Ex. 81.  Email from Michael McCarthy to Remy Bernarda and Mark Ahn dated November 14, 2013; Ex. 92.  Email from Jonathan Keim to Mark Ahn dated November 25, 2013; Ex. 114. Email from Michael McCarthy to Remy Bernarda and Mark Ahn dated February 4, 2014.

[56] *Id.*

[57] Ex. 83.  Email from Remy Bernarda to Mark Ahn dated November 19, 2013.

[58] See, e.g., Ex. 94.  Email from Remy Bernarda to Jonathan Keim, Michael McCarthy and Mark Ahn dated December 3, 2013; Ex. 95. Email from Mark Ahn to Remy Bernarda, Jonathan Keim and Michael McCarthy dated December 3, 2013; Ex. 108.  Email from Remy Bernarda to Michael McCarthy dated January 22, 2014; Ex. 110. Email from Mark Ahn to Michael McCarthy dated January 31, 2014.

[59] Compare Ex. 7.  Article written by Tom Meyer titled "4 Reasons Why Galena Biopharma Is Headed Higher" dated December 4, 2013 with Exs. 94-95.  Emails from Remy Bernarda and Mark Ahn to Jonathan Keim and Michael McCarthy dated December 3, 2013; see also Ex. 110.  Email from Mark Ahn to Michael McCarthy and Remy Bernarda dated January 31, 2014.

[60] Exs. 94-95.  Emails from Remy Bernarda and Mark Ahn to Jonathan Keim and Michael McCarthy dated December 3, 2013; Ex. 110.  Email from Mark Ahn to Michael McCarthy and Remy Bernarda dated January 31, 2014.

[61] Ex. 7.  Article written by Tom Meyer titled "4 Reasons Why Galena Biopharma Is Headed Higher" dated December 4, 2013; Exs. 94-95.  Emails from Remy Bernarda and Mark Ahn to Jonathan Keim and Michael McCarthy dated December 3, 2013.

Importantly, of the six articles we were able to review, we found no false or misleading statement of material fact. Without a doubt, the articles generally favored the Company (and contained some "puffery"), but they highlighted facts that were publicly available at the time. The articles provided general information about the market and competitive landscape that was contemporaneously available in analyst reports.[62]

For example, the article titled "Galena Biopharma Presents An Attractive Investment Opportunity" by the Wonderful Wizard concerned the Company's 52-week stock performance, an analysis of the Company's product pipeline, and the market and competitive landscape.[63] The article's representation of the Company's publicly available stock performance was true. Further, the article's assertions concerning the Company's growing product pipeline were supported by the launch of Abstral, the status of NeuVax, and the Company's agreement with Teva Pharmaceuticals ("Teva") to commercialize NeuVax, all events that had been publicly disclosed in press releases and SEC filings.[64] The article described market conditions by citing to data concerning breast cancer from sources such as the National Cancer Institute and American Cancer Society. Those figures were cited elsewhere and appear to have been accurate.[65] The remainder of the article was statements of opinion and not fact.

Similarly, the article titled "Will Galena Biopharma Triple Soon?" by James Katz concerned Abstral sales, partnerships, NeuVax enrollment, and the progress of the Company's Folate Binding Protein.[66] The information contained in the article such as the results of Phase 1 and 2 trials for NeuVax, enrollment of patients in the Phase 3 trial of NeuVax, the Company's

---

[62] Exs. 119-125, 127-129, 131-135, 137-142, 144, 148, 150, 153, and 156. Analyst reports dated variously.

[63] Ex. 5. Article titled "Galena Biopharma Presents An Attractive Investment Opportunity" dated August 3, 2013.

[64] Ex. 73. Press release dated March 18, 2013 titled "Galena Biopharma Acquires Abstral(R) (fentanyl) Sublingual Tablets in U.S., a Novel, Best-in-Class Treatment Approved for Breakthrough Cancer Pain"; Ex. 77. Press release dated December 7, 2012 titled "Galena Biopharma Presents Final Landmark 60-Month Results From NeuVax(TM) Phase 1/2 Trials at the 35th Annual CTRC-AACR San Antonio Breast Cancer Symposium"; Ex. 78. Press release dated December 4, 2012 titled "Galena Biopharma Announces Signature of Commercialization Partnership With Teva for Israel".

[65] Ex. 79. "Childhood Cancer Statistics, Research Funding Statistics" as provided by American Child Cancer Organization; Ex. 98. "Cancer Facts and Figures 2013", American Cancer Society, 2013; Ex. 77. Press release dated December 7, 2012 titled "Galena Biopharma Presents Final Landmark 60-Month Results From NeuVax(TM) Phase 1/2 Trials at the 35th Annual CTRC-AACR San Antonio Breast Cancer Symposium".

[66] Ex. 6. Article titled "Will Galena Biopharma Triple Soon?" dated November 12, 2013.

14

partnership with Teva, and the results of the Phase 1 trial for Folate Binding Protein all appear to be sourced from publicly available documents such as Company press releases and filings.[67] The article further provided some revenue projections based on certain assumptions, but the projections were in-line with analyst reports.[68] We found no misstatement of material fact in the article.

An article written by Kingmaker and titled "Galena BioPharma Continues to Develop a Deep Pipeline of Products" tracked the previous articles in highlighting facts that were also available in Company press releases.[69] The article summarized the Phase 1 trial results for Folate Binding Protein and included data matching the data available in the Company's November 11, 2013 press release.[70] The article also described the Company's stock price movement, third quarter financial results, and upcoming NeuVax enrollment, all of which are accurate and publicly available.[71]

In his article, "4 Reasons Why Galena Biopharma is Headed Higher," Tom Meyer generally discussed the appreciation of the Company's stock price and the launch of Abstral.[72] The articles outlined several factors that positioned the Company for growth, including analyst coverage, institutional holdings, and Abstral. With respect to analyst coverage, Mr. Meyer noted that Oppenheimer & Company issued an outperform rating for the Company on November 26, 2013. This was a true statement.[73] With respect to institutional holdings, Mr. Meyer further wrote that institutions held approximately 17% of the Company's outstanding shares. This was

---

[67] Ex. 73. Press release dated March 18, 2013 titled "Galena Biopharma Acquires Abstral(R) (fentanyl) Sublingual Tablets in U.S., a Novel, Best-in-Class Treatment Approved for Breakthrough Cancer Pain"; Ex. 77. Press release dated December 7, 2012 titled "Galena Biopharma Presents Final Landmark 60-Month Results From NeuVax(TM) Phase 1/2 Trials at the 35th Annual CTRC-AACR San Antonio Breast Cancer Symposium"; Ex. 78. Press release dated December 4, 2012 titled "Galena Biopharma Announces Signature of Commercialization Partnership With Teva for Israel"; Ex. 87. Article titled "The Cancer Pain Drug Market" dated November 17, 2009.

[68] Ex. 136. Needham Analyst Report titled "Neuvax Remains Key Driver" dated November 7, 2013. Ex. 137. Noble Financial Analyst Report titled "For Galena, the value driver is the lead NeuVax program" dated November 8, 2013.

[69] Ex. 88. Article titled "Galena Biopharma Continues to Develop a Deep Pipeline of Products" dated November 22, 2013.

[70] Ex. 89. Press release titled "Galena Biopharma Announces Initial Results From the Folate Binding Protein Vaccine Phase 1 Trial at the Society for Immunotherapy of Cancer Conference" dated November 11, 2013.

[71] Ex. 90. Press Release titled "Galena Biopharma Reports Third Quarter 2013 Results" dated November 6, 2013. Ex. 91. Press release titled "Galena Biopharma Initiates Patient Enrollment in NeuVax(TM) Phase 3 PRESENT Trial to Prevent Breast Cancer Recurrence" dated January 20, 2012.

[72] Ex. 7. Article titled "4 Reasons Why Galena Biopharma Is Headed Higher" dated December 4, 2013

[73] Ex. 143. Analyst report by Oppenheimer & Company dated November 26, 2013.

also a true statement.[74]   With respect to Abstral, Mr. Meyer accurately repeated statistics concerning the cancer drug market from a consulting company, Decision Resources.[75]   We found no misstatement of material fact.

In "Galena Biopharma Has Promising Pipeline for Revenue Growth," John Mylant discussed the Company's financials as reported in its 10Q filing, the Company's acquisition of Mills Pharmaceuticals, and the Company's positive analyst coverage, all which were public and true.[76]   Also discussed in the article was the Company's product pipeline with a description of Abstral and NeuVax, and their market size and potential.   We found no material misstatements in the discussion on the Company's products.[77]   Citing Decision Resources, Mr. Mylant stated that Abstral sales could potentially generate  $40 million per year, which appeared to be an accurate reference.[78]   The article concluded by stating that the Company's potential growth was based on FDA approval of NeuVax and Gale-401, but there was no guarantee that the products would reach the market.   We found no false or misleading statements of material fact in the article.

Last, an article titled, "The Momentum Continues for Galena Biopharma" by Christine Andrews touted the Company's stock as one of the hottest in the past year citing its 190% growth in 2013.   That was an understatement because the Company's stock price in fact increased approximately 324% in 2013.[79]   The article contained facts and figures gathered from Decision Resources regarding market size, which appeared accurately referenced.[80]   The article describes the Company's positive analyst coverage, including Oppenheimer & Company's outperform rating and Piper Jaffray, Maxim Group, and Roth Capital Partners' valuations, which were accurate and public.   The article further highlights the Company's acquisition of Mills Pharmaceuticals, the Company's partnership with Dr. Reddy's Laboratories, and the potential

---

[74] Ex. 97. Analyst Report titled "Galena: On track to advance clinical programs, acquisition of Abstral transforms GALE to a commercial stage biotech company - Outperform" dated May 10, 2013.

[75] Ex. 87. Article titled "The Cancer Pain Drug Market" dated November 17, 2009.

[76] Ex. 8. Article titled "Galena Biopharma Has A Promising Pipeline For Revenue Growth " dated February 5, 2014.

[77] Ex. 91. Press release titled "Galena Biopharma Initiates Patient Enrollment in NeuVax(TM) Phase 3 PRESENT Trial to Prevent Breast Cancer Recurrence" dated January 20, 2012. Ex. 90. Press release titled "Galena Biopharma Reports Third Quarter 2013 Results" dated November 6, 2013.

[78] Ex. 87. Article titled "The Cancer Pain Drug Market" dated November 17, 2009.

[79] Ex. 9. Article titled "The momentum Continues for Galena Biopharma" dated January 15, 2014.

[80] Ex. 87. Article titled "The Cancer Pain Drug Market" dated November 17, 2009.

market for GALE 401 at $200 million, which was information available in the Company's January 13th and 14th 2014 press releases.[81]   Ms. Andrews concluded by stating that the Company was valued at $700 million, which was approximately $12 million less than its then market capitalization.[82]   As with the other articles we reviewed attributed to the Dream Team in the Feuerstein and Pearson article, we found no false or misleading statements of material fact in Ms. Andrews' article.

The articles appear to be regurgitations of publically available information found in press releases and analyst reports.   Because most, if not all, of the articles allegedly written at the direction of the Dream Team have been removed from the internet, we were unable to analyze every article at issue for potential misstatements of material fact; but, if our sampling is any indication, then we would not expect that any of the articles contained false or misleading statements of material fact.

Moreover, given that DTG declined to respond to the questions we propounded, we were unable to determine if DTG actually paid bloggers to write articles about the Company. Nevertheless, we found no evidence at the Company indicating that to be the case or that the Company was aware of that purported fact.   There was never any reference to payments being made to bloggers in any of the communications between the Company and DTG.   Ms. Bernarda assumed that the bloggers were employees of DTG and not independent third parties, and therefore were being paid as employees.[83]

Likewise, we were unable to determine if bloggers were using multiple aliases to pose as separate individuals.   There was no mention of aliases in the communications between the Company and DTG.   Indeed, as previously stated, the draft articles did not include by-lines and it appears that the Company did not consciously track the names of the bloggers writing about the Company.   For example, Ms. Bernarda reviewed an article written by Tom Meyer published on

---

[81] Ex. 116.  Press release titled "Galena Biopharma Acquires Mills Pharmaceuticals, LLC" dated January 13, 2014. Ex. 117. Press release titled "Galena Biopharma and Dr. Reddy's Announce Strategic Partnership for NeuVax(TM) in India" dated January 14, 2014.
[82] See Galena Biopharma Historical Market Cap Data.
[83] Interview of Remy Bernarda dated May 20, 2014.

Wall St. Cheat Sheet on December 3, 2013. Yet, when she learned that Mr. Meyer had written a favorable article about the Company in Forbes a mere two weeks later, she did not recognize Mr. Meyer.[84] Thus, to the extent that bloggers were using multiple aliases, we found no evidence at the Company indicating that to be the case or that the Company was aware of that purported fact.

### i.    Movement Of The Price Of The Company's Stock

One of the central allegations of the Feuerstein and Pearson articles is that the Company hired DTG to boost the Company's stock price.[85] Mr. Ahn denied that was the purpose for the hiring,[86] but the communications between the Company and DTG indicate that DTG used the Company's stock price as metric of its effectiveness. For example, on July 31, 2013, Mr. McCarthy emailed Mr. Ahn a summary of the Company's stock price steadily rising from $1.81 to $1.95 with a notation "$2.00 here we come!"[87] Similarly, on November 13, 2013, Jamie Spangler emailed Mr. Ahn and Ms. Bernarda a graph of the Company's stock trading above $3.00 a share with a subsequent remark, "I am just happy that everything is paying off."[88] The best example, however, is a document prepared by DTG and titled "Case Study: Investor Awareness Campaign." The case study was a year-end summary of DTG's purported activities and included a graph of the Company's stock price from July of 2013 to December of 2013 relative to its activities.[89] The timeline suggested that DTG's activities correlated with a 97% increase in the Company's stock price.[90] Notably, the first time the Company became aware of the case study was when Tiberend informed Ms. Bernarda on February 10, 2014 that DTG had posted the case study on its website for promotional purposes.[91] The Company terminated its contractual relationship with DTG two days later, the same day that the Feuerstein article also happened to be published.[92]

---

[84] Ex. 99. Email from Remy Bernarda to Claire Sojda dated December 16, 2013.
[85] Ex. 2. Article titled "Galena Biopharma Pays For Stock-Touting Campaign While Insiders Cash Out Millions" by Adam Feuerstein dated February 12, 2014; Ex. 3. Article titled "Behind The Scenes With Dream Team, CytRx And Galena" dated March 13, 2014.
[86] Interview of Mark Ahn dated May 8, 2014.
[87] Ex. 75. Email from Michael McCarthy to Mark Ahn dated July 31, 2013.
[88] Ex. 80. Email from Jamie Spangler to Mark Ahn and Remy Bernarda dated November 13, 2013.
[89] Ex. 17. Case Study: Investor Awareness Campaign
[90] Id.
[91] Ex. 104. Email from Gregory Tiberend to Remy Bernarda dated February 10, 2014.
[92] Ex. 106. Email from Remy Bernarda to Michael McCarthy dated February 12, 2014.

Our investigation, moreover, has revealed that DTG's activities had no demonstrable material effect on the Company's stock price.[93] As an initial point, it bears noting that DTG appeared to take credit for activities unrelated to its work. For example, DTG appeared to take credit for the publication of a host of articles on Seeking Alpha, but we have confirmed that at least two of those articles written by Grant Zeng and Regarded Solutions were published independently of DTG.[94] Mr. Zeng was a Senior Biotech Analyst for Zachs Investment Research, who wrote at least two articles about the Company in 2013. Each of those times, he informed Mr. Ahn and Ms. Bernarda directly that he had written an article that would be published on Seeking Alpha.[95] One of those articles titled "Galena: The Launch Of Abstral And Other Important Catalysts" was listed in a summary of articles DTG purportedly had published on Seeking Alpha at its direction.[96] The article written by Regarded Solutions, also known as Alan Saltzman, was the result of a question and answer session arranged by Tiberend.[97] Nevertheless, we credited DTG with their alleged activities and compared it to the movement of the Company Stock, and found no direct correlation.

The chart below (a full size version is attached as Appendix I) illustrates the price of the Company's stock from July 1, 2013 to February 24, 2014 in relation to the Company's press releases, the publication of analyst reports, and articles allegedly written at the direction of DTG.[98]

---

[93] We recognize that an effort to increase a company's market visibility in a positive and truthful way can have an effect on a company's stock price.

[94] Ex. 10. Email from Michael McCarthy to Remy Bernarda dated November 26, 2013.

[95] Exs. 111-113. Email from Mark Ahn to Grant Zeng and Remy Bernarda dated July 29, 2013; Email from Mark Ahn to Grant Zeng and Remy Bernarda dated July 30, 2013; Email from Grant Zeng to Mark Ahn and Remy Bernarda dated October 8, 2013.

[96] Ex. 10. Email from Michael McCarthy to Remy Bernarda dated November 26, 2013; Ex. 113. Email from Grant Zeng to Mark Ahn and Remy Bernarda dated October 8, 2013.

[97] Ex. 76. Email from Remy Bernarda to Mark Ahn dated August 1, 2013.

[98] Ex. 157. Full size version of this illustration.



The chart reflects that the Company's stock moved marginally between July 1, 2013 and November 2, 2013 during which time DTG purported to publish or have published twelve articles about the Company. The Company's stock only truly began to rise after the Company released the results of the Phase 1 trial of its Folate Binding Protein vaccine on November 11, 2013.[99] Between November 11, 2013 and December 4, 2013, the Company's stock more than doubled in price. During that same period, the Company made two presentations on the Company's progress at the Piper Jaffray and Oppenheimer & Company conferences. DTG published or caused to be published five articles about the Company during this period. While this would suggest that DTG articles could have had a material effect on the stock price, that notion is disabused when considering that the stock nearly doubled again in price between December 4, 2013 and January 20, 2014, a time when no articles attributed to DTG were published. The Company's rising stock price during that period seems to have been driven principally by the announcements that the Company had acquired Mills Pharmaceuticals LLC and partnered with Dr. Reddy's Laboratories in India, and subsequent buy recommendations by analysts. Indeed, the stock's market price tracked consistently with the analysts' projections in

---

[99] Ex. 89. Press release titled "Galena Biopharma Announces Initial Results From the Folate Binding Protein Vaccine Phase 1 Trial at the Society for Immunotherapy of Cancer Conference" dated November 11, 2013.

their reports.  Moreover, the Company's stock price likely profited from the general upswing in the biotech market during that period.[100]  Accordingly, DTG's assumption that its activities were the driving force behind the Company's rising stock price appears to have been hubris.  There is no conclusive evidence that was the case.

With respect to the collapse of the Company's stock price, we found that there were several reasons for the sharp decline.  First, allegations that the stock price may have been inflated by DTG's activities depressed the price.  To illustrate, Cantor Fitzgerald almost immediately downgraded the Company's stock from a buy to a sell "based on concerns of an overhang created by recent news of the use of promotional practices by a contracted IR firm and stock sales by insiders."[101]  Second, there was a substantial short interest in the Company.  Near the time the Feuerstein article was published, the Company already had a high short interest of 23% of the float.[102]  The short interest naturally increased following the Feuerstein and Pearson articles to approximately 31%.[103]  Third, there was a general bear trend in the biotech market beginning in late February and early March of 2014.[104]  Finally, the large volume of sales by insiders in January and February of 2014 was not well-received by the market.  All of these factors had a cumulative and depressive effect on the Company's stock price.

### ii.    The Insiders' Knowledge Of DTG's Activities

With the exception of Mark Ahn, all of the directors we interviewed uniformly stated that they first became aware that the Company had retained DTG after the Feuerstein article was published.[105]  This comports with Mr. Ahn's representation that he retained DTG without first consulting the Board.[106]  Moreover, while the October 11, 2013 and January 16, 2014 Board meeting minutes indicate that Ms. Bernarda discussed investor relations and public relations

---

[100] Ex. 158.  Comparison of Company Stock Price relative to NASDAQ Biotech Index from July 1, 2013 to May 6, 2014.
[101] Ex. 155.  Analyst report by Cantor Fitzgerald dated February 18, 2014.
[102] Ex. 154.  Analyst report by MLV & Co. dated February 14, 2014.
[103] Ex. 159.  Graph of short interest between July 2013 to April 2014.
[104] Ex. 158.  Comparison of Company Stock Price relative to NASDAQ Biotech Index from July 1, 2013 to May 6, 2014.
[105] Interview of Steven Kriegsman dated June 3, 2014; Interview of Richard Chin dated June 16, 2014; Interview of Rudolph Nisi dated June 4, 2014; Interview of Sandy Hillsberg dated May 28, 2014; Interview of Steven Galliker dated May 21, 2014.
[106] Interview of Mark Ahn dated May 8, 2014.

21

matters with the Board, all of the directors and officers present stated that these discussions were related only to analyst activity and not DTG.[107]  The Board presentation materials corroborate this account and indicate that the presentation regarding investor relations and public relations centered on analyst activity.[108]

With the exception of Mark Ahn, Mr. Schwartz was the only Company officer that sold Galena shares in the first quarter of 2014.  Mr. Schwartz stated in his interview that he did not play a management role in the Company's investor or public relations affairs.[109]  He stated that while on occasion he would review an article drafted by an analyst for factual accuracy, he does not recall ever reviewing an article drafted by DTG.[110]  In fact, although he was aware generally that the Company had retained investor/public relations firms, he was not aware of their specific names or activities.[111]  Mr. Schwartz's statements were credible and were not contradicted by the other interviewees or documents.

Accordingly, we have determined that, with the exception of Mark Ahn, insiders had no knowledge of DTG's activities for the Company before trading.

### B.    Lidingo Holdings LLC

Lidingo was another investor relations firm that operated concurrently with DTG, but had roots much earlier than the summer of 2013.  In late 2011, Sanford Hillsberg had heard from a friend and chief executive of another company that Lidingo had provided him with effective investor relations services.[112]  Mr. Hillsberg conveyed this information to Mr. Ahn and suggested that he take a look at Lidingo.[113]  On January 4, 2012, the Company retained Lidingo as a consultant tasked with reviewing the Company's research and development plan, providing strategic input on the Company's investor relations efforts, generating independent coverage of

---

[107] Interview of Steven Kriegsman dated June 3, 2014; Interview of Richard Chin dated June 16, 2014; Interview of Rudolph Nisi dated June 4, 2014; Interview of Sandy Hillsberg dated May 28, 2014; Interview of Steven Galliker dated May 21, 2014; Interview of Ryan Dunlap dated May 15, 2014; Interview of Remy Bernarda dated May 20, 2014; Interview of Mark Ahn dated May 8, 2014; Interview of Mark Schwartz dated May 14, 2014.

[108] Ex. 27.  Board presentation materials dated October 11, 2013; Ex. 28 Board presentation materials dated January 16, 2014.

[109] Interview of Mark Schwartz dated May 14, 2014.

[110] *Id.*

[111] *Id.*

[112] Interview of Sanford Hillsberg dated May 28, 2014.

[113] Interview of Sanford Hillsberg dated May 28, 2014; Interview of Mark Ahn dated June 9, 2014.

the Company through third parties, and distributing key press releases and news items through its network.[114]    In practice, this translated into transforming press releases and analyst reports into so called "email blasts," posting messages on message boards, and publishing original articles on various websites.[115]    The contract price was $20,000 per month for a period of twelve months.[116] In accordance with Company practice, the officers identified Lidingo as a company with a contract value exceeding $100,000 in materials sent to the Audit Committee for its November 8, 2012 meeting.[117]    The Audit Committee ratified and affirmed the contract at the November 8, 2012 meeting.[118]

Unfortunately, we were unable to obtain any copies of the "email blasts," messages, or articles written by Lidingo or its "writers."    During his second interview, Mr. Ahn claimed to have never reviewed Lidingo's work product, even though there are numerous emails between Mr. Ahn and Lidingo either requesting copies or representing that copies had been sent.[119]    We found Mr. Ahn's claim highly suspect.    The documents and interviews of senior management portray Mr. Ahn as an engaged and hands-on chief executive.    It is hard to believe that Mr. Ahn did not review the work product of an investor relations firm he paid $20,000 per month. Moreover, members of senior management stated in their interviews that Mr. Ahn managed the Company's relationship with Lidingo himself.[120]    Indeed, Ms. Bernarda stated that, based on statements from Mr. Ahn, she believed that the Company had terminated its relationship with Lidingo in the spring of 2013, and only recently found out that Mr. Ahn renewed its contract without her knowledge.[121]    Ms. Bernarda's representations were supported by another witness'

---

[114] Ex. 36.  Lidingo Consulting Agreement dated January 4, 2012.  Ex. 55 Emails between Milla Bjorn and Madeline Hatton regarding execution of Lidingo Consulting Agreement dated January 4, 2012.
[115] Interview of Mark Ahn dated June 9, 2014; Ex. 56.  Email from Milla Bjorn to Mark Ahn dated January 18, 2012.
[116] Ex. 36.  Lidingo consulting agreement dated January 4, 2012.
[117] Ex. 168.  Presentation Materials for Audit Committee Meeting dated November 8, 2012.
[118] Ex. 169. Minutes of Audit Committee Meeting dated November 8, 2012.
[119] Interview of Mark Ahn dated June 9, 2014; Ex. 67.  Email from Mark Ahn to Milla Bjorn dated April 11, 2013; Ex. 69.  Email from Milla Bjorn to Remy Bernarda dated April 12, 2013; Ex. 84.  Email from Mark Ahn to Andrew Hardy, Milla Bjorn and Ryan Dunlap dated November 20, 2013; Ex. 85.  Email from Milla Bjorn to Mark Ahn, Andrew Hardy and Ryan Dunlap dated November 20, 2013.
[120] Interview of Remy Bernarda dated May 20, 2014; Interview of Ryan Dunlap dated June 5, 2014; Ex. 82.  Email from Ryan Dunlap to Roswitha Swensen dated November 13, 2013.
[121] Interview of Remy Bernarda dated May 20, 2014; Ex. 65.  Email from Remy Bernarda to Angela DiPlato dated April 8, 2013.

23

account.[122]  Thus, while we found no direct evidence that Mr. Ahn reviewed Lidingo's work product, the record reflects an inference that he reviewed it.

More troubling is that Lidingo clearly represented its task to be to increase the price of the Company's stock.  In a November 12, 2012 email, Lidingo represented that the Company's stock price had increased the day following its October email blasts on the 3rd, 17th, 25th, and 31st.[123]  Lidingo promised that if the Company paid Lidingo an additional $15,000 to $20,000, Lidingo would guarantee it would increase the price of the Company's stock by 25% by the end of 2012 or refund the Company its payment.[124]  Mr. Ahn responded by agreeing to pay Lidingo an additional $20,000.[125]  In his second interview, Mr. Ahn claimed that he never took Lidingo's representations seriously and, to be sure, he did not request a refund when Lidingo failed to follow through on its promise.[126]  We nevertheless found the implications in the emails troubling. Notably, Lidingo's representation that the Company's stock price had increased the day following its email blasts was inaccurate.  The Company's stock price increased the day following only two of four email blasts.[127]

Also problematic is that Lidingo represented that it paid "writers" to write articles about the Company,[128] and the Company was aware of this fact.[129]  There was constant pressure on the Company from Lidingo to make its contractual payments because the email blasts were purportedly expensive[130] or because Lidingo was purportedly adding new "writers" to write about the Company.[131]  Both the Company's payments to Lidingo and Lidingo's payments to "writers" implicate Section 17(b) of the Securities Act of 1933, but since we have been unable to

---

[122] Interview of Madeline Hatton dated July 1, 2014.
[123] Ex. 62.  Email from Milla Bjorn to Mark Ahn dated November 12, 2012.
[124] Id.
[125] Ex. 62.  Email from Mark Ahn to Milla Bjorn dated November 12, 2012.
[126] Interview of Mark Ahn dated June 9, 2014; Ex. 161. Illustration of Company stock price from November 9, 2012 to January 2, 2013.
[127] Ex. 162.  Illustration of Company stock price from October 1, 2012 to November 2, 2012; Our methodology was to compare the stock prices at the close of the market days.
[128] Given the record of Lidingo's actions, we did not believe it was necessary to seek out Lidingo, particularly in view of our failed efforts to interview DTG.
[129] Ex. 59.  Email from Milla Bjorn to Madeline Hatton dated April 7, 2012.
[130] Ex. 63.  Email from Milla Bjorn to Mark Ahn, Angela DiPilato, and Madeline Hatton dated January 22, 2013; Ex. 66. Email from Milla Bjorn to Mark Ahn and Remy Bernarda dated April 9, 2013.
[131] Ex. 64.  Email from Milla Bjorn to Mark Ahn dated April 6, 2013; Ex. 66. Email from Milla Bjorn to Mark Ahn and Remy Bernarda dated April 9, 2013.

review the email blasts or articles and Lidingo does not maintain any noticeable website, we have been unable to determine if adequate compensation disclosures were made.

i. **The Company's Grant Of Stock Options To Lidingo**

Lidingo first made a request for stock options as part of its compensation on April 5, 2012.[132] Lidingo requested 400,000 stock options, 200,000 to vest immediately and 200,000 to vest over the second and third quarter of 2012.[133] We found no response from the Company to this request. The request for options was renewed on April 19, 2013, when Lidingo asked Mr. Ahn for an equity stake as compensation for its services.[134] Mr. Ahn replied that he would review the request with Ms. Bernarda (which he apparently never did) and respond at a later date.[135] Lidingo emailed Mr. Ahn again on July 10, 2013 noting that the Company's stock price was not performing well, and offering its services.[136]

On August 1, 2013, Mr. Ahn, on behalf of the Company, executed a second consulting agreement with Lidingo with the following scope of work: (i) review the Company's financial requirements; (ii) analyze and assess alternatives for the Company's financial requirements; (iii) create awareness of the Company through email and other distribution mechanisms; (iv) provide analysis of the Company's industry and competitors in the form of general industry reports directly to the Company; and (v) assist the Company in developing corporate partnering relationships.[137] The contract price was $20,000 per month and an option to purchase 250,000 shares of the Company's stock, 100,000 shares to vest immediately and 150,000 shares to vest over eight months.[138] Critically, Mr. Ahn executed the second consulting agreement without first consulting Company counsel or the Board notwithstanding that he had no authority to grant stock options unilaterally to a vendor.[139] Indeed, even after the fact, Mr. Ahn never informed the

---

[132] Ex. 58. Email from Milla Bjorn to Mark Ahn dated April 5, 2012.
[133] *Id.*
[134] Ex. 70. Email from Milla Bjorn to Mark Ahn dated April 19, 2013.
[135] Ex. 70. Email from Mark Ahn to Milla Bjorn dated April 21, 2013.
[136] Ex. 170. Email from Milla Bjorn to Mark Ahn dated July 10, 2013.
[137] Ex. 37. Lidingo consulting agreement dated August 1, 2013.
[138] *Id.* Ex. 86. Email from Ryan Dunlap to Andrew Hardy and Milla Bjorn dated November 20, 2013 attaching Nonstatutory Stock Option Granted Under Galena Biopharma, Inc. 2007 Incentive Plan.
[139] Interview of Mark Ahn dated June 9, 2014; Interview of Steven Kriegsman dated June 3, 2014; Interview of Richard Chin dated June 16, 2014; Interview of Rudolph Nisi dated June 4, 2014; Interview of Sandy Hillsberg

Board that he had granted options to Lidingo so that the Board could ratify the grant.[140]  This could have been done when the Board considered and granted options to several employees in November of 2013.[141]  The only reference to Lidingo made to the Board was in the January 16, 2014 Board presentation materials, which listed Lidingo as a vendor with a contract greater than $100,000, but there was no mention of an options grant.[142]

We have learned through public disclosures that two other companies granted Lidingo options as part of its compensation for its services.[143]  Indeed, Lidingo represented to Mr. Ahn that equity stakes are how Lidingo generates its income.[144]  Irrespective of the wisdom of granting options to a vendor that represented that it could influence the price of the Company's stock, in this case, Mr. Ahn exceeded his authority in granting Lidingo stock options.[145]  To date, Lidingo has exercised 149,998 options and currently has 100,002 options outstanding.[146]  To the extent that Lidingo attempts to exercise its remaining options, the Company should give due consideration to whether honoring them is appropriate.

Because we were unable to review the email blasts and articles, we were unable to conduct an analysis as to the potential material effect Lidingo's activities had on the price of the Company's stock.  That being said, of the four occasions Lidingo represented that it raised the price of the stock, the stock price in fact dropped on two of those dates.[147]  Accordingly, we found no reason to believe that Lidingo's activities had any more influence on the price of the Company's stock than DTG's activities, which in our view was none.  Under public scrutiny for

dated May 28, 2014; Interview of Steven Galliker dated May 21, 2014; Ex. 163.  Amended and Restated 2007 Incentive Plan.

[140] Interview of Steven Kriegsman dated June 3, 2014; Interview of Richard Chin dated June 16, 2014; Interview of Rudolph Nisi dated June 4, 2014; Interview of Sandy Hillsberg dated May 28, 2014; Interview of Steven Galliker dated May 21, 2014; Ex. 163.  Amended and Restated 2007 Incentive Plan; Ex. 22.  Unanimous written consent of the Board dated November 22, 2013.

[141] Ex. 22.  Unanimous written consent by the Board dated November 22, 2013.

[142] Ex. 28.  Board presentation materials dated January 16, 2014; Ex. 61.  Email from Angela DiPlato to Ryan Dunlap dated November 5, 2012;

[143] See, e.g., Ex. 164.  Consulting agreement by and between Advanced Medical Isotope Corporation and Lidingo Holdings LLC dated June 4, 2012; Ex. 165. Lion Biotechnologies, Inc.'s S-1 Statement.

[144] Ex. 84.  Email from Andrew Hardy to Mark Ahn dated November 19, 2013.

[145] Mr. Ahn stated in his second interview that he believed the grant of stock options to Lidingo allowed the Company to increase its immediate cash on hand, which benefited the Company.

[146] Ex. 38.  Galena stock option exercise request forms dated November 21, 2013, December 31, 2013, February 6, 2014, and March 4, 2014.

[147] Ex. 62.  Email from Milla Bjorn to Mark Ahn dated November 12, 2012.

its contractual relationship with DTG, the Company terminated the Lidingo contract on April 3, 2014.[148]

We note that, significantly, with the exception of Mr. Ahn, none of the selling directors or Mr. Schwartz were aware that the Company had executed a second contract with Lidingo until the January 16, 2014 Board meeting and none were aware of Lidingo's specific activities even after the meeting.[149]

While Mr. Ahn's unilateral and unauthorized decision to grant stock options to Lidingo for questionable and apparently ineffective services reflected poor judgment, we do not necessarily conclude that Mr. Ahn breached his fiduciary duty to the Company in doing so. Mr. Ahn did not grant stock options to Lidingo out of self-interest or for personal profit, but rather because he believed that Lidingo's services would benefit the Company by exposing more of the public to its accomplishments. Even if one could find that Mr. Ahn breached his fiduciary duty to the Company by granting Lidingo stock options, we conclude that there was no appreciable harm for the purported breach. The Company received monies when Lidingo exercised its options and services for the grants. Accordingly, we do not recommend filing an action against Mr. Ahn for a breach of fiduciary duty.

### C.    Section 17(b) of the Securities Act of 1933

Section 17(b) of the Securities Act of 1933 prohibits disseminating information about a security without disclosing any consideration received or to be received, directly or indirectly, in connection with sales of the security.[150] Section 17(b) is aimed at preventing the misleading impression of impartiality in certain recommendations.[151] The prohibition focuses on the person making the recommendation and does not expressly extend to the company or other person

---

[148] Ex. 115. Email from Mark Ahn to Milla Bjorn dated April 3, 2014.

[149] Interview of Steven Kriegsman dated June 3, 2014; Interview of Richard Chin dated June 16, 2014; Interview of Rudolph Nisi dated June 4, 2014; Interview of Sandy Hillsberg dated May 28, 2014; Interview of Steven Galliker dated May 21, 2014.

[150] 515 U.S.C. § 77q(b).

[151] *See, e.g., SEC v. Liberty Capital Group, Inc.*, 75 F. Supp. 2d 1160 (W.D. Wa. 1999) (upholding SEC complaint challenging investor relations firm's newsletter and Web site characterizations of companies as "picks" and "hot stocks").

paying for the recommendation.[152]  A company soliciting or paying for the recommendation, however, might be held accountable for aiding and abetting, although not in a private action.[153]

In this instance, whether DTG or Lidingo paid bloggers or "writers" to tout the Company is a factual question that we cannot answer, but one that the SEC may ultimately determine under its subpoena power.  Our investigation revealed that the articles written by DTG on its affiliate websites did not contain a compensation disclosure, but did contain a link to a compensation disclosure.  Whereas, the articles written by bloggers purportedly on behalf of DTG such as Tom Meyer and John Mylant did not contain compensation disclosures.

With respect to Lidingo, we were unable to review copies of its email blasts and articles, but we have serious doubts that those contained compensation disclosures.  Accordingly, DTG, Lidingo, Mr. Meyer, Mr. Mylant, and others similarly situated may have violated Section 17(b) of the Securities Act of 1933, but that is for others to decide.  What is clear is that the bloggers are the ones principally exposed to liability under this statute, not the Company, which may have unwittingly compensated the bloggers indirectly for their work.  Accordingly, we conclude the likelihood of liability for the Company under Section 17(b) to be low.

## IV.    FINDINGS OF FACT: SALES OF COMPANY'S STOCK BY INSIDERS IN 2014

In January and February of 2014,  with the exception of Mr. Ashton, all of the directors sold a significant percentage of their shares of Company stock.  The volume of shares sold by all but one of the directors combined with publication of the Adam Feuerstein article led to public speculation that the Company hired DTG to inflate artificially the Company's stock in order to allow the directors to sell their shares before a market correction.  Based on our investigation, there is no evidence that the Company or the directors perpetuated such a scheme.

### A.    The Company's Insider Trading Policy

The Company's original insider trading policy was a permanent blackout on trades of the Company's stock by employees and directors.[154]  The only exception to the policy was that an

---

[152] *See Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D.Mass. 2005) (footnote omitted).
[153] *Id.*
[154] Ex. 60.  Email from Ryan Dunlap to Lynn Sutton dated November 2, 2012; Interview of Mark Ahn dated May 8, 2014; Interview of Ryan Dunlap dated May 15, 2014; Ex. 171.  Insider Trading Policy.

employee or director could trade his/her shares with the preapproval of Mr. Ahn.[155]    As the Company grew in size, the officers decided that a more sophisticated insider trading policy around window periods would be more appropriate.[156]

In the summer of 2013, Mr. Dunlap began drafting an insider trading policy with open trading windows triggered by the Company's earnings releases and subject to the lack of material nonpublic information.[157]  Under the draft policy, employees and directors could only trade the Company's stock between the close of trading on the second day following the Company's release of quarterly or annual earnings and the close of trading on the 15th day of the last month of the fiscal quarter in which the earnings were released.[158]  Mr. Dunlap submitted the draft policy to the Nominating and Governance Committee of the Board for its consideration at its October 7, 2013 meeting.[159] At the meeting, the committee resolved that it would recommend to the Board that the Board adopt the draft policy at its January 16, 2014 meeting.[160]  Until the Board adopted the draft policy, the permanent blackout on trades subject to the preapproval of Mr. Ahn should have remained the Company's effective insider trading policy.  The officers and directors of the Company, however, had competing understandings of the operative insider trading policy between the summer of 2013 and January 16, 2014.

The officers believed that the draft policy with trading windows had become effective in the summer or fall of 2013.[161]  This was illustrated by an August 17, 2013 email to Company employees and a December 2, 2013 email from Mr. Dunlap to the Company's Section 16 officers and predetermined insiders reminding them that a blackout on trading was in effect as of

---

[155] *Id.* The Insider Trading Policy required preclearance of sales by the Chief Financial Officer, but that office was vacant until 2014.  Therefore, Mark Ahn as Chief Executive Officer, served as the preclearance officer for purposes of the original insider trading policy.  In practice, however, Mr. Dunlap also had a *de facto* role in that regard.
[156] Interview of Mark Ahn dated May 8, 2014; Interview of Ryan Dunlap dated May 15, 2014.
[157] Interview of Ryan Dunlap dated May 15, 2014.
[158] Ex. 18.  Document titled "Galena Biopharma, Inc. Policy Against Disclosure of Confidential Information and Insider Trading" dated July 31, 2013; Ex. 19.  Document titled "Galena Biopharma, Inc. Policy Against Disclosure of Confidential Information and Insider Trading" dated August 15, 2013.
[159] Ex. 20. Minutes of the Nominating and Governance Committee Meeting dated October 7, 2013.
[160] *Id.*
[161] Interview of Remy Bernarda dated May 20, 2014; Interview of Mark Schwartz dated May 14, 2014; Interview of John Burns dated May 21, 2014.

that date until March 13, 2014 under the revised insider trading policy.[162] Similarly, when Mr. Kriegsman first expressed his desire to exercise and sell some of his shares of Company stock in December of 2013, Mr. Ahn stated that the Company had a blackout on trading under the Company's revised insider trading policy.[163]

The selling directors, on the other hand, fell into two camps. The first believed that there was a permanent blackout on trades subject to the preapproval of trades by Mark Ahn.[164] The second believed that there was no blackout on trades and no insider trading policy at all.[165] None of the selling directors, however, believed that the draft insider trading policy had taken effect because it had not been considered or approved by the full Board.[166] We found that the selling directors' position was consistent with the minutes of the Nominating and Governance Committee and the Board.[167] The Board had not approved the draft policy (with revisions) until its April 18, 2014 Board meeting, and was therefore not enforceable as Company policy before that date.[168]

The confusion as to the applicable insider trading policy led to a sequence of events that further confused the situation. On or about December 19, 2013, Mr. Kriegsman expressed to senior management and certain directors his desire to sell 200,000 shares of Company stock for estate planning purposes.[169] The Company initially blocked Mr. Kriegsman's request. Mr. Dunlap expressed concern that the Company had not yet announced its acquisition of Mills Pharmaceuticals LLC or its strategic partnership with Dr. Reddy's Laboratories, transactions of

---

[162] Ex. 93. Email from Ryan Dunlap to Mark Ahn, Mark Schwartz, Brian Hamilton, Remy Bernarda, Lynn Sutton, Hana Moran, Chris Lento, John Burns, and Travis Cook dated December 2, 2013; see also Ex. 96. Email from Ryan Dunlap to Mark Ahn dated December 11, 2013; Ex. 74. Email from Ryan Dunlap to Galena Company dated August 17, 2013; Ex. 103. Email from Ryan Dunlap to Galena Company dated January 3, 2014.
[163] Ex. 101. Email from Mark Ahn to Steven Kriegsman, Ryan Dunlap, and Dale Short dated December 21, 2013. Exercises of options, however, were permitted under the Company's insider trading policy.
[164] Interview of Sandy Hillsberg dated May 28, 2014; Interview of Steven Galliker dated May 21, 2014.
[165] Interview of Steven Kriegsman dated June 3, 2014; Interview of Richard Chin dated June 16, 2014; Interview of Rudolph Nisi dated June 4, 2014.
[166] Interview of Steven Kriegsman dated June 3, 2014; Interview of Richard Chin dated June 16, 2014; Interview of Rudolph Nisi dated June 4, 2014; Interview of Sandy Hillsberg dated May 28, 2014; Interview of Steven Galliker dated May 21, 2014.
[167] Exs. 20-21; 23-26. Minutes of the Nominating and Governance Committee and Board dated variously.
[168] Ex. 26. Minutes of the Board of Directors meeting dated April 18, 2014.
[169] Ex. 100. Email from Dale Short to Ryan Dunlap dated December 19, 2013; Interview of Rudolph Nisi dated June 4, 2014; Interview of Sanford Hillsberg dated May 28, 2014.

which Mr. Kriegsman had knowledge.[170]  He further expressed concern that permitting Mr. Kriegsman to sell his shares would send an "odd message" to officers who had been prohibited from selling their shares by Mr. Ahn.[171]  Specifically, Mr. Ahn had denied Mr. Schwartz's request to sell shares because Mr. Schwartz had knowledge of the same undisclosed transactions.[172]  Mr. Ahn shared Mr. Dunlap's concern and, on December 21, 2013, informed Mr. Kriegsman that, in addition to the Company's insider trading policy, the pending Mills Pharmaceuticals LLC acquisition and Dr. Reddy's Laboratories partnership were material nonpublic transactions that prohibited Mr. Kriegsman from trading in the Company's stock.[173] Mr. Kriegsman responded that he disagreed with Mr. Ahn's assessment stating that the Board had not approved the draft insider trading policy and that the pending transactions were immaterial.[174]  Mr. Ahn and Mr. Kriegsman tabled the issue until the January 16, 2014 Board meeting, although there was a strong signal by Mr. Ahn that Mr. Kriegsman would be permitted to sell his shares by January 18, 2014.[175]

On January 13th and 14th of 2014, the Company announced its acquisition of Mills Pharmaceuticals LLC and its partnership with Dr. Reddy's Laboratories to the public.[176]  On January 16, 2014, the Board held a meeting where Mr. Ahn stated that since the transactions had been announced, employees and directors no longer possessed material nonpublic information, and therefore could trade in the Company' stock.[177]  The minutes of the January 16, 2014 Board meeting reflect that there was a subsequent discussion among the Board and that the Board lifted the blackout on trading.[178]  The selling directors, however, did not recall an interactive

---

[170] Ex. 100.  Email from Ryan Dunlap to Dale Short dated December 19, 2013.
[171] Ex. 100.  Email from Ryan Dunlap to Dale Short, Mark Ahn and Remy Bernarda dated December 19, 2013.
[172] Interview of Mark Schwartz dated May 14, 2014; Interview of Ryan Dunlap dated May 15, 2014.
[173] Ex. 101.  Email from Mark Ahn to Steven Kriegsman, Ryan Dunlap, and Dale Short dated December 21, 2013.
[174] Ex. 102.  Email from Steven Kriegsman to Mark Ahn, Ryan Dunlap, and Dale Short dated December 22, 2013.
[175] Ex. 102.  Email from Mark Ahn to Steven Kriegsman dated December 28, 2013.
[176] Ex. 116.  Press release dated January 13, 2014 titled "Galena Biopharma Acquires Mills Pharmaceuticals LLC"; Ex. 117.  Press release dated January 14, 2014 titled "Galena Biopharma and Dr. Reddy's Announce Strategic Partnership for NeuVax (TM) in India."
[177] Ex. 23.  Minutes of the Board dated January 16, 2014; Interview of Ryan Dunlap dated May 15, 2014; Ex. 105. Email from Ryan Dunlap to unknown recipients dated January 17, 2014.
[178] Id.

discussion on the subject or a vote to lift a blackout in their interviews.[179]   The directors' varying positions as to whether there was a blackout at all, a permanent blackout subject to preapproval of trades by Mr. Ahn, or a blackout subject to open trading windows, are all inconsistent with the Board minutes.   If there was no blackout in place, then there was no need to lift a blackout;   if there was a permanent blackout subject to preapproval of trades by Mr. Ahn, then Board action was not required;   and if there was a blackout subject to an open trading window, then the window was never closed.   What is clear, however, is that the Company opened a trading window seemingly for the sole purpose of allowing insiders to sell substantial shares of their Company stock.   This was an opening of convenience.   There was no other discernable motivation for opening a trading window at that time.

### B.   The Sales By Insiders

In January of 2014, the Board consisted of seven members: Sanford Hillsberg, Mark Ahn, William Ashton, Richard Chin, Stephen Galliker, Steven Kriegsman, and Rudolph Nisi.   With the exception of Mr. Ashton, all of the directors sold a significant amount of their vested beneficial interest (shares and vested options owned) in the first quarter of 2014.

Mr. Kriegsman sold shares on January 17th, 22nd, and February 3rd of 2014 in the amounts of 200,000, 250,000, and 150,000, which represented approximately 22%, 36%, and 34% of his vested beneficial interest at the time of sales.   Mr. Nisi sold shares on January 17th and 29th of 2014 in the amounts of 200,000 and 250,000, which represented approximately 27% and 71% of his vested beneficial interest at the time of sales.   Mr. Hillsberg sold 200,000 shares from his family trust on January 17, 2014, which represented approximately 64% of the trust's vested beneficial interest at the time of sale.[180]   He individually sold 250,000 shares on January 30, 2014, which represented approximately 32% of his vested beneficial interest at the time of sale.   Mr. Ahn sold 796,765 shares on January 27, 2014, which represented approximately 67%

---

[179] Interview of Steven Kriegsman dated June 3, 2014; Interview of Richard Chin dated June 16, 2014; Interview of Rudolph Nisi dated June 4, 2014; Interview of Sandy Hillsberg dated May 28, 2014; Interview of Steven Galliker dated May 21, 2014.
[180] Mr. Hillsberg exercised 200,000 options through his family trust on January 14, 2014, but non-broker assisted exercises were not violative of the insider trading policy.  Mr. Hillsberg apparently paid the options exercise price by delivering to Galena 24,426 shares of Company stock.

of his vested beneficial interest at the time of sale.  Mr. Chin sold shares on January 30th and February 12th of 2014, in the amounts of 75,000 and 187,500, which represented approximately 20% and 63% of his vested beneficial interest at the time of sales.  Mr. Galliker sold 300,000 shares on February 3, 2014, which represented approximately 59% of his vested beneficial interested at the time of sale.[181]  Mr. Schwartz, the only officer who sold shares of Company stock in the first quarter of 2014, sold 94,344 shares on January 30, 2014, which represented approximately 10% of his vested beneficial interest at the time of the sale.

While the volume of shares sold was *de minimis* compared to the total volume of shares outstanding, the sales were highly significant when considering that the selling directors were visible captains of the Company.  This fact was not lost on the officers who openly discussed the timing and method of filing the Form 4s to reflect both employee purchases of stock and the directors' sales in order to lessen the negative impact of the sales.[182]

Once the directors became aware that other directors were selling shares, it became what Mr. Hillsberg likened to a domino effect where each tranche of sales spurred the next tranche.[183] Some directors felt that once Mr. Ahn's sales became public, the damage was done and that any subsequent sales by directors would add little to the certain public blowback.[184]

Each selling director claimed to have a reasonable and sound basis for selling his shares, including estate planning, diversification, and compensation for steering the Company for many years.[185]  The primary motivation, however, appears to have been to sell shares because other insiders were selling.  Individually the sales may have been justifiable, but collectively, the sales reflected a lack of good judgment, which was demonstrated by the subsequent negative publicity

---

[181] Exs. 29-35.  Form 4s for the directors listed and dated variously.  Ex. 160.  Summary of Insider Sales.
[182] Ex. 107.  Email from Ryan Dunlap to Mark Ahn and Remy Bernarda dated January 22, 2014; Ex. 109.  Emails between Ryan Dunlap, John Burns, Mark Ahn and Remy Bernarda dated January 22, 2014; Interview of Ryan Dunlap dated May 15, 2014.
[183] Interview of Sanford Hillsberg dated May 28, 2014.
[184] Interview of Sanford Hillsberg dated May 28, 2014; Interview of Rudolph Nisi dated June 4, 2014
[185] Interview of Steven Kriegsman dated June 3, 2014; Interview of Richard Chin dated June 16, 2014; Interview of Rudolph Nisi dated June 4, 2014; Interview of Sandy Hillsberg dated May 28, 2014; Interview of Steven Galliker dated May 21, 2014; Interview of Mark Ahn dated May 8, 2014.

33

precipitated by the Feuerstein and Pearson articles.  The sales also had the unintended but not surprising consequence of demoralizing the staff.[186]

### C.    Possession Of Material Nonpublic Information

Before trading, the selling directors possessed knowledge of two facts that could be construed as material nonpublic information.

First, the selling directors were aware of the preliminary annual revenue for 2013, which was provided to them at the January 16, 2014 Board meeting and estimated to be $3.1 million.[187] Earnings have historically been considered material nonpublic information.[188]  However, we have determined that the preliminary annual revenue for 2013 was not material nonpublic information in this case because the Company was not revenue driven when the directors made their sales.  The analyst reports we reviewed from 2012 to 2014 reflect this fact.  For example, on November 13, 2012, Roth Capital Partners reported that the Company had released its third quarter revenue, but that the revenue had no impact on their buy rating or their target share price of $5.00.[189]  Similarly, on August 9, 2013, JMP Securities reported a target share price of $5.00, even though the Company reported no revenue in the second quarter.[190]  Later, Maxim Group gave the Company a buy rating with a target share price of $6.00 while stating in bold "we believe NeuVax is still the main supporter of GALE's valuation long term."[191]  Even after the commercial launch of Abstral, the Company's first approved product for sale, in October of 2013, Needham & Company and Oppenheimer & Company both reported that NeuVax, which is still in Phase III trials, remained the key driver of their valuations.[192]  Indeed, on January 13, 2014, Oppenheimer & Company acknowledged that some investors see the company primarily as a NeuVax development-stage company, but that it anticipated that, with time, the sentiment

---

[186] Interview of Remy Bernarda dated May 20, 2014; Interview of Mark Schwartz dated May 14, 2014; Interview of Ryan Dunlap dated May 15, 2014.
[187] Ex. 28.  Board presentation materials dated January 16, 2014.
[188] SEC Final Rule: Selective Disclosure and Insider Trading; 17 CFR Parts 240, 243, and 249; Release Nos. 33-7881, 34-43154, IC-24599, File No. S7-31-99.
[189] Ex. 118.  Analyst report by Roth Capital Partners dated November 13, 2012.
[190] Ex. 126.  Analyst report by JMP Securities dated August 9, 2013.
[191] Ex. 130.  Analyst report by Maxim Group dated September 11, 2013.
[192] Ex. 136.  Analyst report by Needham and Company dated November 7, 2013; Ex. 143.  Analyst report by Oppenheimer & Company dated November 26, 2013.

would include the specialty oncology sales element of the Company.[193]   Oppenheimer & Company raised its target share price to $8.00 in that report.[194]

Another factor in our determination was that the preliminary annual revenue was in line with the guidance the Company had provided to the public, which was reflected in analyst projections of between $2.6 million to $3.2 million in annual revenue.[195]   Thus, the preliminary revenue did not change the total mix of information available to the public.   There is recognition by the Company, however, that revenue driven by Abstral sales will become material in the near term.[196]

Second, on December 24, 2013, the FDA informed the Company that it had denied the Company's request for Breakthrough Therapy designation for NeuVax.[197]   "Breakthrough Therapy designation is a process designed to expedite the development and review of drugs that are intended to treat a serious condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s)."[198]   The Company requested the designation for NeuVax on December 3, 2013, but did not disclose that it had made the request in any press releases or SEC filings.   The FDA, on the other hand, did not disclose the request as a matter of practice.[199]   Breakthrough Therapy designations have been available since July 9, 2012, but since that time, one designation out of eleven requests was granted in 2013, and three designations out of twenty requests were granted in 2014.[200]   Since the Company did not disclose its request for Breakthrough Therapy designation for NeuVax and the likelihood of obtaining the designation was exceedingly low, we did not find the denial of the request to be material nonpublic information.

Accordingly, while the concurrent sale of stock by directors in the first quarter of 2014 was not in the best interest of the Company, we found no violation of Company policy or law.

---

[193] Ex. 149. Analyst report by Oppenheimer & Company dated January 13, 2014.
[194] *Id.*
[195] Exs. 145-147; 149; 151-152.   Analyst reports dated variously.
[196] Ex. 26.  Minutes of April 18, 2014 Board Meeting, Annex 1; interview of Sanford Hillsberg dated May 28, 2014.
[197] Ex. 39.  Letter from Celia Witten to Hana Moran dated December 23, 2013.
[198] www.fda.gov.
[199] Ex. 40.  Frequently Asked Questions: Breakthrough Therapies as of May 31, 2014.
[200] *Id.*

## V.   RECOMMENDATIONS

Based on our investigation, we provide the following recommendations to the Company:

First, we recommend more Board oversight of the utilization of all investor/public relations firms. The Board and the Company should closely monitor how these firms operate and their activities. The Company should insist on seeing copies of any investor/pubic relations work product (i.e., email blasts, articles, blog posts, etc.), and remain informed on the manner in which the work product is produced, including the name of the author and the extent to which third party authors were paid. The Company should also limit the number of investor/public firms operating concurrently for it. Moreover, the Company should centralize investor, public, and analyst activities to a single executive office.

Second, we recommend more Board oversight of Company expenditures and Company execution of high value contracts. The Chief Executive Officer is currently permitted to unilaterally execute contracts valued up to $1 million so long as they are accounted for in the Board approved annual budget. That limit should be reduced to $200,000, exclusive of options value.

Third, we recommend that the Company should enact practices and procedure that would prevent a reoccurrence of large scale sales by insiders within a compressed time frame. Examples of such policies are mandatory 10b5-1 plans or limited and counseled coordination of insider sales subject to state and federal securities laws during open trading periods.

The Special Committee may have additional recommendations that are beyond the scope of this report, which it will make to the Board directly when appropriate.

# Appendix

## Appendix I

### GALE Stock Price v. Key Press Releases and Analyst Reports (July 2013 – February 2014)



Appendix II

BioTech Index



NASDAQ Biotech Index & Galena Biopharma, Inc. - Adjusted Closing Prices

38

## Appendix III

### Short Interest History (1 Year)

## Short Interest History (%)

This is the historical short interest of Galena Biopharma Inc, as measured by the short interest of float.



## Appendix IV

## GALE Stock Price (November 9, 2012 – January 2, 2013)



| Date | Open | High | Low | Close | Volume |
|------|------|------|------|-------|--------|
| 1/2/2013 | 1.6 | 1.6 | 1.55 | 1.59 | 1660300 |
| 12/31/2012 | 1.57 | 1.57 | 1.51 | 1.53 | 1480000 |
| 12/28/2012 | 1.56 | 1.56 | 1.48 | 1.5 | 1607300 |
| 12/27/2012 | 1.58 | 1.58 | 1.51 | 1.55 | 2168700 |
| 12/26/2012 | 1.58 | 1.63 | 1.55 | 1.57 | 1179200 |
| 12/24/2012 | 1.57 | 1.58 | 1.56 | 1.57 | 506900 |
| 12/21/2012 | 1.56 | 1.58 | 1.54 | 1.58 | 1019200 |
| 12/20/2012 | 1.64 | 1.64 | 1.55 | 1.58 | 1848800 |
| 12/19/2012 | 1.58 | 1.63 | 1.57 | 1.61 | 4053000 |
| 12/18/2012 | 1.5 | 1.58 | 1.48 | 1.57 | 18876100 |
| 12/17/2012 | 1.85 | 1.9 | 1.85 | 1.87 | 1558000 |
| 12/14/2012 | 1.89 | 1.9 | 1.84 | 1.87 | 786000 |
| 12/13/2012 | 1.92 | 1.93 | 1.88 | 1.9 | 825100 |
| 12/12/2012 | 1.9 | 1.94 | 1.88 | 1.88 | 923700 |
| 12/11/2012 | 1.95 | 1.95 | 1.83 | 1.89 | 1544300 |
| 12/10/2012 | 2.03 | 2.03 | 1.87 | 1.89 | 2144400 |
| 12/7/2012 | 2.33 | 2.35 | 1.82 | 2.06 | 6748100 |
| 12/6/2012 | 2.27 | 2.27 | 2.15 | 2.18 | 1148800 |
| 12/5/2012 | 2.28 | 2.3 | 2.07 | 2.17 | 2048100 |

| | | | | |
|---|---|---|---|---|
| 12/4/2012 | 2.25 | 2.43 | 2.22 | 2.24 | 7812500 |
| 12/3/2012 | 2.09 | 2.11 | 1.97 | 2.04 | 1196800 |
| 11/30/2012 | 2.03 | 2.12 | 1.92 | 2.08 | 2217100 |
| 11/29/2012 | 1.88 | 2.1 | 1.87 | 2.04 | 4522900 |
| 11/28/2012 | 1.72 | 1.84 | 1.65 | 1.79 | 3449500 |
| 11/27/2012 | 1.67 | 1.69 | 1.48 | 1.58 | 1219000 |
| 11/26/2012 | 1.69 | 1.69 | 1.63 | 1.69 | 540000 |
| 11/23/2012 | 1.68 | 1.68 | 1.62 | 1.68 | 250800 |
| 11/21/2012 | 1.66 | 1.69 | 1.64 | 1.67 | 404600 |
| 11/20/2012 | 1.62 | 1.68 | 1.62 | 1.64 | 546500 |
| 11/19/2012 | 1.66 | 1.74 | 1.6 | 1.62 | 675600 |
| 11/16/2012 | 1.6 | 1.68 | 1.58 | 1.66 | 675900 |
| 11/15/2012 | 1.7 | 1.74 | 1.43 | 1.6 | 3091800 |
| 11/14/2012 | 1.68 | 1.86 | 1.68 | 1.8 | 3015300 |
| 11/13/2012 | 1.55 | 1.78 | 1.53 | 1.7 | 5293200 |
| 11/12/2012 | 1.98 | 1.99 | 1.23 | 1.4 | 11918900 |
| 11/9/2012 | 2.02 | 2.09 | 2.02 | 2.03 | 682,000 |

41

Appendix V

## GALE Stock Price (October 1, 2012 – November 2, 2012)



| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 11/2/2012 | 2.21 | 2.32 | 2.2 | 2.23 | 2473300 |
| 11/1/2012 | 2.15 | 2.19 | 2.12 | 2.18 | 1048200 |
| 10/31/2012 | 2.15 | 2.19 | 2.1 | 2.11 | 1407600 |
| 10/26/2012 | 2.12 | 2.15 | 2 | 2.15 | 3381000 |
| 10/25/2012 | 1.95 | 2.07 | 1.95 | 2.01 | 2355600 |
| 10/24/2012 | 1.93 | 1.95 | 1.86 | 1.88 | 502100 |
| 10/23/2012 | 1.85 | 1.92 | 1.81 | 1.92 | 612600 |
| 10/22/2012 | 1.88 | 1.91 | 1.83 | 1.85 | 1012900 |
| 10/19/2012 | 2 | 2.01 | 1.89 | 1.92 | 1289000 |
| 10/18/2012 | 2.08 | 2.19 | 1.99 | 2.01 | 2412000 |
| 10/17/2012 | 1.94 | 2.15 | 1.92 | 2.09 | 3916400 |
| 10/16/2012 | 1.94 | 1.94 | 1.87 | 1.94 | 894300 |
| 10/15/2012 | 1.88 | 1.9 | 1.84 | 1.9 | 645200 |
| 10/12/2012 | 1.86 | 1.88 | 1.83 | 1.85 | 454200 |
| 10/11/2012 | 1.81 | 1.89 | 1.81 | 1.83 | 871600 |
| 10/10/2012 | 1.82 | 1.86 | 1.76 | 1.78 | 676500 |
| 10/9/2012 | 1.88 | 1.88 | 1.82 | 1.82 | 446400 |
| 10/8/2012 | 1.88 | 1.88 | 1.82 | 1.86 | 513700 |
| 10/5/2012 | 1.87 | 1.91 | 1.81 | 1.85 | 867500 |
| 10/4/2012 | 1.91 | 1.98 | 1.83 | 1.84 | 2054500 |
| 10/3/2012 | 1.77 | 1.91 | 1.77 | 1.89 | 1754200 |
| 10/2/2012 | 1.81 | 1.83 | 1.77 | 1.78 | 600100 |
| 10/1/2012 | 1.8 | 1.82 | 1.75 | 1.78 | 478200 |

42

## Appendix VI

## Insider Sales History (1 Year)

 

Total Records: 65  Page: [ ]  2  3  4  ▶

| Insider | Position | Date | Buy/Sell. | Shares | Shares Owned Following This | Trade Price ($) | Cost ($1000) | Price Change Since Trade (%) | Details |
|---|---|---|---|---|---|---|---|---|---|
| Chin Richard | Director | 2014-02-12 | Sell | 187,500 | 0 | $4.33 | 811.9 | -29.1 | Link |
| Nisi Rudolph | Director | 2014-02-07 | Buy | 20,000 | 23,500 | $4.94 | 98.8 | -37.85 | Link |
| GALLIKER STEPHEN S | Director | 2014-01-31 | Sell | 300,000 | 10,000 | $4.18 | 1254 | -26.56 | Link |
| Chin Richard | Director | 2014-01-31 | Sell | 75,000 | 0 | $5.58 | 418.5 | -44.98 | Link |
| SCHWARTZ MARK W. | EVP & COO | 2014-01-23 | Sell | 100,000 | 409,665 | $5.57 | 557 | -44.83 | Link |
| Hillsberg Sanford | Director | 2014-01-13 | Sell | 250,000 | 113,421 | $5.41 | 1352.5 | -43.25 | Link |
| Nisi Rudolph | Director | 2014-01-29 | Sell | 250,000 | 3,500 | $5.28 | 1320 | -41.65 | Link |
| Ahn Mark J | President & CEO | 2014-01-27 | Sell | 799,765 | 113,784 | $4.83 | 3846.4 | -35.44 | Link |
| KRIEGSMAN STEVEN A | Director | 2014-01-22 | Sell | 150,000 | 5,000 | $5.92 | 888 | -48.14 | Link |
| KRIEGSMAN STEVEN A | Director | 2014-01-22 | Sell | 450,000 | 5,000 | $6.52 | 2934 | -52.91 | Link |
| Hillsberg Sanford | Director | 2014-01-17 | Sell | 200,000 | 128,421 | $6.93 | 1386 | -55.7 | Link |
| Nisi Rudolph | Director | 2014-01-07 | Sell | 200,000 | 3,500 | $6.9 | 1380 | -55.51 | Link |
| Ahn Mark J | President & CEO | 2011-12-07 | Buy | 10,000 | 20,000 | $0.66 | 6.6 | 365.15 | Link |
| Lea Kwang | Principal Accounting Officer | 2011-12-07 | Buy | 5,000 | 5,000 | $0.6 | 3 | 411.67 | Link |
| Ahn Mark J | President and CEO | 2011-04-28 | Buy | 10,000 | 10,000 | $0.95 | 9.5 | 223.16 | Link |
| CYTRX CORP | 10% Owner | 2015-12-29 | Sell | 2,593,891 | 0 | $2.2 | 5706.5 | 39.55 | Link |
| CYTRX CORP | 10% Owner | 2015-12-23 | Sell | 500,000 | 2,593,891 | $2.65 | 1325 | 15.85 | Link |
| Varanasi Ramani | VP Business Development | 2010-07-15 | Sell | 5,000 | 11,150 | $2.05 | 10.3 | 49.76 | Link |