# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re GALENA BIOPHARMA, INC. DERIVATIVE LITIGATION, | Case No. 3:14-cv-382-SI (LEAD)<br><br>**OPINION AND ORDER ON MOTION TO DISMISS** |

Christopher A. Slater and Michael J. Ross, SLATER ROSS, Sovereign Hotel, 4th Floor, 710 S.W. Madison Street, Portland, OR 97205; Robert B. Weiser, Brett D. Stecker, Jeffrey J. Ciarlanto, THE WEISER LAW FIRM, P.C., 22 Cassatt Avenue, First Floor, Berwyn, PA 19312; Kathleen A. Herkenhoff, THE WEISER LAW FIRM, P.C., 12707 High Bluff Drive, Suite 200, San Diego, CA 92130; Michael J. Hynes and Ligaya Hernandez, HYNES KELLER & HERNADEZ, LLC, 1150 First Avenue, Suite 501, King of Prussia, PA 19406; Nadeem Faruqi, FARUQI & FARUQI, LLP, 369 Lexington Avenue, 10th Floor, New York, NY 10017; William B. Federman and Sara E. Collier, FEDERMAN & SHERWOOD, 10205 N. Pennsylvania Avenue, Oklahoma City, OK 73120. Of Attorneys for Plaintiffs.

Kristen Tranetzki, ANGELI UNGAR LAW GROUP LLC, 121 S.W. Morrison Street, Suite 400, Portland, OR 97204; Jonathan R. Tuttle, DEBEVOISE & PLIMPTON LLP, 555 13th Street N.W., Suite 1100E, Washington D.C., 20004. Of Attorneys for Defendant Mark J. Ahn.

Robert L. Aldisert and Misha Isaak, PERKINS COIE LLP, 1120 N.W. Couch Street, 10th Floor, Portland, OR 97209. Of Attorneys for Defendants Rudolph Nisi, Sanford Hillsberg, Steven Kriegsman, Stephen Galliker, Richard Chin, Mark Schwartz, Ryan Dunlap, and William Ashton.

Lois O. Rosenbaum and Stephen H. Galloway, STOEL RIVES LLP, 900 S.W. Fifth Avenue, Suite 2600, Portland, OR 97204; Paul R. Bessette, Michael J. Biles, James P. Sullivan, KING & SPALDING LLP, 401 Congress Avenue, Suite 3200, Austin, TX 78701. Of Attorneys for Nominal Defendant Galena Biopharma, Inc.

**Michael H. Simon, District Judge.**

This shareholder derivative action is brought by shareholders ("Plaintiffs") of nominal defendant Galena Biopharma, Inc. ("Galena" or "Company"). Plaintiffs allege that certain members of Galena's Board of Directors ("Board") and executive officers of Galena (collectively, "Defendants") breached their fiduciary duties and were unjustly enriched by engaging in a scheme to artificially inflate the price of Galena's stock. Plaintiffs further allege that many Defendants sold their personally-owned Galena stock at artificially inflated prices, in a classic "pump and dump" insider trading scheme.

Before the Court is a motion to dismiss (Dkt. 52) filed by Defendants Rudolph Nisi, Sanford Hillsberg, Steven Kriegsman, Stephen Galliker, Richard Chin, Mark Schwartz, Ryan Dunlap, and William Ashton (collectively "Defendant Directors"). Also before the Court is Defendant Mark J. Ahn's ("Ahn") motion to dismiss (Dkt. 60). (The Defendant Directors and Ahn are collectively referred to as the "Moving Defendants.").[1] For the following reasons, these motions are granted in part and denied in part.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629

---

[1] The Director Defendants also filed a motion to stay, which was heard at the same time as the pending motions to dismiss. The motion to stay is addressed in a separate opinion.

F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## BACKGROUND

### A.  The Alleged Misconduct

As alleged in the Verified Amended Consolidated Shareholder Derivative Complaint ("Amended Complaint"), Galena is a biotechnology company based in Portland, Oregon. The Company focuses on the development and commercialization of targeted oncology treatments that address major unmet medical needs to advance cancer care. Galena is pursuing the development of cancer therapeutics, including its main product candidate, NeuVax™, for the treatment of breast cancer and other tumors.

By early 2013, analysts were beginning to question NeuVax™. Galena's share price dropped from a high of about $7.70 per share in 2010 to under $2 per share at the beginning

of 2013. In July 2013, Galena entered into a contract with The DreamTeam Group or one of its

subsidiaries, MissionIR (also known as "Mission Investor Relations") (collectively

"DreamTeam"). Galena paid DreamTeam $50,000 for 240 days of advertising, branding,

marketing, investor relations, and social media services. Plaintiffs allege that as part of these

services, Galena intended that DreamTeam would place misleading articles and comments on

investor websites touting Galena. Plaintiffs further allege that Defendants hired DreamTeam with

the plan to wait until the share price of Galena was artificially inflated as a result of

DreamTeam's misleading campaign and then Defendants, in possession of material, adverse,

non-public information, would sell their personally-held stock.

After being hired by Galena, DreamTeam caused to be published a variety of articles

promoting Galena stock, without disclosing that Galena had paid for the promotion. For

example, on or about August 6, 2013, DreamTeam submitted to the online investment advice

website *Seeking Alpha* an article entitled "Galena Biopharma Presents an Attractive Investment

Opportunity." This article recommended investment in Galena stock, but failed to disclose any

financial relationship between the author, who was identified only as "Wonderful Wizard," and

either Galena or DreamTeam. Another article placed by DreamTeam touting Galena in *Seeking*

*Alpha* appeared on November 22, 2013, this time by an author identified as "Kingmaker," who

also failed to disclose any relationship with either Galena or DreamTeam. These two articles

about Galena in *Seeking Alpha* were presented as being written by two different people, each

recommending investment in Galena, but were allegedly written by the same author.[2] Overall,

---

[2] Ultimately, the website *Seeking Alpha* removed from its website the August 6, 2013
article by "Wonderful Wizard" and the November 22, 2013 article by "Kingmaker." *Seeking
Alpha*'s Vice President of Content and Editor-in-Chief, Eli Hoffman, explained that the removal
of the articles was done because they violated *Seeking Alpha*'s terms of use when the author

there were 26 articles about Galena published on *Seeking Alpha* between July 2013 and February 2014, the time period during which DreamTeam was providing paid promotional services for Galena.

In September 2013, shortly after the publication of the August 6th DreamTeam article on *Seeking Alpha*, Galena conducted a $37.5 million public offering of common stock and warrants. On November 6, 2013, Galena issued a press release, entitled "Galena Biopharma Reports Third Quarter 2013 Results." This press release quoted Galena's then-president and chief operating officer, Mark Ahn, as stating that Galena's "commercial success to date with Abstral® has been very encouraging and we are excited to report initial revenues ahead of schedule. . . . [We] expect continuing strength with the launch. We are also making steady progress in advancing our NeuVax™ and FBP cancer immunotherapy pipeline." The press release also set forth the "financial highlights" for the third quarter 2013. That same day Galena filed a Form 10-Q with the Securities Exchange Commission ("SEC"), signed by Ahn and vice president and chief financial officer Ryan Dunlap, which reiterated the financial results announced in the press release. Neither the press release nor the 10-Q disclosed the stock promotion agreement with DreamTeam.

On November 26, 2013, four days after the November 22nd *Seeking Alpha* article, Galena's Compensation Committee[3] granted a total of 2.75 million shares of stock options to Defendants director Rudolph Nisi, current president and chief executive officer and former chief operating officer and executive vice president Mark W. Schwartz, Chairman of the Board

---

failed to disclose to *Seeking Alpha* that "Kingmaker" and "Wonderful Wizard" were, in fact, the same person.

[3] The Compensation Committee consisted of Defendants Richard Chin, Steven Kriegsman, and Ryan Dunlap (collectively, "Compensation Committee Defendants").

Sanford Hillsberg, director Richard Chin, director Stephen Galliker, director William Ashton, director Steven Kriegsman, Ahn, and Dunlap. These options issued in November carried an exercise price of $3.88 per share. This was the only time that options had been awarded by the Compensation Committee at that time of year. The usual practice by the Compensation Committee was to grant stock options to Galena's officers and directors in January of any given year. The options granted in November 2013 vested on February 26, 2014, when the eight-month DreamTeam promotional campaign was scheduled to end.

By early January 2014, Galena's stock price had risen significantly. In October 2013, it traded at between $2 and $3 per share. By January 2014, it more than doubled and traded at between $5 and $7 per share.

As alleged in the Amended Complaint, at the beginning of 2014 Defendants had reason to believe that the stock promotion deal with DreamTeam could be discovered at any time, so many of them engaged in a significant number of high-volume, single-day sales of their personally-held Galena stock. In a period of less than one month, between January 17, 2014 and February 12, 2014 (a period of eighteen trading days), all but two Defendants sold more than a total of 2.9 million shares, collectively receiving proceeds of more than $16 million. Specifically, Ahn sold approximately 800,000 shares for proceeds of approximately $3.8 million, Schwartz sold 100,000 shares for proceeds of approximately $557,000, Hillsberg sold 450,000 shares for proceeds of approximately $2.7 million, Kriegsman sold 600,000 shares for proceeds of approximately $3.8 million, Chin sold 262,500 shares for proceeds of approximately $1.2 million, Galliker sold 300,000 shares for proceeds of approximately $1.2 million, and Nisi sold 450,000 shares for proceeds of approximately $2.7 million. (The Defendants who sold stock

are collectively referred to as the "Selling Defendants.").[4] The Amended Complaint alleges that these were all direct sales and not made pursuant to any pre-arranged Rule 10b5-1 trading plan. Plaintiffs further allege that none of the Selling Defendants had engaged in open market sales of Galena stock during the four years before January 2014.

On February 12, 2014, journalist Adam Feuerstein published an online article on *TheStreet.com* titled "Galena Biopharma Pays for Stock-Touting Campaign While Insiders Cash Out Millions." In his article, Mr. Feuerstein alleged that Galena was engaging in a misleading brand-awareness campaign aimed at boosting its stock price. The article also reported that Galena had paid DreamTeam to publish articles promoting the Company's stock without disclosing who paid for those articles. On this news, Galena's stock dropped $0.85 per share to close at $4.34 per share on February 12, 2014, a one-day decline of 16 percent. None of the Selling Defendants sold any personally-held stock after February 12, 2014.

Two days later, on February 14, 2014, *Seeking Alpha* published an article titled "A Deeper Look at the Galena Biopharma Controversy," which noted that "the company's monstrous rise appeared to occur without a catalyst" and that "[l]ogic thus dictates that this meteoric rise was primarily the result of promotional efforts by DreamTeam, and had little to do with a change in the underlying fundamentals of the company." That same day, Galena issued a press release entitled "Galena Biopharma Issues Letter to Shareholders." The letter, purportedly authored by Ahn, was said to "set the record straight." The letter admitted that the Company had paid DreamTeam to promote Galena's stock and that Company insiders had divested shares in mid-January 2014 and denied all other allegations. On that same day, February 14, 2014,

---

[4] The Amended Complaint does not allege any sale of shares or receipt of proceeds by Defendants Dunlap or Ashton.

Galena's stock price dropped $0.63 per share to close at $3.73 per share, a one-day decline of 14 percent.

On February 18, 2014, Mr. Feuerstein discussed Ahn's letter in an article titled "Galena's CEO's Response to Stock Promotions Leaves Questions Unanswered." The article highlighted what Mr. Feuerstein described as inconsistencies and unanswered questions. For example, Mr. Feuerstein questioned why, if there was nothing improper with DreamTeam's services provided to Galena, did DreamTeam, after its relationship with Galena became public, try to remove all evidence of DreamTeam's services to Galena from the internet by deleting articles, blogs, comments, Twitter feeds, and the compensation disclosure noting the $50,000 payment made by Galena. Mr. Feuerstein also questioned Ahn's inconsistent statements about why he sold his Galena shares—explained on February 4, 2014 as to "diversify for my family" and explained after the DreamTeam story broke that company insiders were prohibited from selling shares earlier because Galena was in negotiations to acquire Mills Pharmaceuticals.

On March 13, 2014, financial analyst and author Richard Pearson published the results of his investigation into the relationship between Galena, CytRx Corp., and DreamTeam on *Seeking Alpha* in an exposé entitled "Behind the Scenes with Dream Team, CytRx and Galena." The article detailed Mr. Pearson's findings after going "undercover" as a writer for DreamTeam assigned to promote Galena. Mr. Pearson's article stated that Defendants approved all articles written about Galena before the articles were published. Mr. Pearson opined that Galena's "[m]anagement will have a very difficult time convincing investors that 'we didn't know'" and that "it seems no coincidence that there appears to have been great urgency to get these articles in almost exact proximity to sales/issuances of stock by insiders and the companies at both Galena and CytRx." Mr. Pearson concluded that "[t]he promotional articles and the paid

retention of the Dream Team Group were coordinated with the release of news and data from the companies such that they coincided with the share prices of both stocks rising dramatically."

On March 17, 2014, two trading-days after the publication of the Pearson exposé, Galena announced that it was under investigation by the SEC, stating in its Form 10-K annual report: "In February 2014, we learned that the SEC is investigating certain matters relating to our company and an outside investor-relations firm that we retained in 2013. We have been in contact with the SEC staff through our counsel and are cooperating with the investigation." Upon disclosure of the SEC investigation, Galena's common stock share price dropped to $2.68, representing a 16.5 percent loss in a single day.

On August 21, 2014, Galena issued a press release stating that Ahn "resigned as the President and CEO and as a director of the company to pursue other long held personal and professional goals." The same day *TheStreet.com* reported, based on the account of "a source close to the company," that Ahn had been "fired" by the Board at a "special meeting" held on August 18, 2014.

## B.  Galena's Two Special Committees and the Ensuing Lawsuits

On February 17, 2014, three days after Ahn's letter to shareholders discussing the allegations of wrongdoing and before any lawsuits had been filed, Galena's Board formed a Special Committee of the Board of Directors ("Special Committee"), consisting of Defendants Kriegsman, Galliker, Ashton, and Hillsberg, to investigate the allegations of wrongdoing being reported in the press. On or about February 27, 2014, the first lawsuit was filed against Galena: a shareholder derivative action filed in the Circuit Court of the State of Oregon for the County of Multnomah. On March 5, 2014, a federal securities class action was filed in this District Court, and on March 7, 2014, the first federal lawsuit in this consolidated shareholder derivative action was filed. Additional securities class action lawsuits were filed in this Court on March 10, 2014

and March 12, 2014. In addition, other derivative lawsuits, ultimately consolidated into this action, were filed on March 31, 2014, and one additional securities class action lawsuit was filed in this Court on April 4, 2014.

On March 14, 2014, Irving Einhorn joined Galena's Board. At approximately the same time that Einhorn joined the Board, the Special Committee was reconstituted to include only two members: Einhorn and Ashton (neither of whom had sold any shares during the relevant period). The Special Committee investigated the allegations contained in the press reports and in the derivative and class action complaints filed in this Court and the Multnomah County Circuit Court. On May 29, 2014, additional derivative actions were filed in the Delaware Court of Chancery. The Special Committee did not specifically investigate the allegations of the Delaware complaints, although the Delaware actions allege substantially similar facts and claims as alleged in the Oregon actions.

The Special Committee consisting of Einhorn and Ashton investigated for approximately four months. Plaintiffs allege that the Special Committee was a "sham" whose sole purpose was to "cover up" the breaches of fiduciary duty by Defendants.

On July 21, 2014, Galena's Board disbanded the Special Committee. The Board then appointed a new, "fully empowered" single-member Special Litigation Committee ("SLC"), consisting only of Einhorn. The SLC is currently investigating the allegations contained in the various lawsuits.

## C.  The Attempted Amendment of Galena's Bylaws—the Forum Selection Clause

On August 6, 2013, shortly after hiring DreamTeam, the Board attempted to amend Galena's Bylaws by enacting a forum selection clause requiring many types of actions to be brought in the Court of Chancery of the State of Delaware. Galena's Certificate of Incorporation, however, provides that Galena's Bylaws can only be amended by a 75-percent shareholder vote

and not by unilateral Board action. Plaintiffs allege that the Board enacted the forum selection clause when it knew or should have known that it did not have the authority to do so and improperly sought to enforce the allegedly invalid forum selection clause in the derivative cases pending before this Court and the Multnomah County Circuit Court. While opposing the motion to dismiss based on the forum selection clause, Plaintiffs' counsel informed then-counsel for all Defendants that the Board did not have authority unilaterally to amend the Bylaws. Defendants later withdrew in this Court their motion to dismiss based on the forum selection, but have not rescinded the clause or informed shareholders that the clause is invalid.

## DISCUSSION

### A.  Federal Rule of Civil Procedure 9(b)—Pleading Fraud with Particularity

The Moving Defendants argue that Plaintiffs' entire Amended Complaint sounds in fraud and thus all claims must be pled with particularity under Federal Rule of Civil Procedure 9(b). *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Plaintiffs respond that they are "masters of their complaint" and because they chose only to bring state law claims, without including a fraud cause of action, their claims need only comply with Rule 8(a). *See* Fed. R. Civ. P. 8(a) (establishing that a pleading need only contain a short and plain statement of the claim showing that the pleader is entitled to relief). Plaintiffs' argument is unavailing.

Regardless of the label placed on a particular claim for relief, if it "sounds in fraud" then the sufficiency of the allegations is tested under Rule 9(b). *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (noting that even if fraud is not an element of a claim, "a plaintiff may nonetheless be subject to Rule 9(b)'s particularity mandate if his complaint 'sounds in fraud'"); *Vess v. Ciba-Geigy Corp, USA*, 317 F.3d 1097, 1104 (9th Cir. 2003) ("[T]he plaintiff

may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)."); *In re MRV Commc'ns., Inc. Derivative Litig.*, 2010 WL 5313442, at *12 (C.D. Cal. Dec. 27, 2010) ("[B]ecause Plaintiffs' breach of fiduciary claim arises out of fraud, Plaintiffs had to plead this claim with particularity pursuant to Rule 9(b)."). To determine whether a complaint alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim, a court must closely examine the language and structure of the complaint. *In re Rigel Pharmaceuticals, Inc. Securities Litig.*, 697 F.3d 869, 885 (9th Cir. 2012). A plaintiff may choose not to allege a unified course of fraudulent conduct in support of a claim, but rather allege both fraudulent and non-fraudulent conduct. *Id.* at 886. When a complaint alleges both fraudulent and nonfraudulent activities, or a particular claim is supported by both types of conduct, Rule 9(b) applies only to the alleged fraudulent activities. *See Vess*, 317 F.3d at 1104.

Plaintiffs argue that their claims do not sound in fraud and should not be subject to Rule 9(b), but yet repeatedly assert in their brief, and allege in the Amended Complaint, that Defendants disseminated false and misleading information, deliberately misinformed shareholders, knew and failed to disclose that they were using company funds to engage in an illicit stock promotion scheme for their own personal benefit, and engaged in a "ruse" and "scheme" to artificially inflate the price of Galena stock so Defendants could sell their personal stock at artificially high prices. Plaintiffs also argue that the activities of Defendants were part of a "continuous whole" that cannot be viewed in isolation and constituted a "unified scheme." These allegations and arguments show that the facts giving rise to many of Plaintiffs' claims sound in fraud and are, therefore, subject to Rule 9(b). *See, e.g.*, *In re Taser Int'l S'holder*

*Derivative Litig.*, 2006 WL 687033, at *13-15 (D. Ariz. Mar. 17, 2006) (finding claims that the individual defendants breached their fiduciary duties by engaging in a common scheme to cause or allow the company to disseminate false or misleading information, including press releases and SEC filings, so that the company's stock price would trade at artificially inflated prices and the individual defendants could sell their personal stock at inflated prices sounded in fraud and were subject to Rule 9(b)).

The Court analyzes Plaintiffs' claims below and applies Rule 9(b) when required. "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)). Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

## B.  The Business Judgment Rule and the "Exculpatory" Clause

As an initial matter, the Moving Defendants argue that Plaintiffs fail to plead particularized facts sufficient to overcome the presumption under the business judgment rule that the Board's decision to hire DreamTeam, grant stock options, and enact the forum selection clause was done on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company. The Moving Defendants also argue that Plaintiffs fail to plead facts sufficient to overcome the exculpatory clause contained in Galena's Certificate of Incorporation, pursuant to 8 Del. C. § 102(b)(7).

### 1.  Business judgment rule

Under Delaware law:

> The business judgment rule serves to protect and promote the role of the board as the ultimate manager of the corporation. Because courts are ill equipped to engage in *post hoc* substantive review of business decisions, the business judgment rule "operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation."
>
> The business judgment rule is not actually a substantive rule of law, but instead it is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, . . . and in the honest belief that the action taken was in the best interests of the company [and its shareholders]." This presumption applies when there is no evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment" on the part of the directors. In the absence of this evidence, the board's decision will be upheld unless it cannot be "attributed to any rational business purpose." When a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste.

*In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746-747 (Del. Ch. 2005) (citations omitted) (alterations in original).

As discussed below in analyzing the sufficiency of each claim, Plaintiffs have alleged facts giving rise to inferences of fraud, bad faith, and self-dealing in the usual sense of personal profit on the part of the directors. These allegations are sufficient to overcome the business judgment rule. With respect to the amendment of Galena's Bylaws to add a forum selection clause, Plaintiffs allege that this action violated Delaware law and Galena's Certificate of Incorporation. These are facts that give rise to an inference of fraud, bad faith, or having no rational business purpose and, thus, are sufficient to overcome the business judgment rule.

## 2.  Exculpatory clause

Under Delaware law, a company's certificate of incorporation may include:

> A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director:

> (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 Del. C. § 102(b)(7). Galena's Certificate of Incorporation contains such an "exculpatory clause" in Article V.

Plaintiffs argue that the Moving Defendants' reliance on Galena's exculpatory clause is an affirmative defense and not appropriate for consideration on a motion to dismiss, citing *In re Tower Air, Inc. v. Nach*, 416 F.3d 229, 242 (3d. Cir. 2005) (declining to address the exculpatory clause argument both because it was raised for the first time on appeal and "because the protection of an exculpatory charter provision appears to be in the nature of an affirmative defense"). *See also Taser*, 2006 WL 687033, at *19 (relying on *Tower Air* in refusing to consider the company's exculpatory clause in considering a motion to dismiss). Defendants respond that many cases disagree with *Tower Air* and consider the application of the exculpatory clause in considering a motion to dismiss, citing *In re Sagent Tech., Inc., Derivative Litig.*, 278 F. Supp. 2d 1079, 1095 n.9 (N.D. Cal. 2003); *In re Bidz.com, Inc. Derivative Litig.*, 773 F. Supp. 2d 844, 855 (C.D. Cal. 2011); *In re MIPS Techs., Inc. Derivative Litig.*, 2008 WL 3823726, at *4, *9 (N.D. Cal. Aug. 13, 2008). The Court need not decide whether consideration of an exculpatory clause pursuant to 8 Del. C. § 102(b)(7) is appropriate on a motion to dismiss because, even assuming that it is, Plaintiffs have alleged sufficient facts stating a non-exculpated claim against Defendants. Plaintiffs have alleged sufficient facts giving rise to an inference that Defendants have breached their duty of loyalty, engaged in acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of the law, or engaged in transactions to derive an

improper personal benefit. Thus, the exculpatory clause does not require dismissal of Plaintiffs'
Amended Complaint.

## C. Count One—Breach of Fiduciary Duty (Disseminating Misleading Information)

Plaintiffs allege that Defendants had a fiduciary duty to ensure that Galena disseminated
accurate, truthful, and complete information to shareholders and that Defendants violated that
duty by causing or allowing Galena to engage in a misleading marketing campaign that was not
disclosed to shareholders, filing reports with the SEC that did not disclose Galena's full and
correct relationship with DreamTeam, and issuing a press release on behalf of Mr. Ahn that was
materially misleading. This claim sounds in fraud, and the Court thus analyzes the sufficiency of
the allegations under Rule 9(b).

"To state a claim for breach by omission of any duty to disclose, a plaintiff must plead
facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from
the [disclosures]." *Pfeffer v. Redstone*, 965 A.2d 676, 686 (Del. 2009). "[O]mitted information is
*material* if a reasonable stockholder would consider it important in deciding whether to tender
his shares or would find that the information has altered the 'total mix' of information available."
*Id.* (alteration and emphasis in original). In order for a defendant to be liable for failing to
disclose something, a plaintiff must "offer 'well-pleaded facts from which it can be reasonably
inferred that this 'something' was knowable and that the defendant was in the position to know
it.'" *Id.* at 687.

The Moving Defendants argue that Plaintiffs fail to state a claim because: (1) they do not
allege any information contained in the SEC filings, press releases, or media articles that was
false or material; (2) Defendants were under no duty to disclose the fact that Galena hired
DreamTeam; and (3) Plaintiffs do not allege with specificity facts showing each Defendants'

knowledge and intent regarding the alleged promotional scheme or the hiring of DreamTeam.

Defendants' arguments are unavailing.

      **1.  Allegations of false statements or material omissions**

      The Moving Defendants argue that Plaintiffs plead no misrepresentation or omission by any individual Defendant and that the media articles quoted in the Amended Complaint describe the actions of DreamTeam, not Galena. This characterization of the articles is not accurate. One article quoted in the Amended Complaint includes assertions that Galena hired DreamTeam, articles posted by DreamTeam were part of a broader campaign to boost Galena's stock price, the stock priced tripled as a result of DreamTeam's efforts, "[c]oincidence or not" Galena directors and officers "made millions by selling company stock in January," and timing of the sales "may or may not be related to the end of the promotional work done by Galena." Am. Compl. ¶ 76. Another article quoted in the Amended Complaint contains assertions that management from Galena was "intimately involved in reviewing and editing the paid articles on their own stock at precisely the time they were looking to sell/issue shares," that DreamTeam articles were given to Galena's management, who "then edited and approved the articles and would have seen the lack of disclosure [of the paid relationship between Galena and DreamTeam]," that "there appears to have been great urgency to get these articles in almost exact proximity to sales/issuances of stock by insiders," and that the retention of DreamTeam and its promotional articles "were coordinated with the release of news and data from [Galena] such that they coincided with the share prices of [the] stock rising dramatically." *Id.* ¶ 86. The author of the article also stated that he was told by DreamTeam that Galena would have to sign off on any pro-Galena promotional article and that the author could not disclose that he was being paid to write the promotional article. *Id.*

In addition to these descriptions of alleged wrongdoing by Galena insiders asserted in the media articles quoted in the Amended Complaint, Plaintiffs separately allege numerous facts relating to the alleged dissemination of false and misleading information by Defendants. Plaintiffs allege that Defendants knew that there were issues with NeuVax™ and that analysts were questioning Galena's financial success. Defendants thus decided to take their financial future into their own hands by causing Galena to hire DreamTeam for the purpose of engaging in a misleading marketing campaign, the purpose of which was to artificially inflate Galena's stock price. This allowed Defendants to sell their personal Galena stock at inflated prices. Plaintiffs further allege that DreamTeam did, in fact, engage in the intended misleading marketing campaign by having authors use various pseudonyms and submit articles online touting Galena and that, as a result, Galena's stock price rose dramatically. Plaintiffs identify the dates and content of several articles and allege that DreamTeam caused to be published a total of 26 articles touting Galena. Plaintiffs also allege that shortly after DreamTeam's campaign began, Defendants caused Galena to conduct a $37.5 million public offering and that Galena's Compensation Committee awarded stock options in November 2013, at a time of year in which Galena stock options had never previously been granted. Further, these stock options vested on February 26, 2014, which was very close to the date when DreamTeam's eight-month promotional campaign was scheduled to end.

In addition, Plaintiffs allege that Galena issued press releases and filed SEC documents discussing Galena's financial status during DreamTeam's promotional campaign without disclosing the relationship between Galena and DreamTeam. Plaintiffs also allege the specific stock price increase caused by DreamTeam's promotion and that Defendants knew that Galena's rise in stock price was not due to any change in the underlying fundamentals of the company but

was a result of the misleading promotional campaign. After the stock price rose, within a span of 18 trading days, all but two of the Moving Defendants sold a significant amount of their personally-held Galena stock at artificially inflated prices, when none of the Selling Defendants had sold any Galena stock in the preceding four years.

The Moving Defendants argue that even if the DreamTeam authors failed to disclose the paid relationship between Galena and DreamTeam, this does not establish a scheme to fraudulently inflate Galena's stock because Plaintiffs fail specifically to allege anything in the articles that was false or misleading. This argument is without merit.

First, the fact that many of the articles were written by the same person but presented as being written by different people is, by itself, false or misleading. Second, the fact that the authors were paid to write positive comments and recommendations about Galena but did not disclose this fact is also misleading because it omits material information. Third, the volume of recommendations—more than 50 blog posts and 26 articles—all from DreamTeam and all paid for by Galena, yet not disclosed as part of the same paid brand-awareness campaign, is false or misleading by omission. Finally, Plaintiffs allege that NeuVax™ was lackluster, that Galena was a small company with few assets besides NeuVax,™ and that when analysts began realizing this fact Galena's stock price fell and the alleged scheme to use DreamTeam was born. Two of the articles Plaintiffs allege were false or misleading were entitled "Galena Biopharma Continues to Develop a Deep Pipeline of Products" and "Galena Biopharma Presents an Attractive Investment Opportunity." It is a reasonable inference from Plaintiffs' factual allegations regarding the health of Galena and its product line that Galena did not have a deep pipeline of products and that Galena was not an attractive investment opportunity. Thus, it is a reasonable inference that those articles were false or misleading.

PAGE 19 – OPINION AND ORDER ON MOTION TO DISMISS

As set out above, Plaintiffs allege sufficient facts to identify what is false or misleading, why it is false, and "the who, what, when, where, and how of the misconduct charged," thereby satisfying Rule 9(b). *Cafasso*, 637 F.3d at 1055 (quotation marks and citation omitted). Plaintiffs also allege sufficient facts to give rise to an inference that the hiring of DreamTeam was done to artificially inflate Galena's stock price through a misleading promotional campaign and that the officers and directors of Galena knew or were in a position to know this fact but did not disclose it. Additionally, the fact of this misleading promotional campaign would be material to investors who were buying Galena stock based on the recommendations by DreamTeam authors and the similarly-timed Company disclosures portraying a positive product line and financial status. This is also shown by the fact that Galena's stock tripled in price during DreamTeam's campaign when there was allegedly no change in the underlying fundamentals of Galena.

## 2. Duty to disclose the alleged scheme

The Moving Defendants also argue that Plaintiffs' allegations that Defendants breached their fiduciary duties by failing to disclose that Galena hired DreamTeam to market the Company and publish articles favorable to the Company must fail because Defendants had no duty to disclose that information. The Moving Defendants rely on *Garvey v. Arkoosh*, 354 F. Supp. 2d 73 (D. Mass. 2005).

*Garvey* is distinguishable from this case. *Garvey* involved allegations that Mr. Arkoosh, CEO of nominal defendant Diomed Holdings, Inc. ("Diomed"), caused Diomed to pay Verus International Holdings ("Verus") $750,000 for financial advisory services and that Verus then secretly funneled money to bribe stock analysts to tout Diomed. *Id.* at 82. The claims in *Garvey* were brought under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. The court in *Garvey* found "a nearly fatal disconnection between the timing of the publication of the analysts' reports and any conceivable influence the reports could have had on the public release

PAGE 20 – OPINION AND ORDER ON MOTION TO DISMISS

of Diomed stock" because, "[w]ith one debatable exception, all of the analysts' reports cited by plaintiffs were published at least one week later." *Id.* The Court also noted that the alleged "pumping" occurred nearly eight months before Mr. Arkoosh could legally sell any of his Diomed stock and seven months after the class period ended, thereby concluding that "if there was pumping, there was no dumping." *Id.* at 85. The present case concerning Galena involves nearly opposite allegations—Galena directly hired DreamTeam, the allegedly misleading articles were published over several months, allegedly causing a steady increase in the price of Galena's stock, and the Selling Defendants sold significant amounts of personal stock, in an unusual selling pattern, after the stock increased as a result of the alleged scheme to inflate the stock price.

Further, because *Garvey* was brought pursuant to the securities laws, the court in *Garvey* found it important that "nothing in the securities laws bars the issuer of a regulated security from paying an analyst for a stock recommendation" because "the approach taken in the securities laws . . . is to require disclosure of the fact that the analyst has been paid" and that under Section 17(b), the burden of disclosure "rests on the person who *publishes* the analyst's report; by contrast, there is no duty imposed by the statute on the *issuer* who has paid for the puffery." *Id.* at 83 (emphasis in original).

The Moving Defendants argue that, as found in *Garvey*, Galena had no duty to disclose the hiring of DreamTeam, so failing to disclose that fact cannot be a breach of fiduciary duty. The Moving Defendants are not asking the correct question. The question is not whether the securities laws require Galena to disclose the hiring of DreamTeam, but whether it is a violation of the fiduciary duties of the officers and directors of Galena to, as alleged, hire DreamTeam with the intent and purpose that it would engage in a misleading campaign to artificially inflate

Galena's stock price so that the directors and officers of Galena could profit by selling their personal stock at inflated prices. Plaintiffs have alleged sufficient facts to give rise to an inference that Defendants did so and that doing so was a violation of their fiduciary duties.

Moreover, the court in *Garvey* noted three circumstances that trigger a duty to disclose when a plaintiff alleges a material omission: "(1) when a corporate insider trades on confidential information; (2) when a corporation has made inaccurate, incomplete, or misleading prior disclosures; and (3) when a statute or regulation requires disclosure." *Id.* at 81 n.10. Here, Plaintiffs allege that corporate insiders traded on confidential information, thereby falling within *Garvey's* first example of when a duty to disclose is triggered. And, unlike in *Garvey*, here Plaintiffs have alleged sufficient facts from which it can be inferred that the alleged insiders traded their personal stock based on the material, nonpublic information that DreamTeam was hired to artificially inflate Galena's stock price. That was not the case in *Garvey*, where the alleged pumping occurred months before any sales of Mr. Arkoosh's personal stock were even possible.

At oral argument, counsel for Mr. Ahn argued that under *Janus Capital Grp., Inc. v. First Derivative Traders*, Defendants, including Mr. Ahn, did not have any duty to disclose. *Janus*, like *Garvey* (and unlike this case), involved claims brought under Section 10(b) and Rule 10b-5. *Janus* held that:

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker.

131 S. Ct. 2296, 2302 (2011). *Janus*, however, does not affect the issues presented here. Even in claims brought under Rule 10b-5, a company cannot escape liability for a third-party's statement

if it is alleged that the company intentionally used the third-party to disseminate false or misleading information. *See, e.g.*, *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009) (recognizing "that where the plaintiff adequately alleged that the defendant 'used . . . third parties to disseminate false information to the investing public,' the defendant 'cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties'") (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). A company may also be liable for third-party statements if the company is alleged to be "sufficiently entangled" so as to render the third-party statements attributable to the company. *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 373-74 (5th Cir. 2004).

These exceptions to the general concepts articulated in *Janus*, *Garvey*, and Section 17(b) are precisely what is alleged in this case. The Amended Complaint contends that Defendants paid DreamTeam and intentionally used DreamTeam to disseminate false and misleading information and that Galena's management retained control by requiring that they be allowed to review and edit the allegedly false and misleading articles before publication. These allegations satisfy the requirements for alleging breach of fiduciary duty for authorizing false and misleading statements, even by a third party.

### 3. Particularized facts regarding knowledge and intent

Defendants' argument that knowledge and intent must be alleged with specificity misunderstands the pleading requirements of Rule 9(b). The rule expressly states that knowledge and intent may be alleged generally. "To hold that the shareholders' complaint must explain what specific information the [defendants] obtained to make them know that their statements were false would ignore Rule 9(b)'s simple statement that 'knowledge . . . may be averred generally.'" *Cooper v. Pickett*, 137 F.3d 616, 628 (9th Cir. 1997) (applying Rule 9(b) to a securities fraud case pre-Private Securities Litigation Reform Act ("PSLRA")). "[W]hen a

complaint alleges with particularity the circumstances constituting fraud, as required by [Rule 9(b)], then generally it will also have set forth facts from which an inference of scienter could be drawn." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1546 (9th Cir. 1994) (applying Rule 9(b) to a securities fraud case pre-PSLRA).

The Director Defendants also argue that Plaintiffs engage in improper "group pleading" that is insufficient to support individual liability, citing *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007), for the proposition that "knowledge on the part of any one board member [cannot] be imputed to other board members as a result of their shared board or committee service." The Director Defendants misapply *Desimone*. The quoted section of *Desimone* was analyzing "demand futility" under Rule 23.1, which under the applicable circumstances required scienter be plead with specificity. *See, e.g.*, *Wood v. Baum*, 953 A.2d 136, 141-42 (Del. 2008). As noted above, Rule 9(b) does not have such a requirement.

Moreover, arguments that under Rule 9(b) a plaintiff must plead facts giving rise to scienter with specificity have been rejected by the U.S. Court of Appeals for the Ninth Circuit. *See Cooper*, 137 F.3d at 628 (rejecting arguments that a plaintiff must allege in detail the basis of a defendant's knowledge that statements made were fraudulent, how that information reached the alleged speaker, and what specific information was falsified by the speaker because they amount to an improper argument that scienter, not falsity, must be pled with specificity); *In re GlenFed*, 42 F.3d at 1546 (declining to adopt the interpretation that Rule 9(b) contains an "*independent* requirement that a complaint allege with particularity facts giving rise to an inference of scienter—which we would take to mean alleging such things as that defendants had read or otherwise knew about particular documents giving rise to an inference that the charged statements were false when made") (emphasis in original). Here, Plaintiffs have sufficiently

alleged the circumstances constituting the alleged dissemination of false and misleading information and have alleged facts from which a reasonable inference of scienter can be drawn. Plaintiffs are not required to plead knowledge and intent with further specificity.

At oral argument, the Director Defendants further argued that the Amended Complaint improperly uses group pleading to allege who engaged in what alleged wrongdoing and how, instead of identifying each individual director's specific actions giving rise to liability. The Court disagrees. The Amended Complaint alleges that Defendants were all directors and senior officers of Galena throughout the relevant time period and were in control of the Company. It then specifically alleges various actions the directors and officers caused the Company to engage in, such as hiring DreamTeam for the purpose of engaging in a misleading campaign. It also alleges certain claims against only a subset of Defendants who were allegedly responsible for certain actions, such as against the Compensation Committee Defendants for issuing the allegedly improper stock options. Courts have found group allegations against directors to be insufficient where some directors were not on a company's board during some of the alleged misconduct. *See, e.g.*, *In re Sagent*, 278 F. Supp. 2d at 1093 ("Because a number of defendants either left or joined the company during the time period spanned by the complaint, the complaint cannot state a claim for breach of fiduciary duty in the absence of more specific allegations regarding which defendants are alleged to have performed which acts."). Because Defendants here were directors and officers throughout the relevant time period, such concerns are not present in this case. *Cf. In re Am. Apparel, Inc. S'holder Derivative Litig.*, 2012 WL 9506072, at * 41-42 (C.D. Cal. Jul. 31, 2012) (noting, without reaching the merits of the breach of fiduciary duty claims, where almost all directors were on the board during the relevant time period that "if directors are similarly situated, pleading the liability of each may not be required" but that one director who joined the

board later "stands in a materially different position than the rest of the board members," which may require more specific factual allegations regarding his conduct).

## D.  Count Two—Breach of Fiduciary Duty (Failing to Maintain Internal Controls)

In their second count, Plaintiffs allege that Defendants had a fiduciary duty to exercise good faith to ensure that the Company's financial statements were properly prepared in accordance with generally accepted accounting principles ("GAAP") and to correct any misconduct with the Company's business practices and controls. Am. Compl. ¶ 108. Plaintiffs further allege that Defendants "willfully ignored the obvious and pervasive problems with Galena's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence." Am. Compl. ¶ 109. The latter allegations essentially amount to a classic *Caremark*[5] claim.

Under Delaware law, "directors can be held liable under [the *Caremark*] theory for knowingly causing or consciously permitting the corporation to violate positive law, or for failing utterly to attempt to establish a reporting system or other oversight mechanism to monitor the corporation's legal compliance." *South v. Baker*, 62 A.3d 1, 6 (Del. Ch. 2012). Because a *Caremark* claim "requires a plaintiff to show that 'the directors knew that they were not discharging their fiduciary obligations' *i.e.*, bad faith—as a 'necessary condition[ ] predicate for director oversight liability,' it has been considered 'possibly the most difficult theory in corporation law' to support a stockholder derivative action." *In re China Auto. Sys. Inc. Derivative Litig.*, 2013 WL 4672059, at *7 (Del. Ch. 2013) (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *Caremark*, 698 A.2d at 967) (citations omitted) (alteration in original). A director's failure to act in good faith may be evidenced by allegations that the

---

[5] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

director: (1) intentionally "acts with a purpose other than that of advancing the best interests of the corporation"; (2) "acts with the intent to violate applicable positive law"; or (3) "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Stone*, 911 A.2d at 369 (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (quotation marks omitted)). This list is not exclusive. *Id.* The third example encompasses allegations of the lack of good faith found sufficient in the *Caremark* case—"a sustained or systemic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists." *Id.* (quoting *Caremark*, 698 A.2d at 971.

As an initial matter, Plaintiffs assert this claim against all Defendants. The Moving Defendants argue that *Caremark* claims are a basis on which to support *director* liability. *See, e.g.*, *Stone*, 911 A.2d at 365 ("*Caremark* articulates the necessary conditions for assessing director oversight liability."); *South*, 62 A.3d at 6 (noting that *directors* can be liable under the *Caremark* theory). Plaintiffs cite to no case holding that non-director officers can be liable for failing to maintain internal company controls, and Plaintiffs do not explain the basis for asserting this claim against Defendants Dunlap and Schwartz, who are alleged to be non-director officers. Thus, this claim is dismissed against Defendants Dunlap and Schwartz because they are not alleged to have served on Galena's Board.

With respect to those Defendants who are alleged to have served on Galena's Board, Plaintiffs argue that they have properly alleged a *Caremark* claim because they plead that the Board caused Galena to file reports with the SEC stating the Company's financial results and failing to disclose the Company's stock promotion deal with DreamTeam. Plaintiffs argue that

Defendants had an obligation to disclose that deal because it was part of a plan from which Defendants intended to, and did, sell their personally-owned stock for personal profit.

As discussed above, the Court has already concluded that Plaintiffs sufficiently allege facts from which it can be inferred that Defendants did not act in good faith by hiring DreamTeam, reviewing and approving articles submitted by DreamTeam, requiring that DreamTeam authors not disclose that Galena paid DreamTeam for promotional articles, and selling personally-held Galena stock for personal gain after the DreamTeam promotion increased Galena's stock price. Plaintiffs have not, however, alleged sufficient facts from which it can plausibly be inferred that Galena's financial statements violated GAAP. Plaintiffs also have not identified the alleged "obvious and pervasive problems with Galena's internal controls" and how Defendants "failed to make a good faith effort to correct problems" with Galena's internal controls.[6] Thus, Plaintiffs' second count is dismissed, with leave to replead.

### E. Counts Three and Ten—Unjust Enrichment

In their third count, Plaintiffs assert that all Defendants have been unjustly enriched and should be required to disgorge their profits, compensation, and benefits received during the time of the alleged scheme and from the sale of their personally-held Galena stock. In their tenth count, Plaintiffs assert that the Defendants who received the November 2013 stock options were unjustly enriched and should be required to disgorge their profits, benefits, and other compensation in connection with that stock option grant.

---

[6] Plaintiffs argue that the Court should consider Galena's Corporate Code of Ethics and Conduct, which prohibits insider trading such as Plaintiffs allege occurred in this case, in evaluating this claim. It is unclear how Plaintiffs propose the Court consider this fact relevant to Plaintiffs' *Caremark* claim, but to the extent it is meant to be an example of the failure of Galena's internal controls, Plaintiffs did not sufficiently explain in their second count how Defendants breached their fiduciary duty to maintain internal controls by failing to comply with Galena's Code.

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citation and quotation marks omitted). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id.* The "impoverishment" element "does not require that the plaintiff seeking a restitutionary remedy suffer an actual financial loss, as distinguished from being deprived of the benefit unjustifiably conferred upon the defendant." *Id.* at n.37 (citing *Metcap Securities LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 n. 26 (Del. Ch. Feb. 27, 2009) (stating that an "impoverishment" is not critical to an unjust enrichment claim because restitution may be awarded based solely on the benefit conferred upon the defendant, even in the absence of an impoverishment suffered by the plaintiff)).

## 1. Count Three

The Moving Defendants argue that Plaintiffs fail to allege facts from which it can be inferred that Defendants obtained any benefit to which they were not entitled because Plaintiffs do not allege the value of Defendants' services to Galena as officers and directors and that the compensation received by Defendants was greater than the value of those services. This argument is rejected with respect to the Selling Defendants. Plaintiffs have alleged facts from which it can plausibly be inferred that Defendants entered into a plan to artificially inflate the stock price of Galena and then sell their personally-held stock at inflated prices. Thus, as alleged by Plaintiffs, the Selling Defendants sold their stock and received a benefit and allowing them to retain that benefit would go against fundamental principles of justice, equity, or good conscience.

To the extent count three is intended to assert claims for unjust enrichment against the Selling Defendants or Defendants Dunlap and Ashton (neither of whom are alleged to have sold personal shares of Galena stock) for their normal or ordinary compensation, such claims require facts be alleged connecting the normal compensation to the alleged wrongdoing or giving rise to a reasonable inference that the compensation was unjustified. *See, e.g.*, *In re Capital One Derivative Shareholder Litig.*, 952 F. Supp. 2d 770, 783 (E.D. Va. 2013) (claim that the defendants were unjustly enriched and should disgorge their compensation and benefits because they were paid to perform a duty and breached that duty when they allowed the company to violate the law dismissed because no facts were plead indicating a relationship between the compensation and the wrongdoing or that the compensation was unjustified); *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 465-66 (S.D.N.Y. 2010) ("Here, the only enrichment alleged by plaintiffs consists of defendants' salaries, benefits, and unspecified bonuses. Plaintiffs have not pleaded that defendants' compensation during this period was of extraordinary magnitude, and have not cited any legal authority supporting the proposition that the mere retention of directors' and officers' ordinary compensation can sustain an unjust enrichment claim predicated on allegations that these defendants breached their fiduciary duties."). Here, Plaintiffs fail to allege facts from which it can plausibly be inferred that Defendants' normal compensation was extraordinary, unjustified, or connected to the alleged wrongdoing. Thus, Plaintiffs' third count is dismissed against Defendants Dunlap and Ashton and dismissed against the Selling Defendants with respect to their normal or ordinary compensation, with leave to replead.

### 2. Count Ten

The Moving Defendants argue that Plaintiffs' unjust enrichment claim with respect to receipt of the November 2013 stock options must fail because those Defendants did not exercise

any of the options received. The Director Defendants rely on a District of Oregon case, *Sommers v. Lewis*, 641 F. Supp. 2d 1151, 1164 (D. Or. 2009), to support this proposition. In *Ryan v. Gifford*, 918 A.2d 341, 361 (Del. Ch. 2007), however, the court held that stock options need not be exercised to state a claim. In *Ryan*, the Court of Chancery of Delaware explained:

> At this stage, I cannot conclude that there is no reasonably conceivable set of circumstances under which Gifford might be unjustly enriched. Gifford does retain something of value, the alleged backdated options, at the expense of the corporation and shareholders. Further, defendants make no allegations that Gifford is precluded from exercising these options or that the options have expired. Thus, one can imagine a situation where Gifford exercises the options and benefits from the low exercise price. Even if Gifford fails to exercise a single option during the course of this litigation, that fact would not justify dismissal of the unjust enrichment claim. Whether or not the options are exercised, the Court will be able to fashion a remedy. For example, this Court might rely on expert testimony to determine the true value of the option grants or simply rescind them. Either way, Gifford's alleged failure to exercise the options up to this point does not undermine a claim for unjust enrichment. Thus, I deny the motion to dismiss the unjust enrichment claim.

918 A.2d at 361.

This case is similar to *Ryan*, and distinguishable from *Sommers*, in that there is no allegation that the Defendants who received the November 2013 stock options cannot exercise the options or that they have expired.[7] In contrast, the court in *Sommers* dismissed the unjust enrichment claim against only one option-recipient defendant, a recipient of the alleged backdated stock options who did not exercise his options, was terminated, and whose options had expired. *Sommers*, 641 F. Supp. 2d at 1164. Additionally, the Court is persuaded by the reasoning of Chancellor Chandler in *Ryan* that at this stage it is not appropriate to dismiss the unjust enrichment claim.

---

[7] At oral argument, counsel for Galena confirmed that the November 2013 stock options have not expired.

PAGE 31 – OPINION AND ORDER ON MOTION TO DISMISS

Defendants also argue that this unjust enrichment claim should be dismissed because Plaintiffs do not allege facts from which it can be reasonably inferred that the granting of the stock options was anything other than normal compensation. The Moving Defendants argue any assertion by Plaintiffs to the contrary is belied because the alleged scheme started five months before the options were granted. As discussed above, the Court has found that Plaintiffs have adequately alleged facts from which the alleged scheme can reasonably be inferred. From the alleged facts it can also be inferred that the November 2013 grant of stock options was part of this alleged scheme. Although Galena hired DreamTeam five months before the stock options were granted, there was no way for Defendants to know if the promotional campaign by DreamTeam would work and the stock price would increase. As the promotional campaign began succeeding and Galena's stock price began rising, it is reasonable to infer that the Compensation Committee Defendants granted the options as part of the alleged scheme. As alleged by Plaintiffs, the Compensation Committee Defendants granted the options before there were "further increases in Galena's stock price." This conclusion is also evidenced by the allegations that the options were granted at a particular time of year that options had not previously been granted, were granted within days of a DreamTeam-authored article, and were scheduled to vest shortly after DreamTeam's campaign was set to finish.

## F.  Count Four—Breach of Fiduciary Duty (Insider Selling)

Plaintiffs allege that the Selling Defendants breached their fiduciary duties by selling their personally-held Galena stock at a time when they possessed material, non-public information about the company. In particular, Plaintiffs allege that the Selling Defendants possessed information about Galena's true financial status and product line and the fact that the positive marketing and concomitant increase in stock price was part of a paid campaign entered-

into with the purpose of artificially inflating Galena's stock price. This claim sounds in fraud and is subject to Rule 9(b).

The standard under Delaware law for insider selling claims was announced in *Brophy v. Cities Serv., Inc.*, 70 A.2d 5 (Del. Ch. 1949). *See In re Oracle Corp.*, 867 A.2d 904, 905 (Del. Ch. 2004) (noting insider selling claims are brought "under the venerable case of *Brophy*"). *Brophy* is "rooted in trust principles that provide that, if a person in a confidential or fiduciary position, in breach of his duty, *uses his knowledge* to make a profit for himself, he is accountable for such profit." *Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003) (emphasis in original) (quotation marks and citation omitted). The doctrine "that directors who misuse company information to profit at the expense of innocent buyers of their stock should disgorge their profits" is "not designed to punish inadvertence, but to police intentional misconduct." *Id.*

To state a claim for insider trading under Delaware law, a plaintiff must allege that the insider selling defendants possessed material, non-public information and used that information improperly by making stock trades while motivated, in whole or in part, by the substance of such information. *In re Oracle.*, 867 A.2d at 926; *see also In re Accuray, Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d 919, 936 (N.D. Cal. 2010) ("To state a claim under Delaware law, Plaintiffs must allege that Defendants possessed material, non-public information and used that information improperly by making stock trades while motivated by the substance of such information."); *Guttman*, 823 A.2d at 505 (noting that a plaintiff must allege "particularized facts that support a rational inference that [the] directors possessed information [about the company] that was materially different than existed in the marketplace as the time they traded"). As previously discussed, Plaintiffs have alleged sufficient facts from which it can be inferred that the fact of the paid promotional campaign was material, non-public information.

Defendants argue that Plaintiffs failed to plead with particularity the required scienter—that the Selling Defendants knew about the alleged scheme. This argument is unavailing. First, this claim is evaluated under Rule 9(b), and scienter can be alleged generally. As discussed above, Plaintiffs have adequately pled Defendants' knowledge of the alleged scheme. Plaintiffs have also pled that Defendants sold significant quantities of their personally-held stock, in the span of 18 trading days, after the DreamTeam campaign had caused Galena's stock price to increase substantially. This is sufficient to state a claim for insider selling.

Second, even in cases evaluated under the securities laws, which require pleading particularized facts giving rise to a strong inference of scienter, the quantity and timing of stock sales can meet that burden. Insider sales give rise to an inference of scienter "when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066-67 (9th Cir. 2008) (quotation marks and citation omitted). Factors relevant to this inquiry are: "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *Id.* at 1067. Plaintiffs have adequately alleged that the Selling Defendants sold large amounts of their personally-held Galena stock in a span of 18 trading days, at a time when the alleged DreamTeam scheme had raised Galena's stock price but was in jeopardy of being disclosed. In fact, the alleged selling frenzy ended only when the media began reporting about the paid promotional campaign. Further, Plaintiffs allege that these stock sales were dramatically out of line with prior trading practices because the Selling Defendants had not sold any of their Galena stock in the preceding four years. Thus, even under the heightened pleading standard of the

PSLRA, which does not apply in this case, Plaintiffs have adequately stated a claim for insider trading.

### G.  Counts Five, Six, and Seven—Abuse of Control; Gross Mismanagement; Rescission

The Moving Defendants argue that "abuse of control" and "gross mismanagement" are not recognized under Delaware law as separate claims but are merely a repackaging of claims for breach of fiduciary duty, citing *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 114 n.6 (Del. Ch. 2009) ("Delaware law does not recognize an independent cause of action against corporate directors and officers for reckless and gross mismanagement; such claims are treated as claims for breach of fiduciary duty."); *Engel v. Sexton*, 2009 WL 361108, at *15 (E.D. La. Feb. 11, 2009) (noting that abuse of control and gross mismanagement "are often considered a repackaging of claims for breach of fiduciary duty instead of being a separate tort"); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1019 (N.D. Cal. 2007) (same).[8] The Moving Defendants also argue that rescission is not a separate claim, but is instead a type of equitable remedy, citing *Engel*, 2009 WL 361108, at *15 ("Additionally, accounting and rescission are equitable remedies, not claims under the law."); *In re Ditech Networks, Inc. Derivative Litig.*, 2007 WL 2070300, at *10 (N.D. Cal. July 16, 2007) (holding, where the plaintiffs did not respond to the defendants' argument that rescission was a remedy, that plaintiffs should include rescission as a remedy and not a claim); *Zoran*, 511 F. Supp. 2d at 1019 (dismissing a claim for rescission because "rescission is a form of remedy, not a claim under the law").

---

[8] The Moving Defendants also cite to *Sommers* as standing for the proposition that Delaware law does not recognize abuse of control and gross negligence. *Sommers*, however, held that *Oregon* law does not recognize these torts. *Sommers*, 641 F. Supp. 2d at 1164-65. The court in *Sommers* addressed the specific cases cited by the plaintiff in *Sommers* for the proposition that Delaware law recognized these torts and noted that those specific cases did not stand for such a proposition, but the court in *Sommers* did not categorically hold that Delaware law does not recognize those torts.

Plaintiffs bear the burden of demonstrating that they are entitled to relief under the theories alleged in the Amended Complaint. Plaintiffs' only response in their brief to Defendants' argument and case authority regarding the gross mismanagement and abuse of control claims is a one-sentence footnote stating that for the same reasons Plaintiffs have adequately alleged breach of fiduciary duty, they have adequately stated claims for abuse of control and gross mismanagement. Plaintiffs cite to no authority recognizing these causes of action as independent torts distinct from a claim of breach of fiduciary duty.

At oral argument, Plaintiffs asked the Court to consider *Belova v. Sharp*, 2008 WL 700961 (D. Or. Mar. 13, 2008), in support of the proposition that gross mismanagement and abuse of control are separate torts. As an initial matter, the defendants in *Belova* did not move to dismiss those claims on the grounds that they were not separate torts from breach of fiduciary duty and, thus, the court did not address the specific question that is before this Court. The court in *Belova* did not discuss the abuse of control claim and with respect to the gross mismanagement claim, cited to *Cincinnati Bell Cellular Systems Co. v. Ameritech Mobile Phone Service of Cincinnati, Inc.*, 1996 WL 506906 (Del. Ch. 1996), for the elements of a such a claim and concluded that enough facts were plead to state a claim in *Belova*.

*Cincinnati Bell*, however, does not help Plaintiffs. In that case, a limited partner filed suit against the general partner alleging, among other claims, breach of fiduciary duty for failing to sell the partnership and gross mismanagement for an alleged pattern of improperly managing the partnership. The court in *Cincinnati Bell* analyzed the gross mismanagement claim as one of gross negligence, and repeatedly referred to it as gross negligence. *Id.* at *1, 13-15. Notably, Judge Michael W. Mosman, the judge who decided *Belova*, was later faced with a direct challenge to the viability of gross mismanagement and abuse of control as independent torts

separate from breach of fiduciary duty and expressly found that *Cincinnati Bell* did not support such a proposition. *Sommers*, 641 F. Supp. 2d at 1165.[9] Moreover, the "gross mismanagement" claim in *Cincinnati Bell* was premised on different factual conduct than the breach of fiduciary duty claim. Here, the allegations supporting the gross mismanagement claim are identical to the allegations supporting the breach of fiduciary duty claim. Under the circumstances of this case, Plaintiffs fail to meet their burden of demonstrating that gross mismanagement and abuse of control are viable as independent claims. Accordingly Plaintiffs fifth and sixth counts are dismissed.

Plaintiffs offer no response to Defendants' argument and case authority that rescission is a remedy and not a cause of action. The Court agrees with Defendants that, under the circumstances of this case, rescission may be included as a requested equitable remedy, but not as a separate cause of action. Plaintiffs' seventh count is dismissed, although Plaintiffs may assert rescission as a requested equitable remedy for breach of fiduciary duty in any further amended complaint.

## H. Count Eight—Breach of Fiduciary Duty (Forum Selection Clause)

Plaintiffs' eighth count is asserted against Defendants Ahn, Hillsberg, Chin, Galliker, Kriegsman, Nisi, and Ashton for breach of fiduciary duty in connection with the enactment and attempted enforcement of the forum selection clause. The Moving Defendants argue that Plaintiffs' breach of fiduciary duty claim with respect to the Board's amending Galena's Bylaws to include a forum selection clause must be dismissed because: (1) they fail to meet the requirements of Rule 9(b) because they do not show each Board member's alleged knowledge

---

[9] As noted in Footnote 7, although Judge Mosman held that abuse of control and gross mismanagement were not independent torts under Oregon law, he also discredited the plaintiff's argument that several cited Delaware cases established that gross mismanagement and abuse of control were independent torts under Delaware law.

and involvement in the enactment and purported enforcement of the clause; (2) amending bylaws to add a forum selection clause does not prevent a suit against directors and officers, but merely chooses a forum and is protected by the business judgment rule; and (3) Plaintiffs did not plead any damage to Galena as a result of the forum selection clause. These arguments are unavailing.

As previously discussed, Rule 9(b) does not require pleading scienter with particularity. Plaintiffs have pled that the Board passed the forum selection Bylaws amendment and that all Defendants against whom this claim is asserted were members of the Board at the time the amendment was passed and at the time Galena and the individual Defendants attempted to enforce the forum selection clause in court. Plaintiffs are not required under Rule 9(b) to specifically allege each director's individual knowledge of the Bylaws amendment or attempted enforcement of the forum selection clause.

With respect to the Board's conduct in amending Galena's Bylaws, the Moving Defendants miss the critical question. The Moving Defendants cite to cases holding that forum selection clauses are valid and appropriate, that hundreds of corporations have enacted them, and that they serve a legitimate business function. The issue, however, is not whether amending company bylaws to add a forum selection clause is generally appropriate and permissible because it merely chooses a particular forum. Instead, as alleged by Plaintiffs, the claim is that the Board knew or should have known that the Delaware statute under which the Board purportedly amended Galena's Bylaws requires that a company's certificate of incorporation provide the Board with authority unilaterally to amend the bylaws before a board may do so and that Galena's Certificate of Incorporation does not provide that authority. To the contrary, Galena's Certificate of Incorporation requires a 75 percent shareholder vote to amend its Bylaws. Thus, as alleged by Plaintiffs, the attempt to amend Galena's Bylaws to add the forum selection

PAGE 38 – OPINION AND ORDER ON MOTION TO DISMISS

clause violated both Delaware law and Galena's Certificate of Incorporation. Plaintiffs also allege that the Board enacted the forum selection clause shortly after hiring DreamTeam and the same day that the first substantive article by DreamTeam appeared on *Seeking Alpha*. These allegations are sufficient to support an inference that the Defendants named in Plaintiffs' eighth count breached their fiduciary duties in attempting unlawfully to amend Galena's Bylaws by enacting the forum selection clause.

Finally, Plaintiffs have pled sufficient harm to Galena with respect to this claim. Galena paid attorney's fees to litigate motions to dismiss in multiple courts based on the forum selection clause, only to withdraw that motion, after the motions to dismiss were fully briefed. Additionally, the forum selection clause has not been formally rescinded, shareholders have not been informed of its alleged invalidity, and although it is no longer being enforced in the current proceedings, there is no guarantee that Galena will not attempt to enforce it in the future, particularly against unsophisticated future plaintiffs.

## I.   Count Nine—Breach of Fiduciary Duty (November 2013 Stock Options)

Plaintiffs assert against the Compensation Committee Defendants a claim for breach of fiduciary duty or aiding and abetting breach of fiduciary duty relating to the issuance of the November 2013 stock options. Defendants argue that this claim fails because Plaintiffs do not allege that the Compensation Committee Defendants received a benefit from the granting of the options or that the Compensation Committee Defendants exercised their options. This argument misunderstands Plaintiffs' claim. Plaintiffs' ninth count is not that the Compensation Committee Defendants breached their fiduciary duties by *obtaining* a personal benefit from the granting of the stock options,[10] but that they breached their fiduciary duties by *granting* those options for an

---

[10] Plaintiffs' tenth count, unjust enrichment, is asserted against the recipients of the options and focuses on the alleged impropriety of receiving the options.

improper purpose or in bad faith. *See, e.g.*, *In re Bidz.com*, 773 F. Supp. 2d at 854 (dismissing breach of fiduciary duty claim based on the granting of stock options because the plaintiffs alleged only that the stock options were awarded, "not that the options were awarded in bad faith, for an improper purpose or without any consideration"). Such a claim does not require that the options be granted to compensation committee members or exercised by those members. To the contrary, such a claim is often brought where the allegations are that the defendants named in the claim improperly granted stock options to others. *See, e.g.*, *id.*

Defendants also argue that Plaintiffs fail to allege with particularity under Rule 9(b) the "who, what, when, where, and how" of the alleged breach because Plaintiffs do not allege the participation and knowledge of the alleged scheme by the Compensation Committee Defendants during the time of the option grants. This argument is rejected.

Knowledge under Rule 9(b) may be alleged generally. Plaintiffs allege that all Defendants, including the Compensation Committee Defendants, knew about the DreamTeam scheme and hired DreamTeam with the intent of inflating Galena's stock price and cashing in. Plaintiffs further allege that DreamTeam engaged in the promotional campaign, Galena's stock price rose as a result, and the three Compensation Committee Defendants awarded stock options on November 26, 2013, as the promotional scheme was underway and only a few days after the publication of a pro-Galena article. These stock options were scheduled to vest shortly after the conclusion of DreamTeam's campaign, which it is reasonable to infer was believed by the Compensation Committee Defendants to be the time that Galena's stock price would be at or near its highest. This ultimately did not turn out to be how events unfolded because the paid relationship between DreamTeam, the authors of the pro-Galena articles and posts, and the Galena directors and officers came to light before the options vested. That does not, however,

mean it cannot be inferred that the Compensation Committee Defendants believed at the time the options were granted that DreamTeam's paid promotional campaign, which had begun to work, would result in a higher stock price at the time the options were to vest. As discussed above with respect to the Court's analysis of Count Ten, Plaintiffs allege sufficient facts from which it can be inferred that the stock option grant was not normal or ordinary compensation.

Plaintiffs also have adequately alleged facts from which it can be inferred that the Compensation Committee Defendants issued the November 2013 stock options in bad faith or for an improper purpose. As discussed by the Delaware Court of Chancery, in a slightly different context, granting stock options while in possession of material, non-public information that one knows will affect the stock price cannot be done in good faith. *In re Tyson Foods, Inc.*, 919 A.2d 563, 593 (Del. Ch. 2007) ("A director who intentionally uses inside knowledge not available to shareholders in order to enrich employees while avoiding shareholder-imposed requirements cannot, in my opinion, be said to be acting loyally and in good faith as a fiduciary."). Plaintiffs allege that the Compensation Committee Defendants were in possession of material, non-public information—the fact that the numerous articles and blog posts touting Galena were part of a unified, paid campaign to artificially inflate Galena's stock price—and knew that this non-public information was, in fact, increasing Galena's stock price. Thus, as alleged by Plaintiffs, it can reasonably be inferred that the Compensation Committee Defendants awarded the options in bad faith or for an improper purpose.

## J.  Damages

The Moving Defendants argue that Plaintiffs fail adequately to plead damages or injury to Galena because the Amended Complaint merely includes speculative and conclusory assertions that Galena has been harmed. Plaintiffs respond that they have made detailed allegations concerning the amounts received by the Selling Defendants in selling their stock,

PAGE 41 – OPINION AND ORDER ON MOTION TO DISMISS

which Plaintiffs seek to disgorge, as well as the value of the stock options for which they seek a remedy. Plaintiffs also argue that the Company has been damaged by incurring investigatory costs, funding its response to the SEC investigation, and defending securities class action lawsuits, as well as by damage to its business reputation.

Defendants are correct that damages cannot be speculative, "but this only means that the *fact* of damages, not their amount, cannot be uncertain." *Pfahler v. National Latex Prods. Co.*, 517 F.3d 816, 837 (6th Cir. 2007) (emphasis in original). As discussed above, Plaintiffs have adequately alleged claims for unjust enrichment, breach of fiduciary duty for insider selling, and breach of fiduciary duty relating to the issuance of the November 2013 stock options, including the requisite harm to Galena. Further, "Delaware has long recognized the availability of a stockholder derivative action to recover profits obtained by corporate insiders through a breach of their fiduciary duties." *In re Symbol Techs. Secs. Litig.*, 762 F. Supp. 510, 517 (E.D.N.Y. 1991) (citing *Brophy*, 70 A.2d 5; *Diamond v. Oreamuno*, 248 N.E.2d 910, 915 (N.Y. 1969); *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 (2d Cir. 1980)). Courts have ruled that damages may be awarded in a derivative action based on a breach of fiduciary duty, absent a showing of actual injury to the corporation, and even if the possibility exists that some third party may in the future bring a superior claim based on the same conduct. *See Diamond*, 248 N.E.2d at 915; *see also Walton*, 623 F.2d at 798 ("The appellants are correct, for *Brophy*, which the Delaware courts have consistently followed, states that a plaintiff need not allege injury to the corporation when claiming a breach of fiduciary duty and seeking an accounting of profits.").[11]

---

[11] With the advent of Rule 10(b)(5) undermining some of the concern in *Brophy* that there was no adequate federal securities cause of action to address insider selling, Courts have

With respect to Plaintiffs' remaining claims, Plaintiffs have alleged that Galena's stock price has dropped significantly since Defendants' alleged conduct was made public. This is a sufficient allegation of damages to withstand a motion to dismiss. *See Bilunka v. Sanders*, 1994 WL 447156, at *2 (N.D. Cal. Mar. 1, 1994) (finding that allegation that company stock price dropped after the defendants' conduct was revealed is sufficiently non-speculative damage to withstand motion to dismiss).

Finally, Defendants are correct that Plaintiffs may not assert as damages future costs to Galena as a result of any liability that may arise from the securities class. *See In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 922 F. Supp. 2d 445, 474 (S.D.N.Y. 2013) ("Courts have found damages unrecoverable where they are contingent 'on the outcome of a class action suit in which no judgment has been entered or settlement reached.'") (quoting *In re Cray Inc.*, 431 F. Supp. 2d 1114, 1133 (W.D. Wash. 2006)); *see also In re Symbol Techs.*, 762 F. Supp. at 516. Plaintiffs may, however, rely on costs already expended by Galena for attorney's fees and internal investigations and in responding to the SEC investigation. *See, e.g., In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 135 (D.N.J. 1999) ("Here, unlike *Symbol Technologies*, [Defendant] has already incurred legal expenses . . . ."). Such costs are general damages, which may be alleged generally, as compared to special damages, which must be specifically stated under Rule 9(g).[12] Plaintiffs have not, however, alleged such damages, even generally. In

---

crafted methods, such as payment into a trust until all related litigation concludes, to avoid double recovery against corporate insiders. *See, e.g., In re Symbol Techs.*, 762 F. Supp. at 518.

[12] The Moving Defendants rely heavily on a quoted portion of *Symbol Technologies*, stating that "boilerplate language is not sufficient to withstand a motion to dismiss." 762 F. Supp. at 517. This quoted portion, however, is from the court's discussion of the plaintiffs' claim of corporate waste based on purported loss of reputation and expenses relating to a related securities class action. The court held that for a claim of corporate waste to survive a motion to dismiss, the plaintiff must more specifically allege the purported waste of assets—the damage to the corporation and how that damage flowed from the defendants' bad acts. Such analysis is

Plaintiffs' brief, they argue that such damages have already been suffered by Galena, but these damages are not alleged in the Amended Complaint. To the extent Plaintiff wishes to rely on these types of general damages, Plaintiff must identify, at least by category, them in any amended complaint.

## K.  Plaintiff Rathore's Standing

The Moving Defendants argue that Plaintiff Pratik Rathore has not adequately alleged standing because he only asserts that he has owned stock since January 2014 and the law requires ownership of stock contemporaneous with the alleged transaction. Plaintiffs summarily assert that Plaintiff Rathore has adequately pled standing with his "January 2014" ownership allegation and argue that the purpose behind the continuous ownership law, to prevent persons from purchasing stock for the purpose of litigation, does not apply in this case and that it would exalt form over substance to find that Plaintiff Rathore does not have standing. Plaintiffs' arguments are rejected.

Under Rule 23.1, a plaintiff must allege that he or she "was a shareholder or member at the time of the transaction complained of." Fed. R. Civ. P. 23.1. A derivative plaintiff has no standing to challenge transactions that occurred before the time that the plaintiff owned company stock. *See In re Computer Sciences Corp. Derivative Litig.*, 244 F.R.D. 580, 591 (C.D. Cal. 2007); *see also Desimone*, 924 A.2d at 924-27 (under Delaware law, "continuing wrong" doctrine does not afford shareholder standing to challenge earlier wrongs that pre-date a plaintiff's stock ownership).

---

inapplicable here, where a claim for corporate waste has not been alleged. Notably, in the paragraph following the discussion of damages in the corporate waste context, the court in *Symbol Technologies* discussed damages more generally and the fact that Delaware has long recognized damage to a corporation through the breaches of fiduciary duties of its officers and directors. That later section of *Symbol Technologies* is quoted above and relied on in the Court's opinion.

Here, Plaintiff Rathore has not met Rule 23.1's pleading requirement.[13] Plaintiff Rathore has not pled his status as a shareholder at all times relevant to the transactions challenged in the Amended Complaint. There are many challenged actions that occurred before January 2014, including the hiring of DreamTeam, the publication of numerous articles, and the granting of the November 2013 stock options. Plaintiff Rathore does not have standing to challenge those actions. With respect to challenged actions that occurred in January 2014, including some of the challenged stock sales, because Plaintiff Rathore did not allege what date in January he first purchased Galena stock, the Court cannot assess which actions alleged to have taken place in January 2014 Plaintiff Rathore has standing to challenge.

Accordingly, the Moving Defendants' motion to dismiss the claims alleged by Plaintiff Rathore is granted. If Plaintiff Rathore chooses to amend, he must unambiguously indicate the date he first purchased Galena stock and that he has continuously owned Galena stock since the date of purchase, and he may then have standing only to challenge actions that occurred after his date of purchase. The practical effect of this dismissal appears to be negligible, however, because Plaintiff Klein remains and there has been no challenge to his standing.

---

[13] The cases cited by Plaintiffs in arguing for a more lenient standing analysis do not support Plaintiffs' argument. *Bateson v. Magna Oil Corp.*, 414 F.2d 128, 131 (5th Cir. 1969), involved a plaintiff who was a longstanding shareholder who intended to bring a derivative claim, allegedly inadvertently sold his stock, and repurchased shares shortly thereafter. The court in *Bateson* held that "it would exalt form over substance" to find that the plaintiff did not have standing. The facts of ownership in *Bateson* are not present here. *Brambles USA, Inc. v. Blocker*, 731 F. Supp. 643 (D. Del. 1990) does not help Plaintiffs because the cited proposition relates to Delaware statutory law, not Federal Rule of Civil Procedure 23.1, and because the court in *Brambles* discussed the liberal construction of Section 327 of Delaware General Corporation Law in the context of the continuing wrongs doctrine, which Plaintiffs do not argue applies in this case. Further, the court in *Brambles* did not apply the continuing wrongs doctrine and found the plaintiff in that case did not have standing because he purchased his stock after the alleged transaction. Finally, in *Fujimoto v. Au*, 19 P.3d 699, 730 (Haw. 2001), the court found that although the plaintiffs had not specifically alleged contemporaneous ownership, the allegation was "clearly implied." *Id.* There is no argument that Plaintiff Rathore has "clearly implied" that he has owned Galena stock throughout the relevant time period.

**CONCLUSION**

The Director Defendants' Motion to Dismiss (Dkt. 52) and Defendant Ahn's Motion to Dismiss (Dkt. 60) are GRANTED IN PART AND DENIED IN PART as set forth in this Opinion and Order. Plaintiffs shall have 30 days from the date of this Opinion and Order to file an amended complaint.

**IT IS SO ORDERED**.

DATED this 4th day of February, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge