Christopher A. Slater, OSB # 97398
cslater@slaterross.com
Michael J. Ross, OSB # 91410
mjross@slaterross.com
SLATER ROSS
Sovereign Hotel, 4th Floor
710 S.W. Madison Street
Portland, Oregon 97205
Telephone: (503) 227-2024
Facsimile: (503) 224-7299

*Local Counsel for Plaintiffs*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

|  |  |
|---|---|
| In re GALENA BIOPHARMA INC. DERIVATIVE LITIGATION | : Case No.: 3:14-cv-00382-SI : LEAD : : 3:14-cv-00514-SI : 3:14-cv-00516-SI : 3:15-cv-01465-SI : |
| This Document Relates To: ALL ACTIONS. | : **PLAINTIFFS' SUPPLEMENTAL BRIEF** : **IN SUPPORT OF PLAINTIFFS'** : **UNOPPOSED MOTION FOR FINAL** : **APPROVAL OF PROPOSED** : **SETTLEMENT, AWARD OF AGREED-TO** : **ATTORNEYS' FEES AND** : **REIMBURSEMENT OF EXPENSES, AND** : **INCENTIVE AWARDS** : : |

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ......................................................................... 1

II.    ARGUMENT ................................................................................................... 2

A.    The Settlement of the Derivative Action Should be Examined
Independently from the Settlement of the Securities Action ................................. 2

B.    The Reforms Alone Are Worth Millions of Dollars to Galena and its
Stockholders ................................................................................................ 4

1.    The Value of the Reduced Annual Non-Employee Director Grants .......... 7

2.    The Value of the Reforms Based Upon Expert Studies ............................. 8

3.    The *Emerson* Value of the Reforms .......................................................... 11

4.    The Value of the Reforms Based Upon Fees Awarded Where
Comparable Relief was Obtained ............................................................. 14

C.    The Value of the Stock Options Cancelled in the Settlement .............................. 14

1.    The Cancellation of the Director Defendant Stock Option Awards ......... 15

2.    Cancellation of the Ahn Stock Option Awards ........................................ 16

3.    Cancellation of the Lidingo Stock Option Awards ................................... 16

D.    The Agreed-To Fee Award Is Justified ............................................................... 16

III.    CONCLUSION ................................................................................................ 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Apple Computer, Inc. Derivative Litig.*,
    No. 06-4128, 2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ........................................10, 11, 12

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3d Cir. 1993).........................................................................................................6

*Citron v. Burns*,
    No. 7647, 1985 Del. Ch. LEXIS 382 (Del. Ch. Feb. 4, 1985)...................................................6

*Cohn v. Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005).....................................................................................12

*Comrie v. Entrasys Networks, Inc.*,
    837 A.2d 1 (Del. Ch. 2003).....................................................................................................14

*In re Countrywide Fin. Corp. Secs. Litig.*,
    273 F.R.D. 586 (C.D. Cal. 2009) ...........................................................................................14

*Croyden Assocs. v. Tesoro Petroleum Corp.*,
    No. 13162, 1994 WL 163638 (Del. Ch. Apr. 20, 1994) .........................................................15

*In re Emerson Radio S'holder Derivative Litig.*,
    No. 3392-VCL, 2011 WL 1135006 (Del. Ch.)..................................................................12, 13

*In re Infinity Broadcasting Corp.*,
    802 A.2d 285 (Del. 2002) .......................................................................................................11

*In re Infospace, Inc.*,
    330 F. Supp. 2d 1203 (W.D. Wash. 2004)................................................................................3

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) ............................................................................................11, 12

*In re NVIDIA Corp. Derivative Litig.*,
    No. 06-6110, 2009 U.S. Dist. LEXIS 24973 (N.D. Cal. Dec. 22, 2008)................................14

*In re Pfizer S'holder Derivative Litig.*,
    No. 09-7822, Settlement Final Approval Hearing Transcript (S.D.N.Y. March 7, 2011).......12

*In re Spokane Concrete Prods., Inc.*,
    126 Wash. 2d 269 (1995).........................................................................................................4

**Other Authorities**

Paul A. Gompers, *et al.*,
  *Corporate Governance and Equity Prices*, Q.J. ECON. 118(1) (2003) ...................................7

Lawrence D. Brown & Marcus L. Caylor,
  *Corporate Governance and Firm Performance* (2004)...........................................................10

McKinsey & Co.,
  *Global Investor Opinion Survey on Corporate Governance* (July 2002)...................7, 8, 9, 11

Plaintiffs Jeffrey Klein, David W. Fuhs, Pratik Rathore, and Harold Spradling (collectively, "Plaintiffs" or "Derivative Plaintiffs") respectfully submit this supplemental brief in further support of their Motion for Final Approval.[1]

## I.    PRELIMINARY STATEMENT

At the April 21 hearing, the Court provided Plaintiffs' Counsel with a draft Worksheet which seeks to calculate the total value of the benefits achieved in the Derivative Settlement to determine that the agreed-to Fee Award is fair and reasonable.  In order to assist the Court with completing the draft Worksheet, Plaintiffs provide herein a valuation of all the non-cash benefits that Galena will receive in the Derivative Settlement.  The non-cash benefits fall into two categories: (1) stock options to purchase Galena common stock; and (2) the extensive corporate governance reforms (the "Reforms").

To appropriately value the stock options, Plaintiffs' Counsel retained the expert services of M. Travis Keath, CFA, CPA/ABV of VALUE Incorporated, who applied the Black-Scholes option pricing model to determine the fair value of the stock options.[2]  In his expert opinion, Mr. Keath determined that the stock options which have been forfeited, cancelled or reduced as a result of the Settlement are collectively worth between $8.57 million and $10.6 million.  *See* Keath Decl. ¶¶7-8.  To estimate the value of the Reforms, Plaintiffs' Counsel applied two methodologies courts have considered in similar cases.  While the value of the Reforms cannot

---

[1] Unless otherwise indicated, all capitalized terms have the same definitions as set forth in Plaintiffs' Unopposed Motion for Final Approval of Proposed Settlement, Award of Agreed-To Attorneys' Fees and Reimbursement of Expenses, and Incentive Awards (the "Motion for Final Approval") [ECF No. 117] and in the Reply in Further Support of the Motion for Final Approval [ECF No. 123].

[2] The Declaration of M. Travis Keath, CFA, CPA/ABV in Support of Plaintiffs' Supplemental Brief in Support of Plaintiffs' Unopposed Motion for Final Approval of Proposed Settlement, Award of Agreed-To Attorneys' Fees and Reimbursement of Expenses, and Incentive Awards ("Keath Decl.") is attached hereto as Exhibit A.

be determined with mathematical exactitude, both methodologies conclude that the Reforms have significant value, ranging from nearly $6 million to tens of millions of dollars. These benefits, together with the cash benefits of the Derivative Settlement (the $15 million payment to Galena and the $5 million Fee Award) have a *minimum* value of approximately $34.5 million and a maximum value of approximately $97.8 million. Thus, the $5 million Fee Award equals no more than 14.5% of the total Derivative Settlement, well below the Ninth Circuit's 25% benchmark.

## II.  ARGUMENT

### A.  The Settlement of the Derivative Action Should be Examined Independently from the Settlement of the Federal Securities Action

An appropriate award of attorneys' fees to counsel for plaintiffs in the Derivative Action should be evaluated independently of the Federal Securities Action. Each settlement has its own consideration (and commensurate contractual obligations). Further, the Court's inquiry into the fairness and reasonableness of the respective awards of attorneys' fees is fundamentally different for each action, and therefore, it would be inappropriate to base the fee award in this case on the collective benefits achieved in the Derivative and Federal Securities Action settlements.

The Derivative Action was brought for the benefit of Galena, and, therefore, whether the agreed-to Fee Award is fair and reasonable should be evaluated solely on the benefits achieved *for Galena*. The benefits achieved for Galena in the Derivative Action are four-fold: (1) a $15 million payment to Galena by the Company's insurers; (2) the Reforms; (3) the forfeiture of several million stock options by Ahn, Hillsberg, Kriegsman, Nisi, Galliker, Chin, and Ashton and the cancellation of stock option grants to Galena's former stock promoter Lidingo Holdings LLC ("Lidingo"); and (4) the $5 million agreed-to Fee Award to be paid by the Company's insurer. These benefits flow directly to Galena solely as a result of the Derivative Action

Settlement and should be considered in their entirety when the Court determines whether the Fee Award is fair and reasonable.[3]

Further, there are fundamentally different considerations in assessing attorneys' fees in each of the respective settlements. Counsel in the Federal Securities Action will apply for attorneys' fees to be paid from the settlement fund. There, the Court's role is to assess whether the application for the sought-after attorneys' fees is fair and reasonable in light of the benefit conferred to the class, the value of which will be reduced by the amount of fees paid to class counsel. In other words, the Court's inquiry into what constitutes a fair and reasonable amount of attorneys' fees in class action litigation must include an eye towards protecting the interests, and recovery, of the members of the class. *See In re Infospace, Inc.*, 330 F. Supp. 2d 1203, 1206 (W.D. Wash. 2004) ("When awarding attorneys' fees from a settlement fund, the district court must assume the role of fiduciary for the class plaintiffs.") (internal quotations omitted). Any reduction in the fee award in the Federal Securities Action will inure directly to the stockholder class, which the Court should consider in evaluating the fee application of Lead Counsel in the Federal Securities Action.

The same is not true in the Derivative Action. Counsel for the Derivative Plaintiffs are asking the Court to approve the Parties' agreement on fees, thereby respecting the Board's independent business judgment; they are not making an application for attorneys' fees to be paid

---

[3] Specifically with respect to the $15 million cash payment to the Company, the Derivative Plaintiffs respectfully submit that this Court's analysis would not change if the money was not earmarked for the settlement fund in the Federal Securities Action. The Derivative Action was the cause of the $15 million coming into the Company – regardless of what Galena's Board, in its independent business judgment, elected to do with the funds. That the Company is able to settle the Federal Securities Action ***with funds provided by the Derivative Action*** is a benefit to the Company worth exactly $15 million.

out of Galena's recovery.[4]  Notably, and unlike the Federal Securities Action, the Fee Award: (1) was agreed-to by the Parties in the Derivative Action as the result of their acceptance of a binding mediator's proposal; (2) has been expressly approved by Galena's Board in an exercise of its independent business judgment; and (3) is to be paid by Galena's insurer, in addition to the $15 million cash payment to the Company, with no funds coming out of Galena's coffers or reducing the settlement consideration to Galena.  In addition, the Fee Award was not objected to by any Current Galena Stockholder.  Thus, the Court is charged with determining whether the agreed-to Fee Award is so unreasonable as to necessitate the Court disturbing the independent business judgment of the Galena Board, as there is no evidence of "fraud, dishonesty, or incompetence."  *In re Spokane Concrete Prods., Inc*., 126 Wash. 2d 269, 279 (1995).

In sum, the distinct nature of the respective actions, as well as the benefits each achieved, should be evaluated independently when determining an appropriate attorneys' fee award.

**B.  The Reforms Alone Are Worth Millions of Dollars to Galena and its Stockholders**

As a result of the prosecution and settlement of the Derivative Action, Galena will make fundamental changes to its corporate governance structure, practices and policies.   The Reforms to Galena are wide-ranging, from the top down, and are designed to protect the Company against future instances of wrongdoing as alleged in the Action.   The Reforms not only provide immediate benefits, they will continue to provide enormous value to Galena and its stockholders for years to come.

---

[4] The derivative dynamic is quite different than the class dynamic in that the real party in interest (the Company) in the derivative context is able to negotiate directly for the benefits it will receive and the value of those benefits.  Simply, there are no "absent class members" in the derivative context, the real party in interest has a seat at the bargaining table and (unlike at least some absent class members) it is a sophisticated party advised by equally sophisticated counsel. Accordingly, the Board's decisions regarding settlement terms and fees – like any other business decision – is a presumptively protected business judgment.

As described in full in the Motion for Final Approval, the Reforms are extensive and transformative.   For example, the Company will completely overhaul its option granting practices.   As a result of the Derivative Settlement, options will be granted on pre-set dates that will be determined prior to the end of the first quarter of the calendar year in which the options are to be granted, and the Compensation Committee must disclose to Galena stockholders the methods used to determine those pre-set dates.   *See* Stipulation, Exhibit A at I.A.   Granting options on pre-set dates will not only help to prevent spring-loading[5] at Galena in the future, but also will help to prevent other misconduct relating to the manipulation of option grants.[6]

The Settlement also implements significant changes at the Board level, including: (1) the appointment of one new independent director as of the 2016 Annual Meeting (Stipulation, Exhibit A at II.N); (2) revisions to the Audit Committee Charter (Stipulation, Exhibit A at II.D and I); and (3) the appointment of a new chair of the Compensation Committee (Stipulation, Exhibit A at III.E).   As a result of the Derivative Settlement, and in order to address the allegations relating to the undisclosed retention of a stock promotional firm, Board approval will be required for all contracts greater than $200,000 (Stipulation, Exhibit A at III.A).

The Derivative Settlement also includes material reforms to Galena's management, including the appointment of a new CEO (Stipulation, Exhibit A at III.D) and the hiring of a new

---

[5] "Spring-loading" is a practice in which options are granted at a time that precedes a positive news event.  Spring-loading relies on the fact that positive news typically causes the price of the underlying company's stock to surge.  Timing an option grant to precede the public news release provides the option holder with an almost instant profit.

[6] For example, stock option "backdating" is the process of granting an option that is dated prior to the date that the company actually granted that option. Thus, the exercise price of the granted option can be set at a lower price than that of the company's stock at the granting date, providing corporate executives a windfall because the timing of the issuance inflates the value of the stock options. Another type of stock option manipulation is "bullet-dodging," which occurs when options are granted just after the release of negative information to the market, so that the recipients benefit from a lower exercise price reflective of the negative publicity.

General Counsel, Tom Knapp (Stipulation, Exhibit A at III.C). Galena's new General Counsel has additional oversight responsibilities as a result of the Derivative Settlement, including serving as Galena's Trading Compliance Officer pursuant to Galena's revised Insider Trading Policy (Stipulation, Exhibit A at II.A-B and F).

The Derivative Settlement further requires reforms to Galena's Insider Trading Policy (Stipulation, Exhibit A at II.A-B), the adoption of a formal ERM program to identify and address corporate risk (Stipulation, Exhibit A at II.C), training for personnel in the areas associated with IR/PR cross-functionality (Stipulation, Exhibit A at II.J), and the retention of an independent Compensation Consultant (Stipulation, Exhibit A at II.L).

These extensive Reforms convey substantial benefits to Galena. Indeed, it is black-letter law that the implementation of previously non-required corporate governance procedures (as will be accomplished by the proposed Settlement) provides significant benefits to the nominal corporate defendant in a derivative suit, particularly where, as here, the Reforms relate directly to the allegations raised in the Action and will help to prohibit future recurrence. *See Citron v. Burns*, No. 7647, 1985 Del. Ch. LEXIS 382, at *6 (Del. Ch. Feb. 4, 1985).[7]

While the vast majority of the Reforms cannot be valued with mathematical precision, some can be valued. For example, as a result of Galena's retention of an independent Compensation Consultant, the number of annual stock option grants to Galena's non-employee directors has been reduced from 200,000 to 100,000 options per year. As discussed below, this benefit is quantifiable and substantial. Although the remaining Reforms are not as easily valued,

---

[7] Federal courts interpreting state law (often, Delaware law) have reached this same conclusion on numerous occasions. *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (collecting cases from the Second, Fourth, Fifth, and Sixth Circuits and finding that remedial measures are an adequate basis for settlement of, and judicial approval of, derivative settlements).

there are various ways to value them for purposes of determining an appropriate attorneys' fee award.  For example, courts have relied upon several expert studies, including McKinsey & Co., *Global Investor Opinion Survey on Corporate Governance* (July 2002) (the "2002 McKinsey Study") and Paul A. Gompers, *et al.*, *Corporate Governance and Equity Prices*, Q.J. ECON. 118(1), at 107-155 (2003) (the "Gompers Study"), which conclude that well-governed companies perform better compared to poorly governed peers.  These studies have calculated the value of the "governance premium" – the additional value a stockholder would be willing to pay for a well-governed company compared to a comparably situated poorly governed one.  This governance premium is then applied to the current market capitalization of the company to determine the increase in value the company stands to gain after significant corporate governance reforms are implemented.  Alternatively, the Delaware Court of Chancery has valued governance reforms by calculating the harm the reforms were intended to prevent and multiplying that amount by the percentage likelihood of future recurrence.  In addition, the Fee Award can be compared favorably to fee awards granted in connection with other derivative settlements where similar corporate governance reforms were achieved.  Regardless of which valuation method the Court employs, the total value of the Settlement easily supports the $5 million Fee Award.

### 1.    The Value of the Reduced Annual Non-Employee Director Grants

In November 2013, the Board increased the number of stock options awarded to non-employee directors from 50,000 per year to 200,000 per year.  The Derivative Action challenged the price and increase in number of those non-employee director awards.  After the initiation of the Derivative Action, Galena retained Radford, an independent third-party compensation consulting firm, to assess Galena's employee and non-employee director compensation practices

and to recommend revisions to Galena's compensation programs. As a result of the prosecution and Settlement of the Derivative Action, Galena has reduced annual non-employee director stock option grants from 200,000 to 100,000 per director. *See also* Stipulation Exhibit A at II.L. The reduction in annual stock option awards is a quantifiable benefit to Galena for the foreseeable future. Plaintiffs' expert, Mr. Keath, finds, in his expert opinion, that the present value to Galena from the reduction in annual director option grants for the years 2015 through 2021[8] is $5,619,000.[9] *See* Keath Decl. ¶17.

### 2.     The Value of the Reforms Based Upon Expert Studies

While the particular value of the remaining Reforms is difficult to quantify with mathematical precision, it is well established that strong corporate governance adds significant value to a company, which increases with the size and market capitalization of the company. Several expert studies, including the 2002 McKinsey Study, the Gompers Study and, most recently, a study performed by CalPERS, conclude that well governed companies enjoy a governance premium ranging from 8.5% to 18.3%.

The 2002 McKinsey Study updated a previous survey of 2,000 of the largest institutional investors in an attempt to place a value on corporate governance by surveying over 200 institutional investors, collectively responsible for over $2 trillion of assets under management.

_____

[8] Although Galena is obligated to maintain the Reforms for as long as it continues as a going entity, in order to estimate a conservative length of time that the director options will remain at 100,000, Mr. Keath calculated the value of such reduced awards until 2021, *i.e.*, five years from the date of the Settlement. Mr. Keath opines that he considers "the truncated five-year period to be a conservative assumption" as "a higher present value figure would have been indicated had the benefit been assumed to extend indefinitely into the future." *See* Keath Decl. ¶16 n.25.

[9] For the 2015 reduced director grants, Mr. Keath used $777,140, which is the Black-Scholes value reported by the Company. *See* Keath Decl. ¶15. For 2016-2021, Mr. Keith calculated the present value of the stock option awards of 100,000 each using Black-Scholes with Galena's closing stock price on June 7, 2016 of $2.02 as the exercise price, which resulted in a value of $4,841,860. *Id.* ¶¶16-17.

The 2002 McKinsey Study determined that "corporate governance is at the heart of investment decisions" and that "an overwhelming majority of investors are prepared to pay a premium for companies exhibiting high governance standards."  These include provisions with a focus of "rebuilding the integrity of the system," such as strengthening corporate transparency, creating more independent boards and achieving greater boardroom effectiveness through such steps as better director selection, more disciplined board evaluation processes and greater time commitment from directors.   The 2002 McKinsey Study concluded that U.S. based institutional investors would pay an 18.3% premium for a well-governed company.

Another study, the Gompers Study, conducted in 2003 by Harvard University Professor Paul Gompers and his colleagues, focused on the stock performance and governance characteristics at 1,500 firms during the 1990s.   The Gompers Study concluded that a hypothetical investor who purchased stock in the firms with the strongest governance and sold stock in the firms with the weakest governance would have earned abnormal returns of 8.5%. Recently, in September 2014, Wilshire, an investment consulting firm, performed an analysis on behalf of CalPERS, an outspoken institutional investor on corporate governance issues and the nation's largest public pension fund. Wilshire measured the stock performance of the 188 companies targeted by CalPERS on its "Focus List Program" from 1999 through the fall of 2013.[10]   The report concluded that companies engaged by CalPERS to reform their corporate governance policies and procedures performed better, specifically, 15.27% above the Russell 1000 Index and 11.90% above their respective Russell 1000 sector indices.  Indeed, ample studies have confirmed a positive correlation between strong corporate governance and a

---

[10] A small number of companies are selected each year as part of the Focus List Program. The objective is to improve corporate governance practices at these companies, which Wilshire confirmed leads to improved stock performance.

corporation's financial performance: poorly governed firms "have lower operating performance, lower valuations, and pay out less cash to their shareholders, while better governed firms have higher operating performance, higher valuations, and pay out more cash to their shareholders." Lawrence D. Brown & Marcus L. Caylor, *Corporate Governance and Firm Performance* (2004).

Courts within this Circuit have accepted the theories underpinning the foregoing in approving settlements and awarding attorneys' fees in derivative actions.  Most notably, in *In re Apple Computer, Inc. Derivative Litigation*, U.S. District Court Judge Jeremy Fogel approved a derivative settlement which included a $14 million payment to the company, corporate governance reforms addressing the company's stock option granting procedures (many of which are similar to those implemented in the Derivative Settlement), and $8.85 million in attorneys' fees and expenses to be paid out of the settlement fund.  *In re Apple Computer, Inc. Derivative Litig.*, No. 06-4128, 2008 WL 4820784, at *1 (N.D. Cal. Nov. 5, 2008) ("*Apple*").  Although the agreed-to fee award totaled "sixty-three percent of the cash payment to Apple," *Id*. at *4, Judge Fogel determined that the fee award was appropriate based upon the significant value of the corporate governance reforms.  Using estimates the court acknowledged would be conservative, Judge Fogel determined that the fee award amounted to 37% of the benefit achieved – an amount in line with the Ninth Circuit's benchmark.  *Id*. at *4 n.3.

In valuing the corporate governance reforms, Judge Fogel relied upon the testimony of Dr. David E. Larcker ("Dr. Larcker"), the director of the Corporate Governance Research Program at Stanford's Graduate School of Business and a co-director of the Rock Center for Corporate Governance, who quantified the "governance premium" to Apple based upon the 2002

McKinsey Study (18.3%) and the Gompers Study (8.5%).[11]  Dr. Larcker valued the governance reforms in *Apple* at between $7.65 billion and $16.47 billion based upon Apple's $90 billion market capitalization at the time of the settlement.  Larker Decl. ¶¶30, 31.

Applying Dr. Larcker's *Apple* analysis to value the Reforms here demonstrates the substantial value of the Reforms.  As of June 7, 2016, Galena's market capitalization was approximately $367 million.  Using Dr. Larcker's methodology, the Reforms can be expected to add between $31.19 million (8.5%) and $67.16 million (18.3%) to Galena's market capitalization.[12]

### 3.     The *Emerson* Value of the Reforms

For years, courts have recognized that the implementation of corporate governance reforms aimed at preventing future similar misconduct and commensurate damages provide significant immediate and future value to a company.  For example, as the Fifth Circuit opined in *Maher v. Zapata Corp*., 714 F.2d 436, 461 (5th Cir. 1983):

> "[P]erhaps of more significance, where, as here, the derivative suit is largely an attack on past corporate management practices, as well as on some present officers and directors, the dollar amount of a possible judgment, which is essentially the sole goal in the class action damage suit, is not the sole, and may well not be the most important, matter to be considered, for the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor in the particular action."

*Id.; see also In re Infinity Broadcasting Corp.*, 802 A.2d 285 (Del. 2002) (holding that a settlement's future impact on the corporation is properly considered in evaluating a proposed settlement and that it would be reversible error for a court to only consider immediate tangible

---

[11] Dr. Larcker's declaration ("Larker Decl.") in support of the *Apple* settlement is attached hereto as Exhibit B.

[12] To be consistent with Mr. Keath's valuation of the stock options, which he valued as of June 7, 2016, Plaintiffs used Galena's market capitalization on the same date.

results in determining the fairness of a proposed settlement); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 854-55 (E.D. Mo. 2005) (applying Delaware law in approving settlement of derivative action and finding that "[a]s a result of the implementation of the settlement's corporate governance changes, [the corporation] is far less likely to become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors.").

Recently, in approving the settlement in *In re Pfizer S'holder Derivative Litig.*, U.S. District Judge Jed S. Rakoff observed that the "forward-looking dimension" of the governance reforms in the settlement, which also included a significant financial payment, were an important and valuable component of the settlement:

> Here, [in connection with settlement, the board of directors is] taking prophylactic measures to prevent future potential recurrences of mistakes that may or may not have been made in the past. And I think one of the more attractive aspects of this settlement is that forward-looking dimension; it's not just a case about money, [not] to minimize money, but it's a case about what is in the public's interests as well as in the shareholders' interests as well as in the board's interests which is, making sure that this company abides in the future by standards that for whatever reason appear not to have been met in the past.

No. 09-7822, Settlement Final Approval Hearing Transcript, at 45:10-20 (S.D.N.Y. March 7, 2011) (attached hereto as Exhibit C).

Vice Chancellor J. Travis Laster of the Delaware Court of Chancery has utilized another methodology to value governance reforms for purposes of determining an appropriate fee award which reflects the rationale set forth in *Maher* and *Pfizer*. When applied here, that methodology values the Reforms at $5.89 million to $6.41 million.

In *In re Emerson Radio S'holder Derivative Litig.*, No. 3392-VCL, 2011 WL 1135006 (Del. Ch.), plaintiffs negotiated a settlement of a derivative action that included a $3 million payment to the company and a set of corporate governance reforms intended to prevent harm

from conflicted transactions with Emerson's controlling stockholder like that which gave rise to the derivative action.   *Id*. at *2-3.  In awarding attorneys' fees based on the governance reforms, the Delaware Court of Chancery first valued the harm the reforms were intended to prevent – the improper transactions – at $3.9 million, which included the $3 million recovered by plaintiffs plus approximately $929,000 that was previously recovered by the Audit Committee for the same transactions.   *Id*. at *5-6.   The court estimated the risk of recurrence without the governance reforms to be 25%.  *Id*.  Since the governance reforms eliminated this risk, the court ruled that the reforms conferred a benefit on the company worth $1 million ($3.9 million x 25%).  *Id*.

As in *Emerson*, the Derivative Settlement here provides for a series of governance reforms designed to prevent a recurrence of the misconduct that gave rise to this Derivative Action.   But the Reforms here are much more extensive and wide-ranging than those in *Emerson*.  As in *Emerson*, the value of the harm from these transactions is equal to the total financial consideration recovered by Galena, which is between $23.6 million and $25.6 million.[13] The risk of recurrence in this Derivative Action is likely greater than the risk in *Emerson* because Galena issues stock options annually as part of its compensation program.  However, even using a very conservative 25% risk of recurrence, the value of the Reforms ranges from $5.89 million to $6.41 million.  Using a slightly higher 40% risk of recurrence, which is more appropriate here due to the conduct at issue, the Company's considerable issuance of stock options, and the significance of the Reforms compared to those in *Emerson*, yields a value of between $9.43 million and $10.25 million.

---

[13] This calculation includes the full $15 million payment to Galena because, like in *Emerson*, the harm from the misconduct is valued by the aggregate amount of consideration recovered by the Company regardless of who caused the recovery.

4.      **The Value of the Reforms Based Upon Fees Awarded Where Comparable Relief was Obtained**

The agreed-to Fee Award is in accord with fees awarded for similar governance reforms even where no financial relief was obtained.  Indeed, many of the fee awards in such cases far exceed the Fee Award in the Derivative Action. *See* Motion for Final Approval at 31 n.21 (providing attorneys' fees ranging from $5.38 million to $14.5 million solely for corporate governance reforms).  And in the rare instances where a derivative settlement contains both financial and therapeutic relief, courts include ***both*** forms of relief in assessing the reasonableness of attorneys' fees.  For example, in *In re NVIDIA Corp. Derivative Litig.*, No. 06-6110, 2009 U.S. Dist. LEXIS 24973, at *6 (N.D. Cal. Dec. 22, 2008), the court awarded $7.25 million where the direct economic benefit to the company was $15.8 million.  *Id.* at *6, 14-15. The court's award considered the financial benefits "in addition to these valuable corporate governance policies and changes."  *Id.* at *6.  Therefore, although it may be difficult to value governance reforms with precision, it is universally accepted that they merit an award of attorneys' fees in a derivative settlement.

C.      **The Value of the Stock Options Cancelled in the Settlement**

As a result of the Derivative Action and the Settlement, over 2.4 million outstanding stock options held by the director defendants, Galena's former CEO, and its former stock promoter Lidingo will be or have been cancelled.  *See* Stipulation ¶¶2.2, 2.4(a)-(b); Exhibit A at II.L.  The monetary benefit to Galena resulting from the forfeiture and cancellation of these stock options based on a Black-Scholes calculation is in the aggregate range of $2,955,000 to $5,001,600.  *See* Keath Decl. ¶¶8, 10, 13.[14]

---

[14] The Black-Scholes options pricing model, is "the leading options pricing model."  *Comrie v. Entrasys Networks, Inc.*, 837 A.2d 1, 18 n.87 (Del. Ch. 2003). *See also In re Countrywide Fin. Corp. Secs. Litig.*, 273 F.R.D. 586, 618 (C.D. Cal. 2009) (stating that the Black-Scholes model is

### 1.    The Cancellation of the Director Defendant Stock Option Awards

The Derivative Settlement requires the cancellation of 1.2 million challenged stock options granted to director defendants Hillsberg, Kriegsman, Nisi, Galliker, Chin and Ashton (the "Director Grants").  *See* Stipulation ¶2.2.  Galena has publicly reported that each of the Director Grants had a grant date fair value of $516,100, or $3,096,600 in the aggregate as of November 26, 2013.  *See* Keath Decl. ¶8.   The Director Grants were forfeited by the director defendants and will be formally cancelled by Galena upon Court approval of the Derivative Settlement.  Accordingly, Mr. Keath valued the Director Grants at $1,050,000 using the Black-Scholes model as of December 3, 2015 which is the date the agreement to settle was reached. *See Croyden Assocs. v. Tesoro Petroleum Corp.*, No. 13162, 1994 WL 163638, at *5 (Del. Ch. Apr. 20, 1994) (in assessing attorneys' fees in a breach of fiduciary duty case, "any valuation of the benefit must be computed as of…the date that the settlement terms were arrived at.").  Mr. Keath also valued the Director Grants at $1,522,000 as of June 7, 2016, which is the date he performed his analysis.  *See* Keath Decl. ¶8.  As a result of the forfeiture and cancellation of the Director Grants, Galena will receive a financial benefit in the aggregate range of $1,050,000 (using the December 3, 2015 date for valuation) to $3,096,600 (using the Company's Black-Scholes valuation of the fair market value on the date of the grant).  *Id*.   In addition, the cancellation of stock options would result in a corresponding reduction in Galena's reported compensation expense, thus improving Galena's net income and earnings per share.  *Id.*

---

"a widely accepted option pricing model"). The Black-Scholes pricing model is a complicated valuation formula based on risk arbitrage theory and requires five separate "inputs": (i) the value of the security underlying the options; (ii) the exercise or strike price; (iii) the time to maturity of the options; (iv) an interest rate; and (v) the volatility of the stock price.

### 2. Cancellation of the Ahn Stock Option Awards

As part of the Settlement, 1,181,250 stock options held by defendant Ahn (the "Ahn Grants") were cancelled. *See* Stipulation ¶2.4(b). These options were granted to Ahn between March 2011 and November 26, 2013 with strike prices ranging from $0.72 and $3.88 and remained unexercised at the time of cancellation. *See* Keath Decl. ¶9. Mr. Keath has opined that the cancellation of the Ahn Grants created a financial benefit of $1,796,000 to Galena. *See* Keath Decl. ¶10.[15]

### 3. Cancellation of the Lidingo Stock Option Awards

On July 30, 2013, Galena awarded its former stock promoter Lidingo stock options to purchase 250,000 shares of Galena common stock, of which 83,333 remained unexercised (the "Lidingo Grants") and were cancelled as part of the Derivative Settlement. *See* Stipulation ¶2.4(a). Mr. Keath opined that Galena received a financial benefit of $109,000 as a result of the cancellation of the Lidingo Grants. *See* Keath Decl. ¶13.

### D. The Agreed-To Fee Award Is Justified

Based on the valuations discussed, *supra*, Plaintiffs respectfully submit a revised Worksheet in order to assist the Court with its task of determining that the Fee Award is fair and reasonable. In doing so, Plaintiffs provide three different versions of the Worksheet. The first version analyzes the benefits of the Derivative Settlement in accordance with the Stipulation, which memorializes the Settlement agreed to by the Parties, *i.e.*, the payment of $15 million to Galena, the value of the various option cancellations, forfeitures and annual reductions; the

---

[15] The parties used the intrinsic value of the cancelled Ahn Grants of $503,062 in order to easily assess a value for them in the Stipulation. *See* Stipulation ¶2.4(b). However, as Mr, Keath explains in his Declaration, the intrinsic valuation method does not take into account all the variables included in a Black-Scholes analysis, which is a more fulsome and reliable methodology for determining the fair value of an option. *See* Keath Decl. ¶11.

value of the Reforms and the agreed-to $5 million Fee Award.   The second Worksheet addresses the Federal Securities Action plaintiffs' amicus submission by assuming joint credit for the $15 million payment as part of the global mediation with the same values for the remaining benefits as set forth in the first Worksheet.  The third version presents the global benefits achieved in the Derivative and Federal Securities Action settlements.   Although Derivative Plaintiffs maintain that attorneys' fees in the two actions should be evaluated separately for the reasons set forth herein, Plaintiffs nonetheless provide a global analysis to address any concerns of the Court.   In sum, the $5 million Fee Award represents 25.3% or less of the total benefits achieved in all three scenarios and, thus, Derivative Plaintiffs respectively submit that the Court should approve the Fee Award in full.

| Settlement Consideration – Scenario No. 1 | |
|---|---|
| Cash | $15,000,000 |
| Corporate Governance Reforms | $5,893,500 – $67,161,000 |
| Cancellation of the Director Grants | $1,050,000 – $3,096,600 |
| Cancellation of the Ahn Grants | $1,760,000 |
| Cancellation of the Lidingo Grants | $109,000 |
| Reduction in Annual Director Option Grants | $5,619,000 |
| Payment of Attorneys' Fees By D&O Insurer | $5,000,000 |
| | |
| **Total Value of Benefits to Galena** | **$34,467,500 - $97,781,600** |
| | |
| **Agreed-to Fee Award** | **$5,000,000** |
| | |
| **Fee Award Calculated as a % of Benefits** | **14.51% - 5.11%** |

| Settlement Consideration – Scenario No. 2 | |
|---|---|
| Cash | $7,500,000 |
| Corporate Governance Reforms | $5,893,500 – $67,161,000 |
| Cancellation of the Director Grants | $1,050,000 – $3,096,600 |
| Cancellation of the Ahn Grants | $1,796,000 |
| Cancellation of the Lidingo Grants | $109,000 |
| Reduction in Annual Director Option Grants | $5,619,000 |
| Payment of Attorneys' Fees By D&O Insurer | $5,000,000 |
| | |
| **Total Value of Benefits to Galena** | **$26,967,500 – $90,281,600** |
| | |
| **Agreed-to Fee Award** | **$5,000,000** |
| | |
| **Fee Award Calculated as a % of the Benefits** | **18.54% - 5.54%** |

| Settlement Consideration – Scenario No. 3 | |
|---|---|
| *Derivative Settlement* | |
| Cash | $7,500,000 |
| Corporate Governance Reforms | $5,893,500 – $67,161,000 |
| Cancellation of the Director Grants | $1,050,000 – $3,096,600 |
| Cancellation of the Ahn Grants | $1,796,000 |
| Cancellation of the Lidingo Grants | $109,000 |
| Reduction in Annual Director Option Grants | $5,619,000 |
| Payment of Attorneys' Fees By D&O Insurer | $5,000,000 |
| | |
| **Total Value of Benefits to Galena** | **$26,967,500 – $90,281,600** |
| | |
| **Agreed-to Fee Award** | **$5,000,000** |
| | |
| *Securities Action Settlement* | |
| Cash | $7,500,000 |
| Additional Cash | $4,000,000 |

| Stock | $1,000,000 |
|---|---|
| | |
| **Total Value of Benefits to Class** | **$12,500,000** |
| | |
| **Total Value of Benefits from the Derivative and Securities Settlements** | **$39,467,500 – $102,781,600** |
| **Total Fee Award Sought By Derivative and Federal Securities plaintiffs** | **$10,000,000**[16] |
| **Total Fee Award Calculated as a % of the Total Value of the Benefits from the Derivative and Federal Securities Settlements** | **25.3% - 9.73%** |

## III. CONCLUSION

For the reasons set forth herein and in Plaintiffs' prior submissions in support of the Derivative Settlement, Plaintiffs respectfully request that the agreed-to Fee Award be approved in full.

Dated: June 9, 2016

**SLATER ROSS**

*/s/ Christopher A. Slater*

Christopher A. Slater, OSB # 97398
Michael J. Ross, OSB # 91410
Sovereign Hotel, 4th Floor
710 S.W. Madison Street
Portland, Oregon  97205
Telephone: (503) 227-2024
Facsimile: (503) 224-7299
cslater@slaterross.com
mjross@slaterross.com

*Local Counsel for Plaintiffs*

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone: (610) 225-2677

---

[16] The Securities Action plaintiffs have moved for attorneys' fees in the amount of $5,000,000, which represents 20% of the $20 million recovery.

Facsimile: (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com

**THE WEISER LAW FIRM, P.C.**
Kathleen A. Herkenhoff
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone:  (858) 794-1441
Facsimile:  (858) 794-1450
kah@weiserlawfirm.com

**HYNES KELLER & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya Hernandez
Hynes Keller & Hernandez, LLC
1150 First Avenue, Suite 501
King of Prussia, PA 19406
Telephone: (610) 994-0292
Facsimile: (914) 752-3041
mhynes@hkh-lawfirm.com
lhernandez@hkh-lawfirm.com

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
685 3rd Avenue
26th Floor
New York, NY 10017
Telephone:  (212) 983-9330
Facsimile: (212) 983-9331

**FEDERMAN & SHERWOOD**
William B. Federman
Sara E. Collier
10205 N Pennsylvania Ave
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com
sec@federmanlaw.com

*Counsel for Plaintiffs Klein and Rathore*

**PRICKETT, JONES & ELLIOTT, P.A.**
Michael Hanrahan
Paul A. Fioravanti, Jr.
Kevin H. Davenport

1310 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 888-6500
Facsimile: (302) 658-8111
Mhanrahan@prickett.com
PAFioravanti@prickett.com
KHDavenport@Prickett.com

**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
Matthew A. Goldstein
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512
ezagar@ktmc.com
rwinchester@ktmc.com
mgoldstein@ktmc.com

**GRANT & EISENHOFER P.A.**
Stuart Grant
Cynthia Calder
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
sgrant@gelaw.com
ccalder@gelaw.com

**GARDY & NOTIS, LLP**
James S. Notis
Kira German
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
Telephone: (212) 905-0509
Facsimile: (212) 905-0508
jnotis@gardylaw.com

**SQUITIERI & FEARON LLP**
Lee Squitieri
32 East 57th Street, 12th Floor
New York, NY 10022
Telephone: (212) 421-6492

Facsimile: (212) 421-6553
lee@sfclasslaw.com

*Counsel for Plaintiffs Fuhs and Spradling*