# *Exhibit "B"*

1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT

8 NORTHERN DISTRICT OF CALIFORNIA

9 SAN JOSE DIVISION

10

11

12 In re APPLE COMPUTER, INC.
DERIVATIVE LITIGATION

13

14 This Document Relates to:

15 ALL ACTIONS.

16

17

Master File No. C-06-4128-JF

**DECLARATION OF DAVID F.
LARCKER IN SUPPORT OF
MOTION FOR FINAL APPROVAL
OF DERIVATIVE SETTLEMENT**

Date:   October 31, 2008
Time:   11:00 a.m.
Courtroom 3, 5th Floor
Hon. Jeremy Fogel

18

19

20

21

22

23

24

25

26

27

28

I, DAVID F. LARCKER, declare:

**Personal Background and Qualifications**

1.    I am the James Irvin Miller Professor of Accounting at the Graduate School of Business at Stanford University. I also currently serve as the director of the Corporate Governance Research Program at the Graduate School of Business and the co-director of the Rock Center for Corporate Governance. Prior to coming to Stanford, I was the Ernst & Young Professor of Accounting at The Wharton School of the University of Pennsylvania, a position I held for twenty years. I have also served as a Professor of Accounting and Information Systems at the J.L. Kellogg Graduate School of Management at Northwestern University. I received undergraduate and masters degrees in engineering from the University of Missouri - Rolla and a doctorate in business from the University of Kansas.

2.    My primary research has focused on the fields of executive compensation and corporate governance. This research has been published in accounting and finance journals. I also teach graduate and executive courses in executive compensation and corporate governance. I previously served as a member of the Financial Accounting Standards Board Task Force on accounting for executive stock options from 1993 to 1996, the Steering Committee for the Business Reporting Research Project of the Financial Accounting Standards Board from 1999 to 2000, and the Option Valuation Group of Financial Accounting Standards Board. A copy of my curriculum vitae is attached hereto as Exhibit A.

**Involvement in the Litigation**

3.    I was retained by Federal Plaintiffs' Counsel in early 2007, and assisted Counsel with the evaluation of the stock option grants made by Apple Inc. ("Apple" or the "Company") during the relevant period, including all grants made to Apple executive officers and directors. I also performed statistical analyses of the purported grant dates and compared them against historical granting patterns and Apple's trading prices. Finally, I assisted in evaluating potential damages caused by the alleged backdating scheme.

1    4.    I was also asked to assist Federal Plaintiffs' Counsel in settlement discussions

2  with the Defendants, and personally attended both meetings with Defendants' Counsel and the

3  mediation sessions with Judge Edward Infante. During the mediations, I consulted with

4  Plaintiffs' Counsel on settlement proposals that were being negotiated by the Parties and gave

5  specific input regarding corporate governance reforms that were being discussed. I was also

6  invited to participate in break out meetings with Apple's counsel and personally participated in

7  discussions with Apple's counsel regarding Apple's existing processes and recommended

8  reforms to maximize the value to Apple going forward.

9    5.    Ultimately, a Settlement was reached between the parties. The Settlement

10  implements numerous reforms to Apple's executive compensation practices and corporate

11  governance arrangements. While the reforms are targeted at remedying the option backdating

12  alleged in the complaint, they also improve corporate governance at Apple beyond its executive

13  compensation practices.

14  **The Harm Caused by Backdating**

15    6.    Many companies use employee stock options as a form of compensation for key

16  employees. Typically, each option gives the grantee the right to buy one share of common stock

17  from the company at a set price, called the "exercise" or "strike" price, on a future date after the

18  option vested. The option is "in-the-money" whenever the trading price of the common stock

19  exceeds the option's exercise price. The option is "at-the-money" whenever the trading price of

20  the common stock and the exercise price are the same. The option is "underwater" or "out-of-

21  the-money" whenever the trading price of the common stock is less than the exercise price.

22    7.    Under the GAAP accounting rules during the relevant time, public companies

23  could grant options to employees without recording an expense so long as the options were "at-

24  the-money." Conversely, a compensation expense had to be recorded for stock options granted

25  "in-the-money." One leading treatise explains:

26    The accounting treatment of a normal stock option that vests or becomes exercisable
     based on the passage of time is quite simple. If this kind of option is granted with an
27    exercise price that is at least equal to the full fair market value of the underlying stock at
     the time the option is granted, no compensation charge is recognized for financial
28    accounting purposes by reason of the option grant. If such an option is granted with an

DECLARATION OF DAVID F. LARCKER IN SUPPORT OF MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT

1    exercise price that is less than the fair market value of the underlying stock on the date of
     grant, there is generally a per share charge against earnings equal to the difference
2    between such fair market value and such exercise price.

3   §5.02 Executive Compensation Chapter 5.  Equity-Based Compensation §5.02 STOCK

4   OPTIONS.

5        8.      Unfortunately, in order to maximize renumeration to directors, officers and

6   employees, a number of companies engaged in a practice of falsifying the issue date of stock

7   options, known as "backdating." Through this practice, corporate executives reviewed historical

8   stock prices before issuing stock options to determine the date upon which stock prices were

9   significantly below the current market price and then falsified the relevant documents to make it

10  appear as if the stock options were granted on the earlier date.  As a result, the executive or other

11  person to whom the options were granted could realize the gain observed between the historical

12  and actual grant date while the company's records would appear to show no difference between

13  the option price and the market price on the purported date of the grant, thereby avoiding both the

14  reporting requirement and the additional compensation expense.

15       9.      Due to poor internal controls and governance, such practices were largely

16  undetected until academics investigated timing anomalies related to stock options.  These studies

17  noted the frequency with which stock option grants occurred just after a drop in stock price and

18  immediately before the price rose, often at the lowest price of the year.  Since companies are

19  required to report "in the money" grants as compensation to the recipient and as a charge to the

20  corporation, the practice of backdating would provide a means to confer additional stock value,

21  or compensation, to officers and employees that was not detectable, thereby permitting the

22  company to conceal the additional compensation and forego reporting or recording the charge.

23       10.     Irregularities in grant practices harm a company in several ways – regardless of

24  whether the irregularities are caused by intentional backdating or lax accounting and governance

25  procedures.  First, option grantees receive higher levels of expected compensation than would be

26  appropriate given the equity plans approved by shareholders, at the company's expense.  Second,

27  the company may be liable for additional taxes, penalties, and legal fees for the investigation and

28  defense of claims.  Again, all of these costs are generally incurred regardless of whether the

1  underlying motivation for the conduct is intentional or innocent.  The revelation or even the

2  suspicion of undisclosed backdating also has dire effects on a corporation's reputation, which is

3  also very costly for shareholders.

4       11.    Another significant harm arises when a company is forced to restate its

5  financials.  When a company grants discounted stock options it must record a compensation

6  expense.  Companies that are found to have irregularities in dating option grants will likely have

7  to restate their financial results for the periods during which the backdating took place.  This is

8  because the "in the money" stock options were improperly accounted for as "at the money" stock

9  options.

10  **Apple's Disclosure of Stock Option "Irregularities" and Corporate Governance Failures**

11       12.    On December 29, 2006, Apple filed its 2006 10-K and 3rd Quarter 2006 10-Q with

12  the SEC.  These reports discussed the investigation of Apple's past stock option granting

13  practices and the restatement of previously reported financial results for fiscal years 2004-2006.

14  In its summary of the findings of the Special Committee's investigation, Apple stated:

15       The Special Committee's investigation identified a number of grants for which
         grant dates were *intentionally* selected in order to obtain *favorable exercise*
16       *prices*.  The terms of these and certain other grants, as discussed below, were
         finalized *after the originally assigned grant dates*.  The Special Committee
17       concluded that the procedures for granting, accounting for, and reporting stock
         option grants did not include sufficient safeguards to prevent manipulation.

18            *               *               *

19       . . . the Company's analysis determined that the originally assigned grant dates for
20       *6,428 grants on 42 dates* are not the proper measurement dates.  Accordingly,
         after accounting for forfeitures, the Company has recognized stock-based
21       compensation expense of *$105 million* on a pre-tax basis over the respective
         awards' vesting terms.

22  3Q 2006 Form 10-Q (filed Dec. 29, 2006) (emphasis added); 2006 Form 10-K (filed Dec. 29,

23  2006) (emphasis added).   Apple stated that its CEO, Steven Jobs, was aware of the selection of

24  some favorable grant dates, received at least one of the misdated grants, and recommended some

25  of the dates.   3Q 2006 Form 10-Q (filed Dec. 29, 2006); 2006 Form 10-K (filed Dec. 29, 2006).

26

27

28

Case 3:14-cv-00382-SI  Document 135-2  Filed 06/09/16  Page 7 of 25
Case 5:06-cv-04128-JF  Document 222-4  Filed 10/23/08  Page 7 of 25

13.     Apple also confirmed that records of a Board meeting that supposedly occurred on

October 19, 2001, to approve an option grant to Jobs, were falsified and the meeting never

occurred:

> The approval for the grant was improperly recorded as occurring at a special
> Board meeting on October 19, 2001. *Such a special Board meeting did not
> occur.* There was no evidence, however, that any current member of management
> was aware of this irregularity. The Company has recognized $20 million in
> stock-based compensation expense for this grant, reflecting the difference
> between the exercise price of $18.30 and the share price on December 18, 2001 of
> $21.01.

14.     With respect to the restatement, the 2006 10-K stated as follows:

> In this Form 10-K, Apple Computer, Inc. ("Apple" or "the Company") is restating
> its consolidated balance sheet as of September 24, 2005, and the related
> consolidated statements of operations, shareholders' equity, and cash flows for
> each of the fiscal years ended September 24, 2005 and September 25, 2004, and
> each of the quarters in fiscal year 2005.
>
> This Form 10-K also reflects the restatement of "Selected Consolidated Financial
> Data" in Item 6 for the fiscal years ended September 2005, 2004, 2003, and 2002,
> and "Management's Discussion and Analysis of Financial Condition and Results
> of Operations" in Item 7 for the fiscal years ended September 24, 2005 and
> September 25, 2004.
>
> Previously filed annual reports on Form 10-K and quarterly reports on Form 10-Q
> affected by the restatements have not been amended and should not be relied on.
>
> *             *             *
>
> As a result of the internal review and the independent investigation, management
> has concluded, and the Audit and Finance Committee of the Board of Directors
> agrees, that incorrect measurement dates were used for financial accounting
> purposes for certain stock option grants made in prior periods. Therefore, the
> Company has recorded additional non-cash stock-based compensation expense
> and related tax effects with regard to past stock option grants, and the Company is
> restating previously filed financial statements in this Form 10-K. These
> adjustments, after tax, amounted to $4 million, $7 million, and $10 million in
> fiscal years 2006, 2005 and 2004, respectively. The adjustment to 2006 was
> recorded in the fourth quarter of fiscal year 2006 due to its insignificance.

15.     On April 24, 2007, the SEC filed a civil complaint against Fred Anderson

and Nancy Heinen for federal securities fraud and destruction of records relating to backdating

stock options at Apple. Notably, the SEC alleged that Heinen engaged in a scheme to grant

in-the-money options while fabricating records to create the appearance that the options had been

granted at the market price on an earlier date, that Heinen communicated with Jobs and Anderson

about selected dates, and that Apple's directors signed Unanimous Written Consents to approve

1 grants, including on one grant date that they never met. According to public reports, Jobs has
2 denied appreciating the accounting implications of his conduct, while Anderson has stated that he
3 discussed the accounting implications with Jobs.

4      16.    As discussed below, regardless of the actual intentions of the Defendants, the
5 impact of their conduct has indisputably caused damage to Apple. Thus, an understanding of the
6 deficient corporate governance environment at Apple predating this Action, which allowed
7 among other things the internal falsification of documents and the granting of stock options at
8 fictitious Board meetings, is absolutely critical in assessing and designing effective policies to
9 ensure that similar harm does not reoccur in the future.

10 **The Settlement Provides Important Corporate Governance Reforms**

11      17.    With respect to compensation practices, appropriate corporate governance
12 requires that board members and officers have sufficient training to understand the accounting,
13 taxation, and legal aspects of granting stock options. There should also be formal oversight (or
14 internal audit) that identifies any questionable option granting practices. Finally, the actions
15 taken with regard to stock options must be supported by a complete set of minutes, records and
16 documents. As noted below, the reforms in this Settlement are consistent with these corporate
17 governance guidelines. Additionally, the new director and officer training program will provide
18 instruction on applicable laws, financial reporting, fiduciary duties, and other similar topics,
19 helping to remove any ambiguities about the executive's responsibilities and the legal and
20 accounting implications of executive compensation decisions.

21         **Equity Award Grant Practices Policy**

22      18.    Apple's corporate governance reforms relating to stock options are set forth in
23 the Company's new Equity Award Grant Practices Policy, which is attached as Exhibit 6 to the
24 Settlement Stipulation. Among other things, these substantive reforms will include:

25      (a) requiring that the exercise price of all option grants shall not be less than 100% of the
26 fair market value of the Company's common stock on the grant date;

27

28

---

DECLARATION OF DAVID F. LARCKER IN SUPPORT OF MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT

6

(b) defining the date of grant as the date on which the board or compensation committee makes the determination granting such options (or, if the grant date is not a trading day, the most recent trading day prior to the grant date);

(c) defining the fair market value of Apple stock to be the closing price of the stock on the date of grant (or the previous trading day if the grant takes place on a day in which the stock is not traded);

(d) prohibiting the grant to executives of options that are in-the-money on the grant date; and

(e) establishing minimum vesting requirements for options grants.

19.     Apple's new Equity Award Policy, and the reforms embodied in it, are of significant value to Apple, essentially prohibiting and preventing the grant to executives of "in-the-money" options disguised as "at-the-money" options. These substantive reforms will make secret option backdating of executive grants impossible, regardless of the various devices that may be used in the future to obtain such a result.

**Additional Corporate Governance Reforms**

20.     To help ensure that the substantive reforms related to equity awards are implemented properly, the Settlement also provides for a number of procedural reforms designed to increase Board oversight and accountability in the option granting process. Among other things, these reforms will include:

(a)     requiring all executive stock option grants to be made by the Board or the Board's Compensation Committee at an in-person or telephonic meeting or by unanimous written consent;

(b)     implementing a secure electronic approval process for unanimous written consent approvals;

(c)     specifically prohibiting delegation of the granting of options to Company management or any other person;

(d)     requiring the Compensation Committee to meet not less than four times a year;

(e)     requiring extensive documentation of each option grant;

1      (f)    requiring the Company to monitor and review grant procedures on a ongoing basis

2  to ensure proper documentation and accounting for all equity grant awards;

3      (g)    requiring the Company's Counsel to attend all meetings where equity award

4  grants are considered or approved;

5      (h)    requiring minutes to be promptly prepared after such meetings;

6      (i)    revising the process for drafting, approving and finalizing Board and Committee

7  meeting minutes;

8      (j)    requiring the Company to select and retain an independent consultant to conduct a

9  study and prepare a report on Apple's executive compensation policies and procedures;

10      (k)    requiring training for those involved in the options granting process; and

11      (l)    implementing a document retention policy for documents relating to approval

12  of option grants.

13      In addition, the Settlement requires Apple to establish a new "Trading Compliance

14  Committee," comprised of the Company's General Counsel and the Chief Financial Officer,

15  designed to more effectively enforce the Company's existing stock trading policies, such as those

16  relating to insider trading, blackout windows, 10b5-1 plans and other insider trading issues that

17  affect Apple officers.

18      21.    It is my opinion that a diligent and good faith implementation of these corporate

19  governance reforms, along with the substantive reforms described above, will not only eliminate

20  any future executive option grant backdating but also help prevent related issues arising from the

21  approval and accounting of equity grants – regardless of a party's intent, fraudulent or otherwise.

22  The reforms will also ensure consistent practices in making award grants, standardize the equity

23  compensation process, reduce the possibility of errors or irregularities in grant procedures and

24  ensure compliance with applicable laws, regulations, accounting and reporting requirements.

25      22.    Indeed, one of the most important goals for the reforms was to clarify the division

26  of responsibilities for equity granting policies at Apple, and to add checks and balances that did

27  not exist before. In this regard, some of the especially desirable changes are the revisions to the

28  Compensation Committee charter. In order to make certain that correct procedures are followed,

1 the General Counsel will attend every meeting at which equity grants are considered. The

2 required use of an independent consultant to provide external comparative data will also provide

3 the compensation committee with information to judge the appropriateness of the equity granting

4 practices of Apple. Finally, Apple will increase the transparency for compensation decisions by

5 including a specific disclosure in its proxy statement regarding the timing and rationale for

6 options grants.

7       23.     The reforms also substantially improve the preparation, collection and retention of

8 board and committee meeting minutes, a specific problem that arose during the investigation of

9 Apple. This change should substantially reduce the possibility of manipulating the board and

10 committee minutes.

11       24.     Finally, the reforms include a secure electronic approval process for collecting

12 and maintaining unanimous written consents, controlled by the Corporate Law Group and

13 Internal Audit. Since a separate file of replies is maintained by Internal Audit, there is little

14 possibility for manipulation of unanimous written consents, and a standardized procedure to

15 securely track the decisions of Board members on future compensation decisions.

16 **Valuation of Reforms**

17       25.     While it is difficult to precisely quantify the value of a particular corporate reform,

18 it is well established that strong corporate governance adds significant value to a corporation.

19 Moreover, the value to a corporation of strong governance (and, conversely, the risk of weak

20 governance) only increases with the size and market capitalization of the corporation.

21       26.     Apple is one of the largest and most recognized corporations in America. Its

22 shares are widely held by individual and institutional investors alike, and actively traded, with

23 about 40 million shares exchanged daily. Even at its lower stock trading price today, it has a

24 market capitalization of almost $90 billion. Based on its size and market capitalization, it is

25 included on the NASDAQ-100 Index, comprised of 100 of the largest domestic and international

26 non-financial securities listed on The NASDAQ Stock Market.

27

28

27.     BusinessWeek ranked Apple's board among the eight worst in America based on governance standards of independence, accountability and quality. Based on my experience, the types of conduct that occurred at Apple, including repeated misdating of option grants, falsification of meeting minutes, and executives claiming that they did not understand or appreciate the accounting implications of compensation decisions that they made, are symptomatic of deficient governance policies.

28.     Thus, the reforms required under the Settlement dramatically improve Apple's governance and, as a result, add significant value to Apple and its shareholders.

29.     The idea of a corporate governance "premium" gained prominence in 1996, with the study by the international consulting firm, McKinsey & Company, in conjunction with Institutional Investor, Inc.[1] The McKinsey study concluded that institutional investors were willing to pay an average of 11% more for well governed companies.

30.     In 2000, McKinsey followed up by surveying 2000 of the largest institutional investors ($3.25 trillion of assets under management) with respect to the value they placed on good corporate governance.[2] The McKinsey survey asked: "Suppose you are considering investing in two well known companies. Both have performed well in the past but are currently going through difficult times. However, their board of governance practices differ. Would you be willing to pay more for Company B - having 'good governance' - than Company A - having 'bad governance'?" Seventy-five percent (75%) of institutional investors responded that board practices are at least as important to them as financial performance. Over eighty percent (80%) of investors reported that they would pay more for Company B than Company A. The actual premium for a well-governed company differed by country. The premium reported for the United States was 18.3 percent, which translates to about $16.47 billion for Apple based on its market capitalization.

---

[1]     McKinsey, *Putting a Value on Board Governance*, 1996.

[2]     McKinsey, *Global Investor Opinion Survey on Corporate Governance*, 2002.

1   31.   These conclusions have been confirmed by other academic work. In 2003,

2  Harvard University Professors Paul Gompers and Joy Ishii, along with University of

3  Pennsylvania Professor Andrew Metrick, completed a study of the stock performance and

4  governance characteristics at 1500 large firms during the 1990s.[3/] The study showed that a fund

5  that purchased stock in firms with the strongest governance and sold stock in firms with the

6  weakest governance would have earned abnormal returns of 8.5 percent per year during the

7  sample period (or about $7.65 billion for Apple). The study also found that firms with stronger

8  governance had higher firm value, higher profits, higher sales growth, and lower capital

9  expenditures.

10   32.   In December 2004, the "governance premium" was demonstrated again in a study

11  performed by Georgia State Professor Lawrence D. Brown.[4/] Professor Brown used 51 factors

12  spanning eight categories to assign a "Gov-Score" for 2,327 firms against which he measured

13  operating performance, valuation, and cash payouts. Professor Brown concluded that "poorly-

14  governed firms (i.e., those with low Gov-Scores) have lower operating performance, lower

15  valuations, and pay out less cash to their shareholders, while better governed firms have higher

16  operating performance, higher valuations, and pay out more cash to their shareholders."

17   33.   In March 2005, Deutsche Bank AG concluded in, *Beyond the Numbers -*

18  *Europe*, that "Corporate governance and equity risk are linked . . . It pays to own the good: Our

19  analysis shows there is a clear link between corporate governance and equity price performance.

20  It pays to buy the improving: Corporate governance is not static . . . Our analysis has found that

21  companies with improving governance outperformed those with deteriorating standards of

22  governance over a one year period." In November 2005, Deutsche Bank published another report

23  on corporate governance and how it influenced shareholders.[5/] After analyzing almost 2,000

---

[3]   Gompers, Ishii & Metrick, *Corporate Governance and Equity Prices*, Quarterly Journal of Economics 118(1), February 2003, pp. 107-155.

[4]   Brown & Caylor, *Corporate Governance and Firm Performance*, December 2004.

[5]   Deutsche Bank, *Beyond the Numbers, Materiality of Corporate Governance*, November 2005.

1  companies over a period of five years, Deutsche Bank concluded that "that the influence of

2  corporate governance standards on a company's long-term equity performance is beyond doubt"

3  and that it was "accepted" that a company's corporate governance was reflected by the market in

4  a company's equity risk premium. The report concluded: "The impact of governance rarely stops

5  at the shareholder level. When governance is poor, it can impact bondholders, employees,

6  retirees, creditors, customers, advisers, and the community. The converse is also true. There is

7  compelling evidence that good governance has a positive impact on companies and their

8  stakeholders beyond just share price performance."

9      34.     Here, the Settlement will establish a new standard of governance at Apple. The

10  reforms, individually and collectively, represent a significant enhancement of Apple's pre-

11  existing policies, as well as of minimum standards set by NASDAQ and the Sarbanes Oxley Act

12  of 2002. The provisions have been documented by studies to correlate positively with higher

13  operating performance, higher valuations, and more cash payouts to shareholders.

14      35.     Therefore, it is my conclusion that the Settlement will have a significant impact

15  on the value of Apple. While it is impossible to assign a precise dollar figure to this increase, it

16  is my opinion that, based on the market value attributable to strong corporate governance

17  determined by McKinsey (18% of total value) and by Gompers, Ishii and Metrick (8.5% of

18  market capitalization), this value increase will be well in excess of several hundred million

19  dollars.

20      I declare under penalty of perjury under the laws of the United States of America

21  that the forgoing is true and correct. Executed October 22, 2008 at Palo Alto, California.

22

23                                                          DAVID F. LARCKER

24

25

26

27

28

## CURRICULUM VITAE

## DAVID F. LARCKER

**HOME ADDRESS:**                              **OFFICE:**

45 Saddleback Road                             275 Littlefield
Portola Valley, CA  94028                      Stanford University
                                               Graduate School of Business
                                               518 Memorial Way
                                               Stanford, CA  94305-5015

                                               Larcker_David@gsb.stanford.edu
                                               (650) 725-6159

**EDUCATION:**

Ph.D.            University of Kansas, 1978
                 Major:  Accounting
                 Dissertation:  Strategic Decision Processes and
                 Implications for the Design of Accounting
                 Information Systems

M.S.             University of Missouri - Rolla, 1974
                 Major:  Engineering Management
                 Master's Thesis: A Training Simulation for Rural
                 Electric Cooperative Management

B.S.             University of Missouri - Rolla, 1972
                 Major:  Mechanical Engineering

**TEACHING POSITIONS:**

2006 – present   James Irvin Miller  Professor of Accounting
                 Graduate School of Business
                 Stanford University
                 Director, Corporate Governance Research Program
                 Co-director, The Rock Center for Corporate Governance

2005 – 2006      Professor of Accounting
                 Graduate School of Business
                 Stanford University

1985 - 2005      Ernst & Young Professor of Accounting
                 The Wharton School
                 University of Pennsylvania

Case 3:14-cv-00382-SI   Document 135-2   Filed 06/09/16   Page 16 of 25
Case 5:06-cv-04128-JF   Document 222-4   Filed 10/23/08   Page 16 of 25

2

| | |
|---|---|
| 1984 - 1985 | Professor of Accounting and Information Systems,<br>J. L. Kellogg Graduate School of Management<br>Northwestern University |
| 1981 - 1984 | Associate Professor of Accounting and Information Systems,<br>J. L. Kellogg Graduate School of Management<br>Northwestern University |
| 1978 - 1981 | Assistant Professor of Accounting and Information Systems,<br>J. L. Kellogg Graduate School of Management<br>Northwestern University |

**OTHER:**

Coopers and Lybrand Research Fellow, 1979-1980.
Hay Group Faculty Research Fellow, 1981-1984.
American Accounting Association Doctoral Consortium Faculty, 1984, 1988, 1989, 1994, 1995, 1997, 2000, 2003, 2005.
Big Ten Doctoral Consortium Faculty, 1985 and 1992.
Pac Ten Doctoral Consortium Faculty, 2000.
Hay Group Academic Advisory Council, 1986-1988.
FASB Task Force Member on Accounting for Executive Stock Options, 1993-1996.
FASB Options Valuation Group Member, 2003.
American Accounting Association Distinguished Visiting International Lecturer, 1993
Coopers & Lybrand Accounting Academics Advisory Group, 1994-1998.
Advisory Board of the American Customer Satisfaction Index, 1995-1997.
Steering Committee for the Business Reporting Research Project of the Financial Accounting Standards Board, 1998-2000.
Advisory Board for the Center for Excellence in Accounting and Security Analysis at Columbia University, 2003-present.

**AWARDS:**

Notable Contribution to Managerial Accounting Research, 2001

**RESEARCH INTERESTS:**

Executive Compensation Contracts
Corporate Governance
Measurement of Intangible Assets
Managerial Accounting
Applied Econometrics

3

**TEACHING INTERESTS:**

Managerial Accounting, Financial Statement Analysis, and Corporate Governance

**EDITORIAL REVIEW BOARDS:**

*The Accounting Review* 1979-1983, 1990-1994, 2008-present
*Journal of Accounting and Economics*, 1985-present
*Journal of Accounting Research*, 1987-present
*Journal of Management Accounting Research*, 1988-2001
*Administrative Science Quarterly*, 1994-1997
*Accounting, Organizations and Society*, 1996-present
*Journal of Accounting and Public Policy*, 2002-present
*Journal of Applied Corporate Finance*, Advisory Board, 2004-present

**MEMBERSHIPS:**

American Accounting Association

**PRIOR EMPLOYMENT:**

August, 1972 - August, 1973          Engineer
                                     Southwestern Bell Telephone Company

**PUBLICATIONS:**

**Articles**

1.     Gordon, L. A., D. F. Larcker, and F. D. Tuggle, "Information Impediments to the Use of
       Sophisticated Capital Budgeting Models," *Omega*, Vol. 7, No. 1 (1979), pp. 67-74.

2.     Gordon, L. A., D. F. Larcker, and F. D. Tuggle, "Strategic Decision Processes and the
       Design of Accounting Information Systems: Conceptual Linkages," *Accounting,
       Organizations and Society*, Vol. 3, No. 3/4 (May, 1978), pp. 203-213.

3.     Larcker, D. F., L. A. Gordon, and G. Pinches, "Testing for Market Efficiency: A
       Comparison of the Cumulative Average Residual Methodology and Intervention
       Analysis," *Journal of Financial and Quantitative Analysis*, Vol. 15, No. 2 (June, 1980),
       pp. 267-287.

4.     Larcker, D. F. and V. P. Lessig, "Perceived Usefulness of Information: A Psychometric
       Examination" *Decision Sciences*, Vol. 11, No. 1 (January, 1980), pp. 121-134.

Case 3:14-cv-00382-SI   Document 135-2   Filed 06/09/16   Page 18 of 25
Case 5:06-cv-04128-JF   Document 222-4   Filed 10/23/08   Page 18 of 25

4

5.    Fornell, C. and D. F. Larcker, "The Use of Canonical Correlation Analysis in
      Accounting Research," *Journal of Business Finance and Accounting*, Vol. 7, No.
      3 (Autumn, 1980), pp. 455-473.

6.    Fornell, C. and D. F. Larcker, "Evaluating Structural Equation Models with Unobservable
      Variables and Measurement Error," *Journal of Marketing Research*, Vol. 18, No. 1
      (February, 1981), pp. 39-50.

7.    Larcker, D. F., "The Perceived Importance of Selected Information Characteristics for
      Strategic Capital Budgeting Decisions," *The Accounting Review*, Vol. 56, No. 3 (July,
      1981), pp. 519-538.

8.    Bagozzi, R. P., C. Fornell, and D. F. Larcker, "Canonical Correlation Analysis as
      a Special Case of a Linear Structural Relations Model," *Multivariate Behavioral
      Research*, Vol. 16, No. 4 (October, 1981), pp. 437-454.

9.    Larcker, D. F. and V. P. Lessig, "An Examination of the Linear and Retrospective
      Process Tracing Approaches to Judgment Modeling, *The Accounting Review*, Vol.
      58, No. 1 (January, 1983), pp. 58-77.

10.   Ferris, K. R. and D. F. Larcker, "Explanatory Variables of Auditor Performance in
      a Large Public Accounting Firm," *Accounting Organizations and Society*, Vol. 8,
      No. 1 (March, 1983), pp. 389-404.

11.   Hillmer, S. C., D. F. Larcker, and D. A. Schroeder, "Forecasting Accounting Data:
      A Multiple Time Series Analysis," *Journal of Forecasting*, Vol. 2, No. 4
      (October/December, 1983), pp. 389-404.

12.   Larcker, D. F. and L. Revsine, "The Oil and Gas Accounting Controversy: An
      Analysis of Economic Consequences," *The Accounting Review*, Vol. 53, No. 4
      (October, 1983), pp. 706-732.

13.   Larcker, D. F., "The Association Between Performance Plan Adoption and
      Corporate Capital Investment," *Journal of Accounting and Economics*, Vol. 5, No.
      1 (April, 1983), pp. 3-30.

14.   Lambert, R. A. and D. F. Larcker, "Golden Parachutes, Executive Decision-
      Making, and Shareholder Wealth," *Journal of Accounting and Economics*, Vol. 7,
      No. 1-3 (April, 1985), pp. 179-203.

15.   Larcker, D. F. "Short-Term Compensation Contracts and Executive Expenditure
      Decisions: The Case of Commercial Banks," *Journal of Financial and
      Quantitative Analysis*, Vol. 22, No. 1 (March, 1987), pp. 33-50.

16.    Larcker, D. F. and T. Lys, "An Analysis of the Incentives to Engage in Costly
       Information Acquisition: The Case of Risk Arbitrage," *Journal of Financial
       Economics*, Vol. 18, No. 1 (March, 1987), pp. 111-126.

17.    Lambert, R. A. and D. F. Larcker, "Executive Compensation Effects of Large Corporate
       Acquisitions," *Journal of Accounting and Public Policy*, Vol. 6, No. 4 (Winter, 1987), pp.
       231-243.

18.    Lambert, R. A. and D. F. Larcker, "An Analysis of the Use of Accounting and
       Market Measures of Performance in Executive Compensation Contracts," *Journal
       of Accounting Research*, Vol. 25 (Supplement, 1987), pp. 85-125.

19.    Defeo, V. J., R. A. Lambert, and D. F. Larcker, "An Analysis of the Executive
       Compensation Effects of Equity-for-Debt Swaps," *The Accounting Review*, Vol.
       54, No. 2 (April, 1989), pp. 201-227.

20.    Lambert, R. A. and D. F. Larcker, "Estimating the Marginal Cost of Operating a
       Service Department when Reciprocal Services Exist," *The Accounting Review*,
       Vol. 54, No. 3 (July, 1989), pp. 449-467.

21.    Lambert, R. A., Lanen, W. N., and D. F. Larcker, "Executive Stock Option Plans
       and Corporate Dividend Policy," *Journal of Financial and Quantitative Analysis*,
       Vol. 2, No. 4 (December, 1989), pp. 409-425.

22.    Lambert, R. A., D. F. Larcker, and R. E. Verrecchia, "Portfolio Considerations in
       the Valuation of Executive Compensation," *Journal of Accounting Research*, Vol.
       29, No. 1 (Spring, 1991), pp. 129-149.

23.    Janakiraman, S. N., R. A. Lambert, and D. F. Larcker, "An Empirical Analysis of
       the Relative Performance Evaluation Hypothesis," *Journal of Accounting
       Research*, Vol. 30, No. 1 (Spring, 1992), pp. 53-69.

24.    Lanen, W. N. and D. F. Larcker, "Executive Compensation Contract Adoption in
       the Electric Utility Industry," *Journal of Accounting Research*, Vol. 30, No. 1
       (Spring, 1992), pp. 70-93.

25.    Holthausen, R. W. and D. F. Larcker, "The Prediction of Stock Returns Using
       Financial Statement Information," *Journal of Accounting and Economics*, Vol. 15,
       No. 2/3 (June/September, 1992), pp. 373-411.

26.    Lambert, R. A., D. F. Larcker, and K. Weigelt, "The Structure of Organizational
       Incentives," *Administrative Science Quarterly*, Vol. 38, No. 3 (September, 1993),
       pp. 438-461.

27.    Holthausen, R. W., D. F. Larcker, and R. G. Sloan, "Annual Bonus Schemes and
       the Manipulation of Earnings," *Journal Accounting and Economics*, Vol.19, No. 1
       (February, 1995), pp. 29-74.

6

28.    Lambert, R. A. and D. F. Larcker, "The Prospective Payment System, Hospital
       Efficiency, and Compensation Contracts for Senior-Level Hospital
       Administrators," *Journal of Accounting and Public Policy*, Vol. 14, No. 1.
       (Spring, 1995), pp. 1-31.

29.    Holthausen, R. W., D. F. Larcker, and R. G. Sloan, "Business Unit Innovation and
       the Structure of Executive Compensation," *Journal Accounting and Economics*,
       Vol. 19, No. 2 & 3 (March-May, 1995), pp. 279-313.

30.    Baiman, S., D. F. Larcker, M. V. Rajan, "Organizational Design for Business
       Units," *Journal of Accounting Research*, Vol. 33, No. 2 (Autumn, 1995), pp. 205-
       229.

31.    Ittner, C. D. and D. F. Larcker, "Total Quality Management and the Choice of
       Information and Reward Systems," *Journal of Accounting Research*, Vol. 33
       (Supplement, 1995), pp. 1-34.

32.    Holthausen, R. W. and D. F. Larcker, "The Financial Performance of Reverse
       Leveraged-Buyouts," *Journal of Financial Economics*, Vol. 42, No. 3 (November,
       1996), pp. 293-332.

33.    Ittner, C. D. and D. F. Larcker, "Product Development Cycle Time and
       Organizational Performance," *Journal of Marketing Research*, Vol. 34, No. 1
       (February, 1997), pp. 13-23.

34.    Ittner, C. D. and D. F. Larcker, "The Performance Effects of Process Management
       Techniques," *Management Science*, Vol. 43, No. 4 (April, 1997), pp. 522-534.

35.    Ittner, C. D., D. F. Larcker, M. V. Rajan, "The Choice of Performance Measures
       in Annual Bonus Contracts," *The Accounting Review*, vol. 72, No. 2 (April, 1997),
       pp. 231-255.

36.    Ittner, C. D. and D. F. Larcker, "Quality Strategy, Strategic Control Systems, and
       Organizational Performance," *Accounting, Organizations and Society*, Vol. 22,
       No. 3/4 (April/May, 1997), pp. 293-314.

37.    Ittner, C. D., D. F. Larcker, and T. Randall, "The Activity-Based Cost Hierarchy,
       Production Policies, and Firm Profitability," *Journal of Management Accounting
       Research*, Vol. 9 (1997), pp. 143-162.

38.    Cavalluzzo, K. S., C. D. Ittner, and D. F. Larcker, "Competition, Efficiency Gains,
       and Cost Allocation Changes in Governmental Agencies: Evidence on the Federal
       Reserve," *Journal of Accounting Research*, Vol. 36, No. 1 (Spring, 1998), pp. 1-
       32.

39.   Ittner, C. D. and D. F. Larcker, "Are Non-Financial Measures Leading Indicators of Financial Performance? An Analysis of Customer Satisfaction," *Journal of Accounting Research*, Vol. 36 (Supplement, 1998), pp. 1-46.

40.   Ittner, C. D. and D. F. Larcker, "Innovations in Performance Measurement: Trends and Research Implications," *Journal of Management Accounting Research* (1998), pp. 205-238.

41.   Core, J. E., R. W. Holthausen, R. W., and D. F. Larcker, "Corporate Governance, Chief Executive Officer Compensation, and Firm Performance" *Journal of Financial Economics*, Vol. 51, No. 3 (March, 1999), pp. 371-406.

42.   Ittner, C. D., D. F. Larcker, V. Nagar, and M. V. Rajan, "Supplier Selection, Monitoring Practices, and Firm Performance," *Journal of Accounting and Public Policy*, Vol. 18 (1999), pp. 253-281.

43.   Ittner, C. D. and D. F. Larcker, "Assessing Empirical Research in Managerial Accounting: A Value-Based Management Perspective," *Journal of Accounting and Economics,* Vol. 32, Nos. 1-3 (December, 2001), pp. 349-410.

44.   Ittner, C.D. and D.F. Larcker, "Determinants of Performance Measure Choices in Worker Incentive Plans," *Journal of Labor Economics*, Vol. 20, No. 2, Part 2 (April, 2002), pp. S58-S90.

45.   Core, J. E. and D. F. Larcker, "Performance Consequences of Mandatory Increases in Executive Stock Ownership," *Journal of Financial Economics*, Vol. 64, No. 3 (June, 2002), pp. 317-340.

46.   Ittner, C. D., W. Lanen, and D. F. Larcker, "Performance Consequences of Activity-Based Costing: Evidence from Manufacturing Plants," *Journal of Accounting Research*, Vol. 40, No. 3 (June, 2002), pp. 711-726.

47.   Ittner, C. D., R, A. Lambert, and D. F. Larcker, "The Structure and Performance Consequences of Equity Grants to Employees of New Economy Firms," *Journal of Accounting and Economics*, Vol. 34, Nos. 1-3 (January, 2003), pp. 89-127.

48.   Ittner, C. D., D. F. Larcker, and M. W. Meyer, "Subjectivity and the Weighting of Performance Measures: Evidence from a Balanced Scorecard," *The Accounting Review*, Vol. 78, No. 2 (July, 2003), pp. 725-758.

49.   Ittner, C. D., D. F. Larcker, and T. Randall, "Performance Implications of Strategic Performance Measurement in Financial Service Firms," *Accounting, Organizations and Society* Vol. 28, Nos. 7-8 (October/November, 2003), pp. 715-741.

Case 3:14-cv-00382-SI   Document 135-2   Filed 06/09/16   Page 22 of 25
Case 5:06-cv-04128-JF   Document 222-4   Filed 10/23/08   Page 22 of 25

8

50.    Larcker, D. F. and S. A. Richardson, "Fees Paid to Audit Firms, Accrual Choices, and Corporate Governance," *Journal of Accounting Research* Vol. 42, No. 3 (June, 2004), pp. 625-658.

51.    Larcker, D. F., S. A. Richardson, and I. Tuna, "Corporate Governance and Accounting Outcomes," *The Accounting Review* Vol. 83, No. 4 (July, 2007), pp. 963-1008.

52.    Ittner, C. D., D. F. Larcker, M. Pizzini, "Performance-based Compensation in Member-Owned Firms: An Examination of Medical Group Practices," *Journal of Accounting and Economics* Vol. 44, No.3 (December, 2007), pp. 300-327.

53.    Core, J.E., W. Guay, and D. F. Larcker, "The Power of the Pen and Executive Compensation," *Journal of Financial Economics* Vol. 88, No. 1 (April, 2008), pp. 1-25.

## Notes, Replies, and Discussion Comments

1.    Fornell, C. and D. F. Larcker, "Structural Equation Models with Unobservable Variables and Measurement Error: Algebra and Statistics," *Journal of Marketing Research*, Vol. 18, No. 3 (August, 1981), pp. 382-388.

2.    Larcker, D. F., "Discussion of the SEC 'Reversal' of FASB Statement No. 19: An Investigation of Information Effects," *Journal of Accounting Research*, Vol. 19 (Supplement, 1981), pp. 218-226.

3.    Larcker, D. F., R. E. Reder, and D. T. Simon, "Trades by Insiders and Mandated Accounting Standards," *The Accounting Review*, Vol. 58, No. 3 (July, 1983), pp. 606-620.

4.    Fornell, C. and D. F. Larcker, "Misapplications of Simulations in Structural Equation Models: Reply to Acito and Anderson," *Journal of Marketing Research*, Vol. 21, No. 1 (February, 1984), pp. 113-117.

5.    Larcker, D. F., "Discussion of Accounting Measurement, Price-Earnings Ratios, and the Information Content of Security Prices," *Journal of Accounting Research*, Vol. 27 (Supplement, 1989), pp. 145-152.

6.    Lambert, R. A., D. F. Larcker, and K. Weigelt, "How Sensitive is CEO Compensation to Organizational Size," *Strategic Management Journal*, Vol. 12, No. 5 (July, 1991), pp. 395-402.

7.    Larcker, D. F., "Discussion of Disqualifying Dispositions of Incentive Stock Options:  Tax Benefits vs. Financial Reporting Costs," *Journal of Accounting Research* (Supplement, 1992), Vol. 30, pp. 69-76.

Case 3:14-cv-00382-SI   Document 135-2   Filed 06/09/16   Page 23 of 25
Case 5:06-cv-04128-JF   Document 222-4   Filed 10/23/08   Page 23 of 25

9

8.    Larcker, D. F. and C. D. Ittner, "Empirical Managerial Accounting Research: Are We Just Describing Management Consulting Practice?," *European Accounting Review*, Vol. 11, No. 4 (2002), pp. 787-794.

9.    Larcker, D. F., "Discussion of 'Employee Stock Options, EPS Dilution, and Stock Repurchases," *Journal of Accounting and Economics*, Vol. 36, Nos. 1-3 (December, 2003), pp. 45-49.

10.   Larcker, D. F., "Discussion of 'Are Executive Stock Options Associated with Future Earnings," *Journal of Accounting and Economics*, Vol. 36, Nos. 1-3 (December, 2003), pp. 91-103.

11.   Larcker, D. F. and T. O. Rusticus, "Endogeneity and Empirical Accounting Research," *European Accounting Review*, Vol. 16, No.1 (2007), pp. 207-215.

12.   Armstrong, C. S., D. F. Larcker, Discussion of "The impact of the options backdating scandal on shareholders" and "Taxes and the backdating of stock option *exercise* dates," *Journal of Accounting and Economics* (forthcoming).


**Other Publications**

1.    Larcker, D. F., "Managerial Incentives in Mergers and Their Effect on Shareholder Wealth," *Midland Corporate Finance Journal*, Vol. 1, No. 4 (Winter, 1983), pp. 29-35.

2.    Lambert, R. A. and D. F. Larcker, "Executive Compensation Contracts, Executive Decision-Making, and Shareholder Wealth: A Review of the Evidence," *Midland Corporate Finance Journal*, Vol. 2, No. 4 (Winter, 1985), pp. 6-22

3.    Larcker, D. F., "Executive Compensation Plans: An Analysis of Alternative Performance Measures," *Topics in Total Compensation*, Vol. 1, No. 1 (Fall, 1986), pp. 57-71.

4.    Larcker, D. F. and R. G. Sloan, "Tracking Pay for Performance," *Chief Executive*, No. 80 (October, 1992), pp. 62-65.

5.    Ittner, C. D. and D. F. Larcker, "Measuring the Impact of Quality Initiatives on Firm Financial Performance," in *Advances in the Management of Organizational Quality*, Vol. 1 (1996), pp. 1-37.

6.    Balkcom, J. E., C. D. Ittner, and D. F. Larcker, "Strategic Performance Measurement: Lessons Learned and Future Directions," *Journal of Strategic Performance Measurement*, Vol. 1, No. 2 (April/May, 1997), pp. 22-32.

10

7.     Low, J., T. Siesfeld, and D. Larcker, "It's Time to Measure Intangible Values,"
       *Forbes ASAP* (August 23, 1999).

8.     Baum, G., C. Ittner, D. Larcker, J. Low, T. Siesfeld, and M. Malone, "Introducing
       the New Value Creation Index," *Forbes ASAP* (April, 3, 2000), pp. 140-143.

9.     Core, J.E., W. Guay, and D. F. Larcker, "Executive Equity Compensation and
       Incentives: A Survey," *FRBNY Economic Policy Research*, 9 (2003), pp. 27-50.

10.    Core, J.E., W. Guay, and D. F. Larcker, "Equity Incentives and Performance," *Top
       Pay and Performance -Chapter 6* (Butterworth Heinemann, forthcoming).

11.    Ittner, C. D. and D. F. Larcker, "Coming Up Short on Nonfinancial Performance
       Measurement," *Harvard Business Review* (November, 2003), pp. 88-95.

12.    Ittner, C. D. and D. F. Larcker, "Moving from Strategic Measurement to Strategic
       Data Analysis," in *Controlling Strategy: Management, Accounting, and
       Performance Measurement*, (Oxford University Press, 2005), pp. 86-105.

13.    Ittner, C. D. and D. F. Larcker "Costs and Benefits of Quality Improvement," in
       *Handbook of Cost Management* (John Wiley & Sons, Inc., 2005), pp. 313-327.

14.    Gerakos, J. J., C. D. Ittner, and D. F. Larcker, "The Structure of Performance-
       Based Stock Option Grants," *Essays in Honor of Joel Demski* (Springer, 2007),
       pp.227-249.

## CURRENT WORKING PAPERS:

1.  Armstrong, C. S, D. F. Larcker, and C. Su "Endogenous Selection and Moral Hazard
    in Compensation Contracts," (2008).

2.  Jagolinzer, A.D., D.F., Larcker, and D.J. Taylor, "The Impact of the General Counsel
    on Corporate Governance," (2008)

3.  Larcker, D.F. and Rusticus, T.O., "On the Use of Instrumental Variables in
    Accounting Research," (2008).

4.  Armstrong, C. S., A. D. Jagolinzer, D. F. Larcker, "Timing of Employee Stock
    Option Exercises and the Valuation of Stock Option Expense," (2007).

5.  Armstrong, C. S., A. D. Jagolinzer, D. F. Larcker, "Chief Executive Officer Equity
    Incentives and Accounting Irregularities" (November, 2007).

6.  Armstrong, C.S., C.D. Ittner, and D. F. Larcker, "Economic Characteristics,
    Corporate Governance, and the Influence of Compensation Consultants on Executive
    Pay Levels," (2008).

1 1

7.  R. Daines, I. Gow, and D. Larcker, "Ratings the Ratings: How Good are Commercial Governance Ratings?" (2008).

**CASES:**

1.  Executive Compensation at Nabors Industries: Too Much, Too Little, or Just Right? Case Number: CG-05 Publication Year: 2007 Author(s): David F. Larcker; Brian Tayan

2.  Sovereign Bancorp and Relational Investors: The Role of the Activist Hedge Fund Case Number: CG-06 Publication Year: 2007 Author(s): David F. Larcker; Brian Tayan

3.  There's a New Sheriff in Town: Institutional Shareholder Services Case Number: CG-07 Publication Year: 2007 Author(s): David F. Larcker; Brian Tayan

4.  Corporate Governance Ratings: Got the grade... What was the test? Case Number: CG-08 Publication Year: 2007 Author(s): David F. Larcker; Brian Tayan

5.  Shareholder Democracy: Does Gretchen Get It Right? Case Number: CG-09 Publication Year: 2007 Author(s): David F. Larcker; Brian Tayan

6.  10b5-1 Plans: Mortgaging a Defense Against Insider Trading Case Number: CG-10 Publication Year: 2007 Author(s): David F. Larcker; Brian Tayan

7.  Models of Corporate Governance: Who's the Fairest of Them All?  Case Number: CG-11 Publication Year: 2008 Author(s): David F. Larcker; Brian Tayan

8.  Say on Pay...Does the Buck Stop Here? Case Number: CG-12 Publication Year: 2008 Author(s): David F. Larcker; Brian Tayan

9.  Attention Shoppers: Executive Compensation at Kroger, Safeway, Costco and Whole Foods Case Number: CG-13 Publication Year: 2008 Author(s): David F. Larcker; Brian Tayan

10. Executive Compensation:  Moving from Utility Services to Power Trading at Aquila Case Number: CG-14 Publication Year: 2008 Author(s): David F. Larcker; Brian Tayan

11. Selecting a CEO: The Leader, the Business Builder, or the TechnologistCase Number: CG-15 Publication Year: 2008 Author(s): David F. Larcker; Brian Tayan